Stephen McArthur (State Bar No. 277712)
stephen@smcarthurlaw.com
Thomas Dietrich (State Bar No. 254282)
tom@smcarthurlaw.com
THE MCARTHUR LAW FIRM, P.C.
9465 Wilshire Blvd., Ste. 300
Beverly Hills, CA 90212
Telephone: (323) 639-4455

*Attorneys for Plaintiff Thrive
Natural Care, Inc.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THRIVE NATURAL CARE, INC., | Case No. 2:21-cv-2022-DOC-KES |
| Plaintiff, | **PLAINTIFF'S OPENING BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| LE-VEL BRANDS, LLC, | Hon. David O. Carter |
| Defendant. | United States District Court Judge<br>**Hearing Date:** April 12, 2021<br>**Time:** 8:30 a.m.<br>**Courtroom:** 9D |

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................... 1

II.   STATEMENT OF FACTS.................................................................. 3

III.  LEGAL ARGUMENT ...................................................................... 8

      A.    Legal Standard for a Preliminary Injunction ......................... 9

      B.    Thrive is Likely to Succeed on the Merits of Its Infringement Claims
            Against LBL ......................................................................... 10

            1.    THRIVE Marks are Registered and Protectable...................... 10

            2.    Protection Over Thrive's Standard Character Marks is
                  "Extremely Broad" Under Ninth Circuit Law................ 11

            3.    THRIVE SKIN Products are Likely to Cause Confusion
                  With the THRIVE Marks for Skincare Products ........... 12

                  a.    The THRIVE Marks are strong ...................................... 13

                  b.    The goods are identical and in direct competition ......... 14

                  c.    The marks THRIVE and THRIVE SKIN are substantially
                        similar .................................................................. 15

                  d.    Thrive's consumer survey shows actual confusion........ 17

                  e.    The parties' marketing channels are convergent............ 18

                  f.    Degree of consumer care favors Thrive ......................... 19

                  g.    Expansion of product lines favors Thrive ..................... 19

                  h.    LBL uses THRIVE SKIN marks with full knowledge of
                        Thrive's rights in the THRIVE Marks...................... 20

                  i.    Balancing the factors favors likelihood of confusion .... 21

      C.    Irreparable Harm to Thrive is Presumed and Can Be Shown .. 21

      D.    The Balance of Hardships Favors Thrive ................................ 23

      E.    The Public Interest Favors an Injunction................................ 24

      F.    Bond, If Any, Should Be Modest ........................................... 24

Conclusion ........................................................................................... 25

i

1

## TABLE OF AUTHORITIES

2

**Cases**

3
*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ..........................10

4
*Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 534 F. App'x 633 (9th Cir. 2013)...........24

5
*AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir.1979)..................... 12 , 17 , 18

6
7
*AOP Ventures, Inc. v. Steam Dist., LLC*, No. 15-cv-1586-VAP (C.D. Cal. Oct. 11, 2016)....................................................................................................................17

8
*Brookfield Comms., Inc. v. West Coast Ent. Corp.*, 174 F.3d 1036 (9th Cir. 1999).................................................................................9, 10, 11, 20, 21

9
*Brooklyn Brewery Corp. v. Black Ops Brewing, Inc.*, 156 F. Supp. 3d 1173 (E.D. Cal. 2016) ...............................................................................................11, 20

10
11
*Cadence Design Sys. v. Avant! Corp.*, 125 F.3d 824 (9th Cir. 1997).........................24

12
*Cf. Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962 (C.D. Cal. 2002) ............13, 15, 20

13
*Conversive, Inc. v. Conversagent, Inc.*, 433 F. Supp. 2d 1079 (C.D. Cal. 2006)..14, 15, 16

14
*Dallas Cowboys Football Club, Ltd. v. Am.'s Team Props., Inc.*, 616 F. Supp. 2d 622 (N.D. Tex. 2009) .........................................................................................18

15
16
*Dep Corp. v. Opti-Ray, Inc.*, 768 F. Supp. 710 (C.D. Cal. 1991) ...............................19

17
*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394 (9th Cir. 1997)...........................................................................................................................13

18
19
*Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127 (9th Cir. 1998) ...14, 15, 16

20
E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280 (9th Cir. 1992)...................13

21
*E.J. Gallo Winery v. Pasatiempos Gallo*, 905 F. Supp. 1403 (E.D. Cal. 1994)...........18

22
*Electropix v. Liberty Livewire Corp.*, 178 F. Supp. 2d 1125 (C.D. Cal. 2001) ....14, 15, 16, 17, 19

23
*Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*, 741 F. Supp. 2d 1165 (C.D. Cal. 2010) ....................................................................................20, 23, 24, 25

24
25
*Goto.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199 (9th Cir. 2000) .....9, 13, 14, 15, 19, 20, 21

26
*Henderson v. Lindland*, No. CV 11-01350-DDP (C.D. Cal. Mar. 21, 2013).........13, 14

27
*Johnson Controls v. Phoenix Control Sys.*, 886 F.2d 1173 (9th Cir. 1989)...................9

28
*Johnson v. Couturier*, 572 F.3d 1067 (9th Cir. 2009) ...........................................10, 24

ii

*Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735 (7th Cir. 2013) ......................................................................... 22

*Kreation Juicery, Inc. v. Shekarchi*, No. 2:14-cv-00658, 2014 WL 7564679 (C.D. Cal. Sep. 17, 2014) ................................................................................ 10

*LGS Architects, Inc. v. Concordia Homes*, 434 F.3d 1150 (9th Cir. 2006) ............. 9, 21

*Moroccanoil, Inc. v. Marc Anthony Cosmetics, Inc.*, 57 F. Supp. 3d 1203 (C.D. Cal. 2014) ....................................................................................... 13, 14

*Moroccanoil, Inc. v. Zotos Int'l, Inc.*, 230 F. Supp. 3d 1161 (C.D. Cal. 2017) ........... 25

*Ossur hf v. Manamed Inc.*, 331 F. Supp. 3d 1005 (C.D. Cal. 2017) ..................... 23, 24

*Pharmacia Corp. v. Alcon Labs., Inc.*, 201 F. Supp. 2d 335 (D.N.J. 2002) ................ 18

*Playboy Enters., Inc. v. Netscape Comm. Corp.*, 354 F.3d 1020 (9th Cir. 2004) ........ 18

*Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118 (9th Cir. 2014)   ....10, 11, 12, 15, 16, 17, 18, 19

*Seed Servs., Inc. v. Winsor Grain, Inc.*, 868 F. Supp. 2d 998 (E.D. Cal. 2012)..... 21, 24

*Starbucks Corp. v. Heller*, No. CV 14-01383-MMM (C.D. Cal. Nov. 26, 2014) ....... 22

*Starbucks Corp. v. Hitman Glass, Corp.*, No. 2:16-CV-03937-ODW(PJW) (C.D. Cal. Oct. 20, 2016) ......................................................................... 13

*Stark v. Diageo Chateau & Estate Wines Co.*, 907 F. Supp. 2d 1042 (N.D. Cal. 2012) ........................................................................................ 19, 20

*Stuhlbarg Int'l Sales v. John D. Brush Co.*, 240 F.3d 832 (9th Cir. 2001 ................... 22

*SunEarth, Inc. v. Sun Earth Solar Power Co.*, 846 F. Supp. 2d 1063 (N.D. Cal. 2012) ................................................................................................ 20

*Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625 (9th Cir. 2005) ............... 12, 13

*Suzie's Brewery Co. v. Anheuser-Busch Cos.*, No. 3:21-cv-178-SI (D. Or. Feb. 9, 2021) ......................................................................................................... 9

*Synoptek, LLC v. Synaptek Corp.*, 309 F. Supp. 3d 825 (C.D. Cal. 2018) ............ 12, 17

*Thane Int'l v. Trek Bicycle Corp.*, 305 F.3d 894 (9th Cir. 2002) ............................... 18

*Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1326 amended, 775 F.2d 998 (9th Cir. 1985) .......................................................................... 24

*Vineyard House, LLC v. Constellation Brands U.S. Ops., Inc.*, No. 4:19-cv-01424-YGR (N.D. Cal. Jan. 26, 2021) ................................................. 9, 22

PLAINTIFF'S OPENING BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

**Statutes**

15 U.S.C. § 1116(a) .......................................................................................... 26

H.R. 6196-116th Congress (2019-2020), Sec. 6 ................................................. 9

PLAINTIFF'S OPENING BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

This action concerns Defendant Le-Vel Brands, LLC's ("LBL") infringement of federally-registered trademarks owned by Plaintiff Thrive Natural Care, Inc. ("Thrive"). LBL is selling identical skincare products under a mark that is identical to Thrive's registered and incontestable trademarks. Because Thrive can demonstrate a likelihood of success on its infringement claims, a likelihood of irreparable harm is presumed under the newly amended Lanham Act. Allowing LBL to continue to sell its infringing skincare products will cause Thrive to lose business and consumer goodwill. A preliminary injunction is thus warranted to return to the pre-infringement status quo and prevent further harm to Thrive during the course of this case.

Since 2013, Thrive built an impeccable reputation for producing all-natural, organic skincare products using regenerative business methods that are good for the environment and communities. Customers buy Thrive products knowing they are made using agricultural methods that restore degraded landscapes and improve livelihoods of rural farming communities. Thrive uses its registered THRIVE trademarks on every product it sells.

By contrast, LBL is a multi-level marketing company that sells shake mix, vitamin supplements, and topical skin patches that allegedly help users lose weight, gain energy, and live a "premium lifestyle." LBL has a dubious reputation. Its supplements have reportedly caused adverse health issues, even emergency room visits, for some users. Its products have been panned in reviews by doctors, researchers, and dietitians. LBL was the subject of a Better Business Bureau investigation which found LBL had made numerous unsupported health claims about its products and about the income allegedly made by those who resell its products.

In April 2019—six years after Thrive registered its first trademark for the THRIVE mark for skincare products—LBL moved into the skincare market in direct competition with Thrive. LBL called its new skincare line THRIVE SKIN, in direct

conflict with Thrive's well-established THRIVE brand. LBL is now selling identical products—skin lotions, balms, and cleansers—using the THRIVE SKIN mark, which is confusingly similar to Thrive's THRIVE trademark registrations. Examples of the parties' products are shown below.

**Thrive's Skincare Products**                    **LBL's Skincare Products**



Thrive has conducted a consumer survey and expert analysis which indicates consumers are extremely likely to believe that the parties' products come from the same source. Of 600 survey participants, **55.6% of all respondents were actually confused** and believed Thrive's and LBL's products originated from the same source or affiliated sources. LBL's misappropriation of Thrive's registered trademarks is unlawful and is irreparably harming Thrive's brand and its valuable goodwill in its THRIVE marks.

That harm is made greater by LBL's business reputation for making unsupported health claims about its products—which is in direct conflict with Thrive's reputation as a maker of all-natural, organic products using regenerative agriculture methods. This Motion requests that the Court issue a preliminary injunction to preserve the status quo that preceded LBL's infringement of Thrive's longstanding trademarks.

/ / /

PLAINTIFF'S OPENING BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## II.     STATEMENT OF FACTS

***Thrive's inception, success, and long use of THRIVE marks.*** Since 2013, Thrive has sold skincare products under the THRIVE brand through its website, and through online retailers such as Amazon.com and Walmart.com and brick-and-mortar retailers such as Whole Foods. [*See* Motion Exhibit ("Mot. Ex.") A (Declaration of Alex McIntosh) ¶¶ 3-4] Thrive focuses on the skincare market, selling lotions, balms, facial cleansers, soap, and shaving and grooming oils. [*Id*. ¶ 3] Every product ever sold by Thrive bears the THRIVE branding, including the word THRIVE in block letters on the package front. [*Id*. ¶ 5] Thrive adheres to a strict skin-healthy philosophy and does not use any synthetic ingredients in its products or source any ingredients in its products that are detrimental to the natural environment. [*Id*. ¶ 7]

Thrive's mission of supporting regenerative agriculture and rural farming communities is central to its business, its products, and its image. [*Id*. ¶ 8] Thrive sources natural ingredients for skincare products from native plants grown by communities on the coasts of Costa Rica. [*Id*.] The company partners with women-led co-ops and smallholder farmers to cultivate native plants that improve soil and biodiversity on degraded lands, boost farmers' incomes, and provide a high-quality supply of plant oils. [*Id*.] Through research, collaboration, and quality, Thrive has built a unique regenerative business model, which one day may inspire regenerative practices in the agriculture, fisheries, and forestry sectors. [*Id*. ¶ 9]

Thrive has devoted substantial money, time, and resources to developing the THRIVE brand. Thrive advertises its skincare products extensively on the Amazon and Walmart online marketplaces. [*Id*. ¶ 12] The company has promotional partnerships with Amazon and Whole Foods and advertises through marketing agencies, public relations firms, social media such as Instagram and Facebook, the Thrive website blog, and online articles published on sites such as Medium. [*Id*.] As one example, Thrive was recently featured in a marketing video produced by Amazon, which was shared with Amazon's 600,000-plus employees and over 100 million

customers. [*Id*. ¶ 13]

Thrive has also received significant acclaim for its high-quality products and cutting-edge production methods. Its products, mission, and business model have been featured in publications such as *Esquire*, *Progressive Grocer*, *Travel + Leisure Magazine*, and *Natural Solutions Magazine*. [*Id*. ¶ 14] Alex McIntosh, the co-founder and CEO of Thrive, has been featured in numerous podcasts and delivered the opening keynote speech at The Future of Sustainability 2017 conference, hosted by the New York Society of Cosmetic Chemists. [*Id*.] In recognition of Thrive's innovative business model, Conservation International Ventures, the investment arm of one of the world's leading environmental organizations, chose Thrive for a five-year partnership and investment. [*Id*. ¶ 15] Key to Thrive's appeal with customers is an understanding of and affinity for the company's mission and positive impact. [*Id*. ¶ 11]

***Thrive's registered trademarks and trademark enforcement.*** Thrive took steps early on to protect its valuable THRIVE brand. It owns two federal registrations for the word "THRIVE" for skincare products. The first, U.S. Reg. No. 4,467,942 (the "'942 Mark"), issued on January 14, 2014, for the word mark THRIVE in relation to "[n]on-medicated skin care preparations, namely, facial lotions, cleansers and creams, creams and oils for cosmetic use, skin moisturizers; pre-shaving preparations; after shave lotions and creams." [*See id*., Attachment ("Att.") 1] A declaration of incontestability for the '942 Mark was accepted and acknowledged by the U.S. Patent & Trademark Office ("USPTO") on March 7, 2020. [*Id*.]

Thrive's second registration, U.S. Reg. No. 6,164,303, which issued on September 29, 2020, is for the word mark THRIVE in relation to "[b]ody and non-medicated soaps and skin cleansing gels; cosmetic sun care preparations and sunscreens; shaving creams and gels; pre-shaving preparations; after shave lotions and creams." [*Id*.] (both registrations are collectively referred to as the "THRIVE Marks"). On September 22, 2020, Thrive filed for a third trademark application, U.S. Serial No. 90/198,496, to officially register other skincare products that it already sells, or which

1   are within the natural zone of expansion of its current trademark rights. [*Id.*, Att. 2]

2   Due to Thrive's recognizable and successful THRIVE Marks, a few competing

3   products and brands have wrongfully used marks that are confusingly similar to the

4   THRIVE Marks. Thrive has expended extensive resources enforcing and defending its

5   intellectual property against such infringers, through cease-and-desist letters and

6   litigation. [*Id.* ¶ 19; Mot. Ex. B (Declaration of Stephen McArthur) ¶ 2] As a result,

7   Thrive has substantially cleared the field in the skincare market of other entities' use

8   of the term "thrive" as a skincare product brand. [Mot. Ex. B ¶ 2]

9   ***LBL's background.*** LBL is a multi-level marketing ("MLM") company started

10  in or about 2013. Its first product was "premium" car insurance, then it switched to

11  selling a "premium lifestyle product line." [*Id.*, Att. 1] That line consisted of

12  "premium lifestyle capsules" (multivitamins), "ultra micronized shake mix" (weight-

13  loss shakes), and "lifestyle DFT with Fusion 2.0 technology" (topical skin patches).

14  [*Id.*, Atts. 1-2] LBL used the name "Thrive" for its supplements and patches. [*Id.*] As

15  an MLM company, LBL sells some of its products to individuals called "Brand

16  Promoters," who then resell the products to the public. [*Id.* ¶ 5] However, LBL also

17  sells its products directly through its website, www.le-vel.com. [*Id.* ¶ 6-7] Consumers

18  can order LBL's products directly from the website, without ever interacting with a

19  promoter, and the products are shipped from LBL's warehouse in Utah. [*Id.*].

20  LBL quickly earned a questionable reputation regarding its products, their

21  effects, and the statements made by its Brand Promoters. Despite lofty claims by LBL

22  about the health benefits of its supplements, government records show that between

23  2014 and 2015, the FDA received numerous adverse health event reports concerning

24  LBL's Thrive products. [*Id.*, Att. 4] Those included reports of abdominal pain,

25  headache, and increased blood pressure, with three individuals requiring

26  hospitalization or a visit to the emergency room. [*Id.*] After a complaint from a

27  consumer watchdog group, the Better Business Bureau ("BBB") investigated LBL. In

28  2020, the BBB issued a case decision finding that LBL and its Brand Promoters had

1  made over 50 inappropriate health claims about LBL's Thrive product line and

2  numerous atypical claims about income they made from selling LBL products. [*Id*.,

3  Att. 5]. One of LBL's Brand Promoter even claimed on social media that LBL's

4  products would " kick covid19's ass." [*Id*.] LBL's products have been heavily

5  criticized in reviews by healthcare professionals and others as expensive

6  multivitamins with questionable, if any, positive health effects. [*Id*., Atts. 6-10]

7      ***LBL moves into skincare market, copying Plaintiff's THRIVE brand.*** Until

8  2019, Thrive and LBL coexisted in different markets (skincare and vitamins,

9  respectively) without issue. But in or about April 2019, LBL began selling skincare

10  products in direct competition with Thrive. [*Id*., Att. 11] LBL named is skincare line

11  THRIVE SKIN, and every product package bears the words "THRIVE SKIN" in

12  block letters across the front. [*Id*., Atts. 11-12] LBL also uses the THRIVE SKIN

13  mark heavily in advertising, including the example below from LBL's website:



20      LBL's THRIVE SKIN line (collectively, the "Infringing Products") includes

21  lotions, cleansers, and body scrubs that are identical to the type of products sold by

22  Thrive under its THRIVE Marks. [*Id*., Att. 12; Mot. Ex. A ¶ 20]. LBL has sold

23  Infringing Products directly from its website to consumers in this District and has

24  shipped Infringing Products from its warehouse into this District. [Mot. Ex. B ¶ 6].

25      LBL has used the THRIVE mark heavily in advertising the Infringing Products

26  on social media and elsewhere online. The broad reach of LBL's advertising and re-

27  posts by its many followers have caused Thrive's own advertising and promotional

28  posts to be lost in a deluge of posts relating to LBL's Infringing Products. For

example, on Instagram, nearly every recent post under the hash tags #thriveskin and #thriveskincare relates to LBL's Infringing Products, and LBL uses those tags on its official Instagram page to promote the Infringing Products. [*Id*., Atts. 13-16]. LBL has also purchased Google adwords for "thrive skin" and "thrive skincare" so that LBL's website appears at the top of those searches, above Thrive's website. [*Id*., Att. 17].

As another example of LBL copying Thrive, LBL has begun referring to its followers as the "Thrive Tribe," which is exactly the same name Thrive has used for its followers since 2013. [Mot. Ex. A ¶ 25; Mot. Ex. B, Att. 18]. When a new customer buys any Infringing Products from LBL, LBL sends that customer an email welcoming them to the "Thrive Tribe," with text almost identical to the introductory email Thrive sends to its new customers, as shown in the screenshots below.




[Mot. Ex. A ¶ 25; Mot. Ex. B, Att. 18].

***Likelihood of confusion survey shows significant confusion.*** Thrive has engaged the services of Rob Wallace—a marketing expert with decades of experience working with skincare clients—to study the likelihood that consumers will be confused about the source or sponsorship of LBL's THRIVE SKIN products. Mr. Wallace conducted a likelihood of confusion survey of 600 consumers who had recently purchased skincare products online and intended to do so again in the near future. [Mot. Ex. C (Declaration of Rob Wallace) ¶¶ 30-38] Of the 600 respondents, 397 believed Thrive's and LBL's products originated from the same source and 14 believed they came from affiliated sources, totaling 68.5% of all respondents. [*Id*. ¶

63] Mr. Wallace called this "an exceptionally high level of confusion" and stated "in my experience, ***it is among the highest level of confusion in any survey that I have performed*** as an expert witness." [*Id*. (emphasis added)]. By contrast, an average of just 12.9% of respondents believed either of the third-party control products came from the same source or affiliated sources. [*Id*. ¶ 65] Thus, as Mr. Wallace found, "[w]hen this 12.9% is subtracted from the primary set's 68.5% level of confusion, it results in an average net confusion score of **55.6%**, or a clear majority of all respondents who believe that the products in question are confusingly similar." [*Id*. ¶ 66] Mr. Wallace says the survey "revealed a significant degree of confusion between the Plaintiff's 'Thrive' branded products and the Defendant's 'Thrive Skin' branded products . . . and suggests that, when purchasing, consumers are likely to confuse the Plaintiff's skin care products with the Defendant's skin care products." [*Id*. ¶ 70].

   ***Thrive attempts to stop LBL's infringements.*** Shortly after learning of LBL's Infringing Products, Thrive sent LBL a letter on October 27, 2020, demanding that LBL immediately cease and desist from using the THRIVE mark on LBL's skincare products. [Mot. Ex. B, Att. 21] LBL responded to Thrive's letter by claiming— without evidence—that LBL itself had senior rights to use the THRIVE mark in relation to skincare products. [*Id*.] In order to diligently investigate LBL's claim, Thrive requested documentary evidence of LBL's alleged prior use rights. LBL was not forthcoming. For the next several months, Thrive followed up on this issue and LBL put off any substantive response. [*Id*., Att. 22]. To date, despite numerous requests, LBL has not offered any evidence to support its claim that it has any prior right to use THRIVE in relation to skincare products or any other related product. [*Id*. ¶ 27] Despite receiving Thrive's cease-and-desist letter and having knowledge of Thrive's registered THRIVE Marks, LBL has continued to sell its infringing THRIVE SKIN products. [*Id*.]

## III.   LEGAL ARGUMENT

   Thrive can prove it is likely to succeed on the merits of its trademark

1   infringement claims against LBL, and irreparable harm must therefore be presumed.

2   Also, Thrive is being harmed daily by LBL's flooding the market and advertising

3   media with its copycat THRIVE SKIN products.

4        **A.**     **Legal Standard for a Preliminary Injunction**

5        "A plaintiff is entitled to a preliminary injunction in a trademark case when it

6   demonstrates either (1) a combination of probable success on the merits and the

7   possibility of irreparable injury or (2) the existence of serious questions going to the

8   merits and that the balance of hardships tips sharply in his favor." *Goto.com, Inc. v.*

9   *Walt Disney Co*., 202 F.3d 1199, 1204-05 (9th Cir. 2000).

10        In the Trademark Modernization Act of 2020 (the "TMA"), recently enacted on

11   December 27, 2020, Congress eliminated a trademark owner's burden of showing

12   irreparable harm and reinstated the presumption that had previously been in place. *See*

13   H.R. 6196-116th Congress (2019-2020), Sec. 6. Specifically, the TMA amended

14   Section 34(a) of the Lanham Act (15 U.S.C. § 1116(a)) to state that for a preliminary

15   injunction a rebuttable presumption of irreparable harm applies upon a finding of

16   likelihood of success on the merits. *See id*.; *see also Suzie's Brewery Co. v. Anheuser-*

17   *Busch Cos*., No. 3:21-cv-178-SI, at *21 (D. Or. Feb. 9, 2021) (applying presumption

18   in TRO analysis); *Vineyard House, LLC v. Constellation Brands U.S. Ops., Inc.*, No.

19   4:19-cv-01424-YGR, at *23 n.16 (N.D. Cal. Jan. 26, 2021) (noting amendment and its

20   effect). Where there is a presumption of irreparable harm, a moving party "seeking a

21   preliminary injunction is therefore not required to make an independent demonstration

22   of irreparable harm." *LGS Architects, Inc. v. Concordia Homes*, 434 F.3d 1150, 1155-

23   56 (9th Cir. 2006). Rather, the moving party "need only show a reasonable likelihood

24   of success on its . . . claim to support the district court's grant of the preliminary

25   injunction." *Johnson Controls v. Phoenix Control Sys.*, 886 F.2d 1173, 1174 (9th Cir.

26   1989); *see also Brookfield Comms., Inc. v. West Coast Ent. Corp.*, 174 F.3d 1036,

27   1066 (9th Cir. 1999) ("Once the plaintiff has demonstrated a likelihood of confusion,

28   it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive

1  relief is not granted.").

2      The goal of a preliminary injunction in a trademark context is to preserve the

3  status quo—that is, to return to the state of affairs before the infringing use began.

4  *GoTo.com*, 202 F.3d at 1210. A preliminary injunction similarly operates to prevent a

5  defendant from continuing to "free ride" on a plaintiff's efforts to promote its brand

6  and establish goodwill. *Kreation Juicery, Inc. v. Shekarchi*, No. 2:14-cv-00658, 2014

7  WL 7564679 at *12 (C.D. Cal. Sep. 17, 2014). Because an injunction is an equitable

8  remedy, the court may apply a sliding test, under which "the elements of the

9  preliminary injunction test are balanced, so that a stronger showing of one element

10  may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632

11  F.3d 1127, 1131 (9th Cir. 2011). In deciding a motion for a preliminary injunction, a

12  court has broad discretion to consider all arguments and evidence, including hearsay

13  and evidence that is otherwise inadmissible. *See, e.g., Johnson v. Couturier*, 572 F.3d

14  1067, 1083 (9th Cir. 2009).

15
**B.**    **Thrive is Likely to Succeed on the Merits of Its Infringement Claims Against LBL**
16

17      Thrive has brought claims against LBL under both section 32 of the Lanham

18  Act (15 U.S.C. § 1114) for infringement of the registered THRIVE Marks and under

19  section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) for unfair competition. While

20  the latter "protects against a wider range of practices," the analysis of both types of

21  claims is "oftentimes identical." *Brookfield*, 174 F.3d at 1047 n.8. To prevail on its

22  claims, Thrive must demonstrate that (1) it has a protected ownership interest in its

23  THRIVE Marks, and (2) LBL's use of the word "THRIVE" is likely to cause

24  consumer confusion, thereby infringing upon Thrive's rights. *Pom Wonderful LLC v.*

25  *Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014). Thrive likely to succeed and "raises

26  serious questions" on the merits of its infringement claims.

27          **1.**    **THRIVE Marks are Registered and Protectable**

28      "Registration of a mark is prima facie evidence of the validity of the mark, the

registrant's ownership of the mark, and the registrant's exclusive right to use the mark in connection with the goods specified in the registration." *Pom*, 775 F.3d at 1124. "When proof of registration is uncontested, the ownership interest element of a trademark infringement claim is met." *Id*. Further, when a mark is deemed incontestable, "its validity and legal protectability, as well as [the registrant's] ownership therein, are all conclusively presumed." *Brookfield*, 174 F.3d at 1048 n.10; *see also Brooklyn Brewery Corp. v. Black Ops Brewing, Inc*., 156 F. Supp. 3d 1173, 1178 (E.D. Cal. 2016).

Thrive has two valid registered trademarks for the word mark THRIVE in relation to skincare products. [Mot. Ex. A, Att. 1] Thrive's '942 Mark has been registered for over five years, is incontestable, and covers the word mark THRIVE in relation to "[n]on-medicated skin care preparations, namely, facial lotions, cleansers and creams, creams and oils for cosmetic use, skin moisturizers; pre-shaving preparations; after shave lotions and creams." [*Id*.] These registrations establish "not only the validity of the '[THRIVE]' mark and [Thrive's] ownership of the mark, but also [Thrive's] exclusive right to use the mark in connection with [skincare products]." *Pom*, 775 F.3d at 1124.

As part of its due diligence, Thrive repeatedly requested evidence of LBL's claimed senior use rights. [Mot. Ex. B, Att. 22] If LBL actually had legitimate evidence of its senior rights, then it would have provided it in order to avoid a lawsuit and this very preliminary injunction. Instead, LVL delayed and ultimately provided nothing. LBL has no senior use rights with regard to the THRIVE mark in relation to skincare products. Thrive has satisfied the first element of the Lanham Act infringement analysis—Thrive has valid, protectable trademarks and senior rights to the THRIVE Marks on skincare products. *See Brookfield*, 174 F.3d at 1046.

### 2. Protection Over Thrive's Standard Character Marks is "Extremely Broad" Under Ninth Circuit Law

In *Pom*, the Ninth Circuit reversed a district court's denial of a preliminary

---

11

injunction to the plaintiff in part because the lower court failed to give sufficient weight to the standard character mark at issue. 775 F.3d at 1125. "Importantly, Pom Wonderful's exclusive right to use the 'POM' mark covers all design variations of the word because 'POM' was registered as a standard character mark." *Id*. "Because a word registered in standard characters is not limited to any particular rendition of the mark, the registration covers the word per se." *Id*. The Ninth Circuit thus held "Pom Wonderful's exclusive right to use its 'POM' standard character mark ***is extremely broad***, covering the word in all types of depictions." *Id*. (emphasis added); *see also Synoptek, LLC v. Synaptek Corp.*, 309 F. Supp. 3d 825, 837 (C.D. Cal. 2018) ("both the 'Synaptek' and 'Synoptek' marks are registered as word marks without any design elements, so any differences in how the marks are displayed is of limited significance."). As in *Pom*, Thrive holds registrations for the word "THRIVE" in standard characters. [Mot. Ex. A, Att. 1] Therefore, the THRIVE Marks must be accorded an "extremely broad" scope, which covers that word in all design variations. *Pom*, 775 F.3d at 1125.

### 3.     THRIVE SKIN Products are Likely to Cause Confusion With the THRIVE Marks for Skincare Products

"Likelihood of confusion asks whether a reasonably prudent marketplace consumer is likely to be confused as to the origin of the good or service bearing one of the marks." *Synoptek*, 309 F. Supp. 3d at 836. The Ninth Circuit's *Sleekcraft* factors guide this analysis: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir.1979). "The test is a fluid one and the plaintiff need not satisfy every factor, provided that strong showings are made with respect to some of them." *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 631 (9th Cir. 2005). "In a close case amounting to a tie, doubts are resolved in favor of the

senior user[.]" *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc*., 109 F.3d 1394, 1404 n.14 (9th Cir. 1997). In cases of either forward or reverse confusion, courts will find a likelihood of confusion where customers are likely to associate two product lines as coming from the same source or affiliated sources. *Surfvivor*, 406 F.3d at 633.

### a.    The THRIVE Marks are strong

The "'strength' of the trademark is evaluated in terms of its conceptual strength and commercial strength." *GoTo.com, Inc.*, 202 F.3d at 1206. "From weakest to strongest, marks are categorized as generic, descriptive, suggestive, and arbitrary or fanciful." *Id*. "The latter three are considered strong." *Moroccanoil, Inc. v. Marc Anthony Cosmetics, Inc*., 57 F. Supp. 3d 1203, 1218 (C.D. Cal. 2014). "A mark's conceptual strength depends largely on the obviousness of its connection to the good or service to which it refers." *Starbucks Corp. v. Hitman Glass, Corp*., No. 2:16-CV-03937-ODW(PJW), at *7 n.2 (C.D. Cal. Oct. 20, 2016). "The less obvious the connection, the stronger the mark, and vice versa." *Id*.

The THRIVE Marks are arbitrary with relation to skincare products. "An arbitrary mark consists of common words arranged in an arbitrary way that is non-descriptive of any quality of the goods or services." *Henderson v. Lindland*, No. CV 11-01350-DDP, at *8 (C.D. Cal. Mar. 21, 2013) (quoting *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1390 (9th Cir. 1993)). Arbitrary marks are "awarded maximum protection." E*. & J. Gallo Winery v. Gallo Cattle Co*., 967 F.2d 1280, 1291 (9th Cir. 1992). The word "thrive" means "to grow vigorously; to gain in wealth or possessions; [or] to progress toward or realize a goal despite or because of circumstances." *See* Merriam-Webster, "thrive," https://www.merriam-webster.com/dictionary/thrive. The word "thrive" is not descriptive of any quality of skincare products. *Cf. Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 979 (C.D. Cal. 2002) (finding GLOW suggestive of bath and body products because it implied they left the skin "glowing"). Indeed, Thrive chose the name not to describe any aspect of its products but because its suggestive of its regenerative business methods that help

the earth and communities thrive. [Mot. Ex. A ¶ 10] While "thrive" has a vague relationship to wellbeing, that not an "obvious" connection to skincare that would render the mark suggestive of Thrive's goods. *See, e.g., Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1131 (9th Cir. 1998) (finding DREAMWORKS arbitrary with regard to movie production services although such services arguably brought dreams to life); *Henderson*, No. CV 11-01350-DDP, at *8 (finding TEAM QUEST arbitrary with regard to mixed martial arts gyms, despite services relating to groups of professional fighters). The THRIVE Marks are thus arbitrary and receive maximum protection, which favors finding a likelihood of confusion. *See id*.

Even if the Court were to find the THRIVE Marks are suggestive, that still weighs in Thrive's favor. A suggestive mark "is inherently distinctive." *Conversive, Inc. v. Conversagent, Inc.*, 433 F. Supp. 2d 1079, 1090-91 (C.D. Cal. 2006). Such a mark "is strong and this factor weighs in favor of a finding of a likelihood of confusion." *Id*.; *see also Moroccanoil*, 57 F. Supp. 3d at 1218. In addition, "long and continuous use of a mark in the marketplace enhances its strength." *Electropix v. Liberty Livewire Corp.*, 178 F. Supp. 2d 1125, 1128 (C.D. Cal. 2001). Thrive has been continuously using its THRIVE Marks in commerce since 2013, which supports the marks' strength. *See id*. Thrive is the only entity with trademark registrations for the THRIVE Marks on skincare and grooming products; similar marks have been refused by the USPTO, cancelled, or abandoned. [Mot. Ex. B ¶ 2] These facts all favor Thrive on the "strength of the mark" factor of *Sleekcraft*.

### b.    The goods are identical and in direct competition

"Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods." *GoTo.com*, 202 F.3d at 1207. "Directly competing goods are in the closest proximity under the likelihood of confusion analysis." *Conversive*, 433 F. Supp. 2d at 1091. "If goods directly compete, then confusion will usually arise because 'complementary products or services are particularly vulnerable to confusion.'" *Id*. (quoting *Sleekcraft*, 599 F.2d at 348).

"Moreover, when goods are complementary, sold to the same class of purchasers, or similar in use and function, less similarity between the marks is needed when analyzing this factor." *Electropix*, 178 F. Supp. 2d at 1129. A court in this District has already found with regard to parties who both sold lotions, shower gel, and fragrance products that their "product lines are clearly related." *Glow*, 252 F. Supp. 2d at 992.

Here, Thrive's skincare products and LBL's skincare products are identical. Thrive sells face wash, body scrub, face lotion, body soap, and moisturizer under its THRIVE Marks. [Mot. Ex. A ¶¶ 3, 20] LBL sells the exact same types of products under its THRIVE SKIN brand. [*Id*. ¶ 20; Mot. Ex. B, Att. 12] Both parties market their skincare products as containing powerful plant derivatives. [Mot. Ex. A ¶¶ 20-21; Mot. Ex. B, Att. 12] They both sell through their online stores, and their websites appear near each in Google search results. [Mot. Ex. A ¶ 4; Mot. Ex. B ¶¶ 6-7, Att. 17] Further, both parties' products can be found together on third-party sales sites such as eBay. [Mot. Ex. B, Att. 19] For this factor, "the key question is, are the uses so related that they are likely to be connected in the mind of a prospective purchaser." *Glow*, 252 F. Supp. 2d at 994. As in *Glow*, the evidence here shows the parties are competitors in the skincare market selling highly related products. This factor therefore favors finding a likelihood of confusion. *See Glow*, 252 F. Supp. 2d at 994; *Conversive*, 433 F. Supp. 2d at 1091.

### c.   The marks THRIVE and THRIVE SKIN are substantially similar

"The greater the similarity between the two marks at issue, the greater the likelihood of confusion." *GoTo.com*, 202 F.3d at 1206. In the Ninth Circuit, "[t]he following axioms define and delimit the similarity analysis: (1) similarity is best evaluated by appearance, sound, and meaning; (2) marks should be considered in their entirety and as they appear in the marketplace; and (3) similarities weigh more heavily than differences." *Pom*, 775 F.3d at 1127-28.

Here, as the Ninth Circuit noted in *DreamWorks*, "[s]ight, sound and meaning is

easy." 142 F.3d at 1131. The non-descriptive portion of the marks is phonetically and visually identical—THRIVE and THRIVE. LBL has incorporated Thrive's entire mark, adding only the descriptive element "SKIN" to it. That does nothing to differentiate the marks. *See Electropix*, 178 F.2d at 1129 ("[T]he general rule is that a subsequent user may not avoid likelihood of confusion by appropriating another's entire mark and adding descriptive or non-distinctive matter to it."). The marks sound the same, look the same, and have the same meaning. Thrive's product packaging, website, and marketing material often immediately follows the mark "THRIVE" with the term "Skincare". [Mot. Ex. A ¶¶ 22-24]. Similarly, LBL refers to its Infringing Products as "THRIVE" alone or as "Thrive Skincare". [Mot. Ex. B, Att. 16] That adds to the marks' similarities, as they are both represented by the word "THRIVE". *See DreamWorks*, 142 F.3d at 1131. Because the marks are nearly identical, this factor favors finding a likelihood of confusion. *See Conversive*, 433 F. Supp. 2d at 1091.

Thrive expects LBL to rely on packaging differences to argue the marks at issue are dissimilar. However, the facts and case law supports Thrive in this analysis. *First*, parties use their marks in a similar manner, as shown below.



Both bear the same mark, THRIVE, in prominent block letters at the upper front face of the packaging. *See, e.g.*, *Pom*, 775 F.3d at 1128 (finding "POM" and "PUR pom" marks similar where each was comprised of three "uniformly cased" letters in the same order). *Second*, these marks are "semantically identical," a "similarity [that] is

1    particularly noteworthy because 'closeness in meaning can itself substantiate a claim

2    of similarity of trademarks.'" *Id.* at 1129 (quoting *Sleekcraft*, 599 F.2d at 352).

3         *Third*, while there are minor differences in the visual appearance of the parties'

4    packaging, given the identical nature of the marks and products, consumers are likely

5    to believe these products originate from the same source. [Mot. Ex. A ¶¶ 20-21; Mot.

6    Ex. C ¶¶ 63-66] Further, as noted above, both of Thrive's THRIVE Marks "are

7    registered as word marks without any design elements, so any differences in how the

8    marks are displayed is of limited significance." *Synoptek*, 309 F. Supp. 3d at 837. As

9    the Ninth Circuit explained in the similar case of *Pom*, "[b]alancing the marks' many

10   visual similarities, perfect aural similarity, and perfect semantic similarity more

11   heavily than the marks' visual dissimilarities—as we must —the similarity factor

12   weighs heavily in Pom Wonderful's favor." 775 F.3d at 1130; *see also Synoptek*, 309

13   F. Supp. 3d at 837 (according minimal weight to the fact that the parties' marks were

14   depicted with contrasting colors and different shapes and logos, because "[t]he

15   striking similarity of appearance and sound in the parties' marks here outweighs

16   differences in how the marks may be presented in the parties' advertising."); *AOP*

17   *Ventures, Inc. v. Steam Dist., LLC*, No. 15-cv-1586-VAP, at *15-18 (C.D. Cal. Oct.

18   11, 2016) (relying on *Pom* and disregarding distinct differences in product packaging

19   and labeling to find defendant's THE MILK MAN mark was highly similar to

20   plaintiff's MILKMAN mark for e-cigarette products, which strongly supported

21   finding a likelihood of confusion). LBL's mark consists only of the word

22   "THRIVE"—an arbitrary word that LBL incorporated in full from Thrive's registered

23   marks. That strongly weighs in Thrive's favor in the Sleekcraft analysis. *See, e.g.*,

24   *Electropix*, 178 F.2d at 1129.

25                    **d.    Thrive's consumer survey shows actual confusion**

26        Actual confusion need not be shown to prove likelihood of confusion.

27   *Sleekcraft*, 599 F.2d at 353. However, courts regularly accept the results of consumer

28   surveys as surrogate evidence of actual confusion. *See Playboy Enters., Inc. v.*

*Netscape Comm. Corp.*, 354 F.3d 1020, 1026 n.28 (9th Cir. 2004). Survey confusion rates as low as 15% to 20% have been considered by courts to support a finding of likelihood of confusion. *See, e.g., E.J. Gallo Winery v. Pasatiempos Gallo*, 905 F. Supp. 1403, 1409 (E.D. Cal. 1994) (finding survey showing confusion rate between 18% and 20% demonstrated "significant level" of confusion); *Dallas Cowboys Football Club, Ltd. v. Am.'s Team Props., Inc.*, 616 F. Supp. 2d 622, 641 (N.D. Tex. 2009) (survey showing 19% confusion is "within the range accepted by courts—generally 15%—in assessing likelihood of confusion"); *Pharmacia Corp. v. Alcon Labs., Inc.*, 201 F. Supp. 2d 335, 380 (D.N.J. 2002) (15-20% range supports finding of confusion). Here, Mr. Wallace's consumer survey found a net average of **55.6% of respondents** believed LBL's THRIVE SKIN products were manufactured by or associated with Thrive. [Mot. Ex. C ¶ 66] That is an "exceptionally high level of confusion" (*id*. ¶ 63), which far exceeds rates deemed "significant" by other courts and strongly supports finding actual confusion exists. *See, e.g., Thane Int'l v. Trek Bicycle Corp.*, 305 F.3d 894, 902 (9th Cir. 2002).

### e.    The parties' marketing channels are convergent

"Convergent marketing channels increase the likelihood of confusion." *Sleekcraft*, 599 F.2d at 353. "In assessing marketing channel convergence, courts consider whether the parties' customer bases overlap and how the parties advertise and market their products." *Pom*, 775 F.3d at 1130. "Marketing channels can converge even when different submarkets are involved so long as the general class of purchasers exposed to the products overlap." *Id*. A "channel of trade includes the same type of distribution channel" and "is not limited to identical stores or agents." *Id*. Highly similar products suggest an overlapping class of consumers. *Id*.

The products at issue here are identical in nature. The parties both advertise online and on the same social media sites such as Instagram. [Mot. Ex. A ¶ 12; Mot. Ex. B, Atts. 13-16] They both sell through their online stores, their websites appear near each in Google search results, and their products can be found together on eBay.

1  [Mot. Ex. A ¶ 4; Mot. Ex. B, Atts. 17, 19] Because the parties sell their products to the
2  same pool of consumers through the same channels, this factor weighs in Thrive's
3  favor. *See Pom*, 775 F.3d at 1130; *Electropix*, 178 F. Supp. 2d at 1131.

4                  **f.**        **Degree of consumer care favors Thrive**

5         "Unlike purchasers of expensive goods—whom we expect to be more
6  discerning and less easily confused—purchasers of inexpensive goods are likely to
7  exercise less care, thus making confusion more likely." *Pom*, 775 F.3d at 1127. "The
8  fact that the goods are not expensive goods, coupled with the fact that the average
9  purchasers are not experts, leads to the conclusion that the degree of care exercised by
10  the purchasers will likely be low, increasing the likelihood of confusion." *Dep Corp.*
11  *v. Opti-Ray, Inc.*, 768 F. Supp. 710, 716 (C.D. Cal. 1991). "[T]he standard of care to
12  be exercised by the reasonably prudent purchaser will be equal to that of the least
13  sophisticated consumer." *Goto.com*, 202 F.3d at 1209; *Stark v. Diageo Chateau &*
14  *Estate Wines Co.*, 907 F. Supp. 2d 1042, 1065 (N.D. Cal. 2012). And "virtually no
15  amount of consumer care can prevent confusion where two entities have the same
16  name." *Electropix*, 178 F. Supp. 2d at 1131.

17         Here, the parties' brands are centered on the same name. Further, the skincare
18  products at issue are inexpensive, ranging between $10 and $60. [Mot. Ex. A ¶ 6;
19  Mot. Ex. B, Att. 3] While consumers certainly exercise some care in choosing
20  skincare items, the relatively low cost of the parties' goods indicates that—unlike with
21  MRI machines or high-end computer programming services, for example—the degree
22  of care here is relatively low. This factor thus favors Thrive and finding a likelihood
23  of confusion. *See, e.g., Stark*, 907 F. Supp. 2d at 1065 (wine purchasers exercised low
24  degree of care, supporting finding of confusion).

25                  **g.**        **Expansion of product lines favors Thrive**

26         Where "the parties already compete to a significant degree because they sell
27  related products and use similar marketing channels, this factor is relatively
28  unimportant to the likelihood of confusion analysis." *Fiji Water Co., LLC v. Fiji*

1   *Mineral Water USA, LLC*, 741 F. Supp. 2d 1165, 1183 (C.D. Cal. 2010). Here, the

2   parties are direct competitors in the skincare market. Thrive also has concrete plans to

3   expand its offerings in the personal grooming market—as evidenced by its pending

4   trademark application. [Mot. Ex. A, Att. 2] The parties will thus continue to be direct

5   competitors and there is "potential for even more direct competition between the two

6   lines in the future." *Glow*, 252 F. Supp. 2d at 1001. This factor therefore favors

7   Thrive. *See id.*; *Stark*, 907 F. Supp. 2d at 1064.

8           **h.**    **LBL uses THRIVE SKIN marks with full knowledge of**

9                 **Thrive's rights in the THRIVE Marks**

10         This factor favors the plaintiff where the alleged infringer used or adopted its

11   mark with knowledge, actual or constructive, that it was another's trademark.

12   *Brookfield*, 174 F.3d at 1059. While an intent to confuse consumers is not required for

13   a finding of trademark infringement, *see GoTo.com*, 202 F.3d at 1208, intent to

14   confuse has been inferred when a defendant has actual knowledge of the existence of

15   plaintiff or where a defendant continues using a mark after it became aware of the

16   plaintiff's registered mark. *See Brooklyn Brewery*, 156 F. Supp. 3d at 1184; *SunEarth,*

17   *Inc. v. Sun Earth Solar Power Co*., 846 F. Supp. 2d 1063, 1080 (N.D. Cal. 2012)

18         Since 2014, LBL has filed at least 37 federal trademark applications for its

19   many vitamin supplement, shake mix, and skin patch products. [Mot. Ex. B, Att. 20]

20   LBL trumpeted that it had made $2 million on sales of its THRIVE SKIN products in

21   the first few hours after their release in what it stated was its "largest product launch in

22   the company's seven-year history." [*Id*., Att. 11] Surely, LBL considers its THRIVE

23   SKIN line a valuable brand worth protecting. Despite having a plethora of trademark

24   registrations for its other products, LBL never filed a trademark application for

25   THRIVE SKIN—the launch of which it called an "historic moment for Le-Vel." [*Id*.]

26   The most reasonable inference here is that LBL did not apply for a trademark

27   registration for this particular brand because it knew it would be rejected due to the

28   existing THRIVE Mark registrations.

On October 27, 2020, after discovering LBL's use of the identical mark, Thrive wrote a letter to LBL demanding that it cease infringing Thrive's THRIVE trademark rights. [*Id.*, Att. 21] Over the course of the next few months, letters and emails were exchanged between the parties' counsel as the parties diligently attempted to resolve the matter. [*Id.*, Atts. 21-22] Despite LBL being on notice of the incontestable THRIVE Mark for at least five months to date, it has not curtailed its use of the identical mark. [*Id.* ¶ 27] Even if LBL initially adopted its mark in good faith, no good faith excuse could possibly exist after LBL received the 2020 cease-and-desist letter.

### i.      Balancing the factors favors likelihood of confusion

For the reasons discussed above, and particularly in the Ninth Circuit's *Pom* opinion, the majority of factors weigh in favor of a finding of likelihood of confusion and no factor weighs against that conclusion. Moreover, the finding is particularly strong on the three factors that courts have found most important—similarity of the marks, relatedness of the goods, and use of similar marketing channels. *See GoTo.com*, 202 F.3d at 1205; *Brookfield*, 174 F .3d at 1054. Thus, it is highly likely that Thrive will prevail on its trademark infringement claims.

### C.      Irreparable Harm to Thrive is Presumed and Can Be Shown

Because Thrive has shown it is likely to succeed on the merits, the Court must presume Thrive will suffer irreparable harm if injunctive relief is not granted. *See* 15 U.S.C. § 1116(a) (as amended by the TMA). Thrive is not required to independently demonstrate irreparable harm to obtain a preliminary injunction. *LGS Architects*, 434 F.3d at 1155-56. The Court should grant a preliminary injunction on this basis alone. *See Brookfield*, 174 F.3d at 1066.

However, the facts also support that Thrive will indeed suffer irreparable harm without an injunction. "Trademarks serve as the identity of their owners and in them resides the reputation and goodwill of their owners." *Seed Servs., Inc. v. Winsor Grain, Inc*., 868 F. Supp. 2d 998, 1005 (E.D. Cal. 2012). "Thus, if another person infringes the marks, that person borrows the owner's reputation, whose quality no

1    longer lies within the owner's control." *Id.* "[T]he injury caused by the presence of

2    infringing products in the market—such as lost profits and customers, as well as

3    damage to goodwill and business reputation—will often constitute irreparable injury."

4    *Starbucks Corp. v. Heller*, No. CV 14-01383-MMM, at *14 (C.D. Cal. Nov. 26,

5    2014). "Evidence of threatened loss of prospective customers or goodwill certainly

6    supports a finding of the possibility of irreparable harm." *Stuhlbarg Int'l Sales v. John*

7    *D. Brush Co*., 240 F.3d 832, 841 (9th Cir. 2001) "The loss of control over one's

8    trademarks, reputation, and goodwill is 'a quintessentially irreparable injury.'"

9    *Vineyard House*, No. 4:19-cv-01424-YGR, at *22-23 (quoting *Adidas Am., Inc. v.*

10   *Skechers USA, Inc*., 149 F. Supp. 3d 1222, 1249 (D. Or. 2016); *see also* McCarthy on

11   Trademarks, § 30:47.70 ("A likelihood of damage to reputation is by its nature

12   'irreparable.' Like trying to un-ring a bell, trying to 'compensate' after the fact for

13   damage to business goodwill and reputation cannot constitute a just or full

14   compensation."). "Irreparable harm is especially likely in a trademark case because of

15   the difficulty of quantifying the likely effect on a brand of a nontrivial period of

16   consumer confusion (and the interval between the filing of a trademark infringement

17   complaint and final judgment is sure not to be trivial)." *Kraft Foods Grp. Brands LLC*

18   *v. Cracker Barrel Old Country Store, Inc*., 735 F.3d 735, 741 (7th Cir. 2013).

19          Here, the evidence shows Thrive is likely to suffer a significant degree of

20   irreparable harm to its brand, reputation, goodwill, and customer base if a preliminary

21   injunction is not granted and LBL's infringement of the THRIVE Marks is allowed to

22   continue. Since its inception, Thrive has focused on building an impeccable reputation

23   for selling all-natural, organic skincare products that are made through regenerative

24   business methods that grow the environment and community. [Mot. Ex. A ¶¶ 7-9, 13-

25   15, 21, 27] Thrive's business is built on its quality and its story. Thrive has spent a

26   significant amount of money and time building and maintaining this perception among

27   consumers. [*Id*.] Allowing LBL to sell skincare products with a trademark that is

28   confusingly similar to Thrive's marks "jeopardizes [Thrive's] ability to obtain a

1    reasonable return on this substantial investment." *Fiji Water*, 741 F. Supp. 2d at 1182-

2    83 (enjoining sales of VITI bottled water due to confusion with FIJI water).

3    　　　　Even more concerning, LBL is interfering with and limiting Thrive's ability to

4    control the reputation of Thrive's brand and the perception of Thrive's skincare

5    products and business. *See id*. LBL is an MLM company that has a terrible reputation

6    for selling basic products such as multivitamins based on overblown claims of

7    medical benefit and questionable testimonials. [Mot. Ex. B, Atts. 4-10] That stands in

8    stark contrast to Thrive's impeccable reputation for quality and responsibility. [Mot.

9    Ex. A ¶ 27] In addition, LBL's THRIVE SKIN products are not organic and contain

10   synthetic ingredients and ingredients that can damage the environment, which Thrive

11   refuses to use in its THRIVE skincare products. [*Id*. ¶ 26]

12   　　　　By "borrowing" the THRIVE Marks, LBL is "impair[ing] [Thrive's] control

13   over its reputation." *Ossur hf v. Manamed Inc*., 331 F. Supp. 3d 1005, 1017 (C.D. Cal.

14   2017) (finding irreparable harm where defendant used mark "Offloader One" for knee

15   braces, which was substantially similar to plaintiff's "Unloader One" mark for the

16   same products). As such, LBL's Infringing Products, which are being sold through a

17   growing number of sources, are likely to cause actual irreparable and imminent harm

18   to Thrive. [Mot. Ex. A ¶ 27]; *see also Fiji Water*, 741 F. Supp. 2d at 1183 ("If VITI

19   continues to introduce its infringing product into the marketplace, FIJI will

20   undoubtedly have great difficulty maintaining and restoring its reputation and

21   goodwill with the public, many of whom are already confused.") (citing 5 McCarthy

22   on Trademarks § 30:47 (4th ed. 2010) ("[I]f an infringer's product is of poor quality,

23   or simply not worth the price, a more lasting, but not readily measurable injury may

24   be inflicted on the plaintiff's reputation in the market.' A likelihood of damage to

25   reputation is by its nature 'irreparable.'")). A preliminary injunction against LBL will

26   protect Thrive from continuing to suffer such irreparable harm. *See id*.

27   　　**D.    The Balance of Hardships Favors Thrive**

28   　　　　LBL will suffer no unwarranted hardship by the issuance of a preliminary

injunction, while the harm to Thrive without one is great. "Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing," no equitable considerations support defendants. *Cadence Design Sys. v. Avant! Corp.*, 125 F.3d 824, 829 (9th Cir. 1997) ("[A] defendant who knowingly infringes another's copyright cannot complain of the harm that will befall it when properly forced to desist from its infringing activities."). Further, LBL's "product is relatively new, so they will not suffer as much from having to change its trademark." *Ossur*, 331 F. Supp. 3d at 1017.

### E. The Public Interest Favors an Injunction

"The public interest favors a preliminary injunction where, as here, the plaintiff has shown a likelihood of confusion." *Fiji Water*, 741 F. Supp. 2d at 1183; *see also Ossur*, 331 F. Supp. 3d at 1017. "An injunction that prevents consumer confusion in trademark cases, as this injunction does, serves the public interest." *Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 534 F. App'x 633, 5 (9th Cir. 2013) "The public interest in preventing trademark infringement is avoiding confusion in the marketplace. " *Seed Servs.*, 868 F. Supp. 2d at 1005. In addition, "[p]rotecting the enjoyment of [a] trademark is a valid public interest." *Id*. at 1006. Here, there exists a high likelihood of consumer confusion from LBL selling identical products to Thrive under identical marks. Thus, the public interest is strongly served by an injunction.

### F. Bond, If Any, Should Be Modest

"Rule 65(c) invests the district court with discretion as to the amount of security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal quotation marks omitted). Moreover, a high likelihood of success on the merits favors a "minimal bond or no bond at all." *Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1326 amended, 775 F.2d 998 (9th Cir. 1985); *see also Ossur*, 331 F. Supp. 3d at 1017 (finding a "modest bond appropriate" and setting bond at $10,000 where plaintiff proved high likelihood of success on trademark infringement claims).

Thrive has shown a high likelihood of success on the merits of its claims,

making "a modest bond appropriate." *Id*. In addition, any damage to LBL would be limited, as it has the ability to repackage its products under a noninfringing mark and resell them. *See Moroccanoil, Inc. v. Zotos Int'l, Inc.*, 230 F. Supp. 3d 1161, 1179 (C.D. Cal. 2017) ("the Court declines to order 'buy back' costs since it appears [defendant] may recoup such amounts if it resumes selling its product with a non-infringing trade dress"); *Fiji Water*, 741 F. Supp. 2d at 1183 (same). Finally, LBL is relatively new in the skincare market and the bulk of its business consists not of skincare products but of supplements, shake mix, and topical patches. Thus, its business will not be significantly impeded by an injunction. For all of these reasons, Thrive requests that the Court either require no bond or set the amount at $10,000.

## Conclusion

For the foregoing reasons, Thrive respectfully requests that the Court enter the concurrently-filed Proposed Order enjoining LBL's further infringement of the THRIVE Marks.

Dated: March 5, 2021                    Respectfully submitted

                                        **THE MCARTHUR LAW FIRM, PC**

                                        By */s/ Stephen C. McArthur*

                                        Stephen C. McArthur
                                        Thomas E. Dietrich

                                        *Attorneys for Plaintiff Thrive*
                                        *Natural Care, Inc.*