KENDALL BRILL & KELLY LLP
Alan Jay Weil (63153)
 *ajweil@kbkfirm.com*
Shauna E. Woods (300339)
 *swoods@kbkfirm.com*
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067
Telephone:  310.556.2700
Facsimile:   310.556.2705

FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
Mark Sommers (*pro hac vice* forthcoming)
 mark.sommers@finnegan.com
Patrick Rodgers (*pro hac vice* forthcoming)
patrick.rodgers@finnegan.com
901 New York Avenue, NW,
Washington, DC 20001-4413
Telephone:   (202) 408-4064
Facsimile:   (202) 408-4400
Morgan E. Smith (SBN 293503)
 morgan.smith@finnegan.com
3300 Hillview Avenue
Palo Alto, CA 94304
Telephone:   (650) 849-6600
Facsimile:   (650) 849-6666

Attorneys for Specially Appearing
Defendant Le-Vel Brands, LLC

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| THRIVE NATURAL CARE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>LE-VEL BRANDS, LLC,<br><br>Defendant. | Case No. 2:21-CV-02022-DOC-KES<br><br>**DECLARATION OF SHAUNA E. WOODS IN SUPPORT OF OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge:       Hon. David O. Carter<br>Hearing Date: April 12, 2021<br>Time:        8:30a.m.<br>Crtrm.:      9D |

## REDACTED VERSION OF DOCUMENT PROPOSED
## TO BE FILED UNDER SEAL

## DECLARATION OF SHAUNA E. WOODS

I, Shauna E. Woods, declare as follows:

1.      I am an attorney at Kendall Brill & Kelly LLP and am counsel for Le-Vel Brands, LLC in this action.  I am a member in good standing of the State Bar of California and am admitted to practice before this Court.  Except where otherwise stated, I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.  I make this declaration in support of Le-Vel's Opposition to Plaintiff's Motion for Preliminary Injunction.

2.      Attached as Exhibit 1 to this declaration is a true and correct copy of the Expert Report of Dr. Michael J. Barone.

3.      Attached as Exhibit 2 to this declaration is a true and correct copy of the Expert Rebuttal Report of Ms. Sarah Butler.[1]

4.      Attached as Exhibit 3 to this declaration is a true and correct copy of the Declaration of Mr. John Plumpe.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct pursuant to 28 U.S.C. § 1746.  This declaration was executed on 3/22/2021 in Los Angeles, CA.

_____
Shauna E. Woods

---

[1] To avoid third-party privacy issues and in the spirit of L.R. 5.2-1 and FRCP 5.2, Le-Vel redacted an individual's name and photograph that appeared in an image on page 22 in Exhibit 2 and another image on page 6 of Exhibit C in Exhibit 2.

# Exhibit 1

## to the Declaration of
## Shauna E. Woods

## REDACTED VERSION OF
## DOCUMENT PROPOSED TO
## BE FILED UNDER SEAL

<div align="center">

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

</div>

THRIVE NATURAL CARE, INC.,

    Plaintiff,

v.

LE-VEL BRANDS, LLC,

    Defendant.

Case No.: 2:21-cv-2022

<div align="center">

**EXPERT REPORT OF DR. MICHAEL J. BARONE**

</div>

**Introduction and Qualifications**

1.      I am the Brown-Forman Professor of Marketing at the University of Louisville. I received a BA in Economics in 1984 from the University of Michigan, MBA from George Washington University in 1990, and Ph.D. in marketing (with psychology as a cognate area) from the University of South Carolina in 1994. I have been hired as an expert in a number of other matters as indicated in the curriculum vitae (C.V.) in Appendix A to this report. In this capacity, I have conducted surveys and offered critiques of surveys conducted by other experts.

2.      I have published over forty articles on branding and consumer psychology (listed in full on my C.V.), including a number of well-cited articles on brand extension strategies, that appear in the leading academic journals. Based on my publication record, I have been formally recognized as a leading researcher in marketing and consumer psychology. As a result of this expertise, I have also been appointed to the Editorial Review Boards, and have served as reviewer, for the leading marketing journals. In these roles, I have reviewed the methodologies and findings associated with literally hundreds of empirical studies, and journal editors have

<div align="center">1</div>

Exhibit 1
Page 3

relied upon my expertise in marketing strategy and consumer behavior in making decisions to accept or reject manuscripts.

3.      I am being compensated at a rate of $675 per hour for work on expert report preparation and at a rate of $775 per hour for time spent testifying. My compensation does not depend on the outcome of this case. I also understand that discovery is ongoing in this case; I therefore reserve the right to revise and/or supplement my report based on additional materials or information that may become available.

**Nature of the Assignment and General Conclusions**

4.      I was retained by the Defendant, Le-Vel Brands, LLC (hereafter, "Defendant") to provide an analysis of the degree to which its brand leverage strategy to introduce new products as extensions to the Thrive umbrella brand conforms to best practices based on extant understanding of brand extension strategies.  I also provide an analysis of the extent to which the strategy used by the Plaintiff, Thrive Natural Care, Inc. (hereafter, "Plaintiff") in extending its Thrive brand conforms to these standards.

5.      My analysis begins with a discussion of various marketplace growth strategies, including the use of brand extension strategies whereby new products are introduced under an established brand name. As such strategies are designed to leverage the equity or goodwill a brand has built up in the minds of its customers, I also define the concept of consumer-based brand equity. After reviewing advantages and disadvantages of this branding approach, I discuss how consumers are likely to react to brand extensions based on certain characteristics of the brands and the new products that are involved.

6.      These concepts are then applied in an analysis of the various brand extensions launched by both the Defendant and the Plaintiff. Based on this analysis, my conclusion is that

Exhibit 1
Page 4

the Defendant's approach to extending its Thrive umbrella brand across a variety of health and wellness products over time conforms to academic and conventional wisdom regarding best practices designed to increase consumer response to such new products. This analysis also indicates that the Plaintiff's approach to extending its Thrive brand from grooming/shaving products aimed primarily at males to skincare offerings targeted primarily towards females violates a number of these best practices and standards.

**The Use of Brand Extensions as a Growth Strategy for Firms**

7.      Companies often wish to grow in terms of revenues and profits. There are a number of strategies by which a firm can achieve this goal (Keller, 490-1), including (1) selling more of its current product to its current customers; (2) selling its current products to new customers; and (3) selling new products it develops to existing customers. When it involves the introduction of new products under an established brand name, this last option is referred to as a brand extension strategy.  If used appropriately, consumers will transfer the positive image they hold for established, successful brands to the extension (Hoyer and MacInnis, 97). As a consequence of this "transfer process", consumers will view the new product more favorably, and with greater trust and credibility, than they might otherwise (e.g., if it was introduced under a new or unknown brand name).

8.      This discussion indicates that whether brand extensions will succeed or not depends on consumers' knowledge and feelings regarding the brand, that is, it depends on consumer-based brand equity:  "the power of a brand lies in what customers have learned, felt, seen, and heard about the brand as a result of their experiences over time" (Keller, 49). To this end, consumers are particularly likely to purchase a new product introduced as an extension from a brand for which they have positive consumer-based brand equity. Importantly, how the brand is

perceived by consumers will also define the products that consumers will accept as natural extensions from that brand: "Consumers will decide, based on their brand beliefs and attitudes, where they think the brand should go and grant permission (or not) to any marketing action or program" (Keller, 51). As a result, new products that are compatible with the equity consumers attach to a brand will be viewed as natural extensions of that brand, while others will not.

9.     Inherent in the use of brand extension strategies is that the new products are introduced to consumers who are aware of and hold a favorable image for the brand that appears on these extensions. The presence of this consumer-based brand equity can significantly reduce the cost of introducing new products for firms and the risk of adopting new products for consumers. Using a brand extension strategy to increase acceptance of new products among current customers can allow firms to enjoy the benefits of customer retention and brand loyalty (Keller, 72). Extending a brand with positive consumer-based brand equity can also help recruit target consumers from competing brands, introducing new customers into the brand franchise to expand the brand's footprint in the marketplace. Further, when extensions become successful in their own right, they can reinforce or enhance the brand's image and equity, and can increase the likelihood of success for future extensions (Keller, 495).

10.     However, brand extension strategies employed under other conditions can hold significant disadvantages for firms (Keller, 502). For example, poorly-conceived extensions that are not compatible with the brand's equity can create confusion regarding what the brand stands for in the minds of consumers.  Poorly-executed extensions that do not perform up to the standards and expectations consumers hold for the brand can also dilute the brand's equity and alienate its existing customers. Accordingly, this strategy should be used judiciously and under conditions that allow consumers to view the new products as naturally extending from the brand.

4

Exhibit 1
Page 6

11.     Guidelines from academic research (Keller, 523) indicate that extensions are more likely to be successful under certain conditions. One of the most-studied aspects of brand extension strategies indicates the extensions are more successful among consumers who view the brand favorably and who perceive a high level of "fit" to exist between the brand and the new product. This 'fit' is based on the overlap between the consumer-based equity that exists for the brand (that is, what consumers know about and associate with that brand) and the new product that is being introduced. When the new product involves a product category, attribute, and/or benefit that is compatible with the brand, consumers will likely believe that the extension naturally fits with the brand's equity. Similarly, perceptions of fit may be high when the brand and extension relate to similar usage situations or user groups (i.e., target markets) (Keller, 525).

12.     The marketing literature further indicates that the success of brand extensions increases when the brand has had past success with extensions. Particularly when the brand has successfully launched intermediate extensions between the brand's initial products and the new extension, consumers will permit it to expand even further to other, related categories (Keller, 524).  Brand extensions are also likely to be successful when they are introduced by brands that are positioned more broadly vs. more narrowly, as well as by brands that consumers perceive to be high-quality, premium, and prestige-oriented (Keller, 525, 527).

**Analysis of the Defendant's Use of "Thrive" in Marketing its Products**

13.     It is my understanding that the Defendant has positioned it's Thrive brand "to encompass ultra-premium products and premium product lines, to be a new brand for a better lifestyle and premium-seeking consumers" (https://le-vel.com/Brand/Philosophy).  Relatedly, the Defendant uses the Thrive brand to market products containing highly effective and high quality

ingredients designed to help people thrive, that is, to "live healthier, happier lives, both mentally and physically" (Hoffman Declaration, ¶3).

14.    The marketplace has been quite receptive to the Defendant's Thrive-branded products, making the Thrive brand "the most important and powerful asset Le-Vel owns" (Hoffman Declaration, ¶24). Indeed, the Thrive brand has attracted over 10 million customers who have accounted for over $2B in sales (https://le-vel.com/Home/Achievements). It is also my understanding that well over half of all purchasers of Thrive-branded products are repeat customers who have previously bought other products offered by the Defendant under its Thrive brand (Hoffman Declaration, ¶56). This ability to retain customers is typically indicative of a firm's offerings meeting or exceeding the expectations of its customers. The Defendant's ability to promote such repeat purchasing is also consistent with the levels of engagement exhibited by its customers with respect to the Thrive brand, as reflected in over 1 million Facebook followers and nearly 10 million views of its YouTube videos (Hoffman Declaration, ¶59).

15.    Reflecting the Defendant's positioning of the Thrive brand, I understand that it initially launched this brand in August 2012 with separate vitamins designed for both women (Thrive W) and men (Thrive M), and shortly thereafter, a protein/meal-replacement shake branded as Thrive that was marketed to both female and male consumers (Hoffman Declaration, ¶11). Both the vitamin capsules and shake products were each designed to help Le-vel's customers live happier, healthier lifestyles, and look and feel better (Hoffman Declaration, ¶16) . Based on the success of these initial products, it is my understanding that a third product for both females and males, a skin vitamin patch, was launched shortly afterwards as the Thrive DFT (Derma Fusion Technology) (Hoffman Declaration, ¶17). Once applied to the skin, the DFT provides a delivery system "designed to infuse the derma (skin) with our unique, premium grade

THRIVE Lifestyle Formula … DFT promotes clean and healthy weight management and an overall healthy lifestyle (https://le-vel.com/Products/THRIVE/DFT). By introducing a product that customers would apply to their skin to receive benefits related to health and wellbeing, the introduction of the Thrive DFT vitamin skin patches began associating the Defendant's Thrive-branded products with the concept of both a person's skin and that individual's personal care and well-being.

16.     Collectively, these three products – the initial vitamins (Thrive W and Thrive M) and shakes (Thrive) along with the skin vitamin patch (Thrive DFT) – were collectively marketed under the umbrella of the Defendant's Thrive brand as the "Thrive Experience" (Hoffman Declaration, ¶19). A commonality among these three products, which were designed to be used in conjunction with one another, is that they were created to help both female and male consumers live thriving, healthy lifestyles and look and feel better (Hoffman Declaration, ¶19). In this way, the Defendant extended its initial Thrive W and M vitamins and Thrive shakes into a new category, Thrive DFT skin vitamin patches, which provided similar benefits (that is, fostering thriving and healthier lives) among similar customers (that is, females and males interested in achieving better health and wellbeing).

17.     In launching its Thrive Experience products, the Defendant employed numerous best practices for brand extensions noted earlier in this report (see ¶11 and ¶12):  (a) leveraging a brand's positive equity to introduce new products among current target customers (i.e., female and male consumers interested in living healthier lifestyles and looking and feeling better); (b) launching new offerings (Thrive DFT skin vitamin patches) that "fit" with products already marketed by the brand (Thrive W and Thrive M vitamins, Thrive shakes) that provide similar benefits (facilitating better health and wellbeing and looking and feeling better); and (c) offering

a new product (Thrive DFT skin vitamin patches) after successful products sold under that brand (i.e., Thrive W and Thrive M vitamins and Thrive MW shakes).

18. Reflecting the Defendant's use of brand extension strategies that conformed to best practices, it is my understanding that consumer acceptance of the Thrive Experience products was substantial. Upon launch of the Thrive Experience, sales of the firm's Thrive W and M vitamins, Thrive shakes, and Thrive DFT skin vitamin patch achieved sales of over ███████ from August 2012 through September 4, 2013 (Hoffman Declaration, ¶22). Sales of the Defendant's Thrive Experience products have continued to grow from ████ in 2013 to ████ today (Hoffman Declaration, ¶22). Thus, the three products that comprise the Thrive Experience were well-received by consumers in the marketplace, helping Le-Vel grow its customer base and naturally expanding its product line by adding other Thrive-branded products designed to help individuals live healthier, happier lifestyles and looking and feeling better (Hoffman Declaration, ¶23).

19. The success of the Defendant's Thrive Experience products has served as a driver of Le-Vel's overall success, making the Thrive Experience "the backbone of Le-Vel's THRIVE business, and Le-Vel's most popular offering (Hoffman Declaration, ¶20). The success of its Thrive Experience offerings has helped Le-Vel become the fastest direct sales company to reach $1B in sales, with total sales of its Thrive products surpassing $2B in 2019 (Hoffman Declaration, ¶29). I understand that the Defendant added other Thrive shake products and many different Thrive DFT skin vitamin patches, along with numerous other Thrive vitamins and supplements offering a variety of health and wellness benefits (e.g., Thrive TAC DFT, Thrive DFT Recharge) (Hoffman Declaration, ¶30, ¶31).

8

Exhibit 1
Page 10

20.     Following the success of Thrive Experience, it is my understanding that the Defendant launched additional product extensions under the Thrive umbrella brand, including Thrive Form, a skin vitamin designed to promote firm and healthy skin along with other benefits (https://le-vel.com/Products/THRIVE/SGTForm), as well as two additional gel products, Thrive Rest and Thrive Move, in 2015 and 2016 (Hoffman Declaration, ¶26).  In 2018, the company also introduced several Thrive-branded nutritious snacks (Thrive Bites) and protein bars (Thrive Pro) (Hoffman Declaration, ¶43).

21.     Although these consumable (gel and food) items represented different products than the vitamins and supplements the Defendant had successfully marketed in the past under the Thrive umbrella brand, these new offerings also met numerous criteria to be viewed by consumers as natural brand extensions. Specifically, Thrive Form, Thrive Rest, and Thrive Move gels, Thrive Bites snacks, and Thrive Pro protein bars were, similar to the Thrive Experience products, all designed to encourage greater customer health and wellbeing and looking and feeling better.

22.     In the context of the Thrive Experience offerings, these extensions –Thrive Form, Thrive Rest, and Thrive Move gels, Thrive Bites, and Thrive Pro – represented complementary products by which customers could achieve their goal of living thriving, healthy lifestyles and looking and feeling better.  The launch of these products was also supported by the Defendant's earlier successes in extending its Thrive umbrella brand—a factor known to improve the effectiveness of brand extension strategies (see ¶12). Likewise, the Defendant's development of Thrive as a premium, high quality brand (https://le-vel.com/Brand/Philosophy) also contributed to the successful launch of these product extensions (see ¶12).

23.     Moreover, by providing benefits compatible with the Thrive Experience products, introducing these Thrive-branded gel and food products helped expand the Thrive umbrella brand beyond health supplements (including ingestible capsules), and beyond its core skin-based patches, to include additional consumable products. Because consumers are often more likely to accept extensions from brands that are positioned more broadly vs. narrowly (see ¶12), the success of these consumable gels and snack food offerings likely made consumers more receptive to seeing the Defendant employ its Thrive umbrella brand on a broader range of naturally-related products beyond those sold previously or currently under the Thrive brand.

**The Defendant's Launch of its Thrive Skin Line of Skincare Products**

24.     After the natural extension of the Thrive brand from health supplements and skin vitamin patches to various consumable products intermittently through 2018, it is my understanding that the Defendant launched a line of skincare products in April 2019 (Hoffman Declaration, ¶47).  In introducing these skincare products as Thrive Skin (Hoffman Declaration, ¶47), the Defendant leveraged the equity in its Thrive umbrella brand for skincare products as anticipated and natural extension of this brand. It is my understanding that the Defendant selected "Thrive Skin" as the brand for these skincare products because, by including both "Thrive" and "Skin", these new products would (a) continue the Thrive brand's association with "skin" and "care" that began with its core DFT patches and (b) signal the "skincare" products the Thrive brand would identify (Hoffman Declaration, ¶47; see also ¶15 of this report). To assure Defendant's Thrive Skin extension was embraced as such, Le-Vel elected to "mirror" the three-step set of products associated with its highly successful Thrive Experience (Thrive W and M vitamins, Thrive shakes, and Thrive DFT skin vitamin patch) (Hoffman Declaration, ¶50). Thus, when Thrive Skin was launched, it also included a three-step set of skincare products (Thrive

10

Exhibit 1
Page 12

Skin Peel, Thrive Skin Reduce, and Thrive Skin Restore) (Hoffman Declaration, ¶50). It is my understanding that following the introduction of the Defendant's skincare line, consumers did not miss the natural connection between the three-step set of products associated with both Thrive Experience and Thrive Skin (Hoffman Declaration, ¶50)

25.     Including its Thrive Skin products under the Thrive umbrella brand allowed consumers to view Thrive Skin offerings within the context of the other THRIVE offerings offered by Le-Vel – that is, as products containing highly effective and high quality ingredients that are designed to help people live healthier, happier lives and look and feel better (Hoffman Declaration, ¶3). This conclusion is supported by the presence of several factors known to encourage consumers to transfer the favorable knowledge and feelings they have for a brand over to an extension to increase purchase of that new product.

26.     First, as discussed in this report (see ¶11), this transfer of equity is likely to occur when a brand's customers overlap with individuals who are target consumers for the new product. To this end, it is my understanding that approximately three-quarters of customers of the Defendant's Thrive products are female (Hoffman Declaration, ¶58). Compatibly, skincare products are targeted primarily toward females, given that nearly twice as many females (65%) indicating daily usage of such products as males (37%) (Statista Survey, May 5 to 22, 2017). Thus, customers familiar with the Defendant's Thrive brand are also likely to be purchasers and users of skincare products. In this regard, I understand that two-thirds of customers purchasing Thrive Skin products had previously purchased other Thrive-branded products (for instance, its vitamins or food products) (Hoffman Declaration, ¶56).

27.     Second, an extension's success is likely to increase when consumers perceive some level of fit between the brand and the new product (see ¶11). The Thrive brand's

11

Exhibit 1
Page 13

connection to skin and care dates back to Defendant's origins, as I understand that one of Le-Vel's founders, Mr. Jason Camper, was the former president of IsXperia and LifeCore Global—two supplement companies that naturally expanded into skincare products (Hoffman Declaration, ¶9)  I further understand that Mr. Camper drove the decision to expand into skincare while at those companies (Hoffman Declaration, ¶9)  And it is my understanding that the skincare suppliers to be used by Le-Vel were the skincare suppliers that Mr. Camper previously used while at his former supplement and skincare companies (Hoffman Declaration, ¶46)  Finally, I understand that numerous Le-Vel customers and promoters were customers and promoters from Mr. Camper's prior supplement and skincare businesses  (Hoffman Declaration, ¶10)  Accordingly, Thrive's initial customers and promoters were likely to expect some association between, on the one hand, Mr. Camper's new brand and, on the other, skin and care, through supplements and/or skincare. These very first skin product associations were quickly confirmed with the brand's launch of its Thrive Derma Fusion Technology (DFT) product, an adhesive patch that delivered vitamins and nutrients through the customer's skin to promote "clean and healthy weight management and an overall healthy lifestyle" (https://le-vel.com/Products/THRIVE/DFT).  The Thrive brand's connection to skin and care was continued with the introduction of its Thrive Form product in March 2016, a consumable vitamin gel promoting firm and healthy skin (https://le-vel.com/Products/THRIVE/SGTForm).

28.     Thus, the Defendant's history is one in which its Thrive brand appeared on skin products (e.g., Thrive DFT), having sold ██████ worth of such products, and a myriad of products with increasingly more direct connections to the care of skin (e.g., Thrive Skin).  As such, customers would have likely considered Le-Vel's launch of Thrive Skin as an expected natural and logical extension of the Thrive brand. Evidence of that is suggested by responses to a

"teaser" campaign the firm conducted in February 2019, just prior to the launch of Thrive Skin in April of that year (Hoffman Declaration, ¶51). In this campaign, the firm presented an infinity symbol with the words "is coming" directly below it along with the question, "What are your guesses?"  It is my understanding that some of the Defendant's Instagram followers posted comments indicating that they anticipated the launch of a skincare product under the Thrive umbrella brand before the consumers were even aware of the impending launch of Thrive Skin (Hoffman Declaration, ¶51).

29.     Also consistent with the notion that consumers were ready to embrace skincare products introduced under the Defendant's Thrive umbrella brand was the marketplace response to Thrive Skin. Since launching in 2019, sales of Thrive Skin products have exceeded ████ Within the first 24 hours of that product launch, I understand sales topped ████ (Hoffman Declaration, ¶53), reflecting that consumers (a) readily discerned and anticipated the "fit" between the Thrive umbrella brand's positioning around health/wellbeing and products promoting skin care and (b) understand the connection between the equity they held for the Thrive umbrella brand and these new skincare products. Based on this success of its Thrive Skin products, Le-Vel has further expanded its product line from the first three skincare products to various others, including creams, gels, and scrubs (le-vel.com/Products/THRIVE/Skin). I also understand that the marketplace receptivity to the Defendant's skincare products has resulted in plans to launch additional Thrive Skin products.

30.     Third, the expansion of the Defendant's Thrive brand from health supplements to skin care was not made all at once but, rather, represented a steady,  natural expansion of the Thrive brand that encompassed numerous other extensions. Given that numerous early Le-vel customers and promoters following Mr. Camper to the Thrive brand from his prior supplement

and skincare business, these individuals would have likely been familiar with those earlier transitions executed by Mr. Camper with his earlier business from health supplements to skincare products. While these skincare products may have been a foreseeable expansion of the Thrive brand by certain consumers (see ¶28 of this report), that product expansion notably followed successful extensions from health supplements, consumable gels, nutritious snack foods that were all introduced under the umbrella of its Thrive brand. As noted elsewhere (¶12), the existence of such prior successful extensions increases consumers' receptivity to additional, related new products offered under that brand.

31.     These intermediate extensions involving consumables and healthy snack foods broadened perception of the Thrive brand beyond health supplements in positioning the brand more generally as a health and wellness brand so that consumers would anticipate the launch of additional new products, consistent with strategies used by Le-Vel's competitors, as noted below (¶32).  Having previously run supplement companies that expanded into skincare products, Le-Vel's founder was no doubt well acquainted with such an expansion as well as with the details of introducing skincare products by a supplement company.  The broadening of the Thrive brand allowed consumers to view other new products (such as Thrive Skin) as natural extensions of the brand, consistent with other competing or like companies (see this report, ¶12), as reflected in social media posts made by Thrive customers reflecting the complementary nature of Le-Vel's Thrive Skin products and other Thrive-branded products offered by the Defendant (Hoffman Declaration, ¶52). This consumer receptivity to Thrive Skin products, as reflected in sales of ████ within 24 hours and exceeding ████ since April 2019 (Hoffman Declaration, ¶53), also supports a conclusion that consumers viewed these skincare products as natural extensions to the Defendant's Thrive brand.

14

Exhibit 1
Page 16

32.     Consumers viewing skincare products as natural extensions from brands marketing health supplements come as no surprise. Indeed, in the marketplace, numerous prominent health supplement companies offer skincare products (e.g., GNC, Vitamin Shoppe, Goop, Garden of Life, Bluebonnet Nutrition), as have more like-positioned direct sales companies such as Beachbody, Isagenix, Herbalife, Amway, and Shaklee (Hoffman Declaration, ¶44). Accordingly, it is little wonder that consumers expect successful brands that market health supplements to also sell skincare products and to therefore view the skincare products as representing natural extensions from such brands.  In fact, the staggering sales of Thrive Skin from April 2019 to date (████) establish with little more that skincare was a very foreseeable and successful natural product expansion for Le-Vel's Thrive house brand, itself having generated ████ in total sales since 2012.

**Analysis of the Plaintiff's Use of "Thrive" in Marketing its Products**

33.     According to the Complaint (¶24), the Plaintiff, Thrive Natural Care, Inc., markets grooming products such as beard oil to men and also sells products such as sunscreen, cleansers, and moisturizers to both male and female consumers. Based on the Complaint (Complaint, ¶2) and the Plaintiff's website (www.thrivecare.co), Thrive was initially, and still is, positioned as a sustainable brand intended to appeal to consumers with an affinity for sustainably-sourced products (Complaint, ¶19). This positioning is built around several dimensions, including the use of agricultural methods that help regenerate ecosystems (Complaint, ¶2; www.thrivecare.co) and the use of natural ingredients from native plaints (Complaint, ¶19).

34.     Based on both the deployment and the marketing of these practices, the Plaintiff has "positioned Thrive on the leading edge of healthy, natural, and sustainable" (Complaint,

15

Exhibit 1
Page 17

¶19). This focus on natural products and sustainable practices, if acknowledged by the marketplace, would result in a consumer-based brand equity for the Plaintiff's Thrive brand that is quite different from the premium lifestyle positioning created by the Defendant for its Thrive brand, that is, as a premium lifestyle brand targeted to premium-seeking consumers seeking a better lifestyle (https://le-vel.com/Brand/Philosophy).

35.     It is my understanding that Plaintiff alleges first use of the Thrive brand in September 2013, at that time, marketing three grooming products (a face wash, shave oil, and face balm). Market research indicates that shaving-related products such as those initially sold by the Plaintiff under the Thrive brand (e.g., beard oil) are targeted heavily toward men: 70% of males (versus 0% of females) report using shaving products daily or several times a week (Statista Survey, May 5 to 22, 2017). This targeting and positioning of its Thrive brand to males is also apparent in the Plaintiff's historical marketing of its products with hashtags that clearly make reference to a male target market. A review of materials including the Plaintiff's website social media show that it targeted males through the use of various male-related hashtags in 2015 (e.g., #mensgrooming, #mensstyle, #mensskincare, #skincareformen), in 2016 (#men, #mengrooming, #mangrooming), in 2017 (#mensgrooming, #mengrooming, #menstyle), in 2018 (mensgrooming, #beardcare, #beardoil, #fathersday, #beards, #bearded), in 2019 (#mensgroomingproducts, #mengrooming, #mensproducts, #menskincare), and in 2020 (#fathersday, #fathersdaygift).

36.     In the Complaint (¶19), the Plaintiff alleges that it targets both males and females with its products. As support for its claim that it targets not only males with its beard oil products but also females with its sunscreen, cleansers, and moisturizers, the Plaintiff discusses an article it published on November 21, 2019 titled "I'm a Women and I Use Thrive Natural Care. Here's

16

Exhibit 1
Page 18

Why" (https://thrivecare.co/blogs/news). Nearly all of the other blogs posted to the Plaintiff's website reference products for males, feature images of products with males, refer to male athlete endorsers, and/or are posted with the tag 'Mens Grooming Products', making it difficult to discern to what degree it has positioned Thrive as a brand that "targets a unisex audience" (Complaint, ¶19).

37.     Several factors complicate the Plaintiff's transition of its Thrive brand from one that initially focused on men's grooming products (e.g., shaving oils) to one that can be extended to encompass the sunscreens, cleansers, and moisturizers it claims to target to female consumers (Complaint, ¶19). As discussed earlier (¶11), there are several important determinants of a brand extension's success, including:  (a) that consumers are familiar with and have positive knowledge and feelings about the brand that is to be extended (i.e., that consumer-based brand equity exists) and (b) that the new product is seen as "fitting" the brand's equity, including the consumers and products with which it is associated.

38.     As noted elsewhere in this report (see ¶26 and ¶35), shaving products such as the beard oil initially sold by the Plaintiff under the Thrive brand are targeted heavily toward men, with the majority (70%) of males (versus 0% of females) reporting frequent use of these products (Statista Survey, May 5 to 22, 2017). In contrast, the use of skincare products skew heavily toward females, with nearly twice as many females (65%) indicating daily usage versus males (37%) (Statista Survey, May 5 to 22, 2017).

39.     Thus, there would seem to be little natural overlap in the customer segments initially targeted by Plaintiff with its Thrive-branded grooming products (males) in relation to those consumers it subsequently sought to engage with its Thrive-branded skincare products. Importantly, the rationale for using a brand extension strategy is that placing an existing brand on

a new product will leverage the brand's familiarity and equity with current customers to facilitate adoption of that new product. This is difficult to achieve when the new products (skincare offerings) and new customer segment (females) are very different from the initial product (grooming products such as shaving oils) and initial customer segment (males) upon which the brand has developed its equity. Accordingly, expanding a brand's equity that has been built on male grooming products into gender-neutral products targeted at a unisex demographic would require a significant brand repositioning as opposed to representing a natural extension of the brand's existing equity with customers.

**Conclusions**

40.     Based on the analysis offered in this report (¶13 - ¶32), it is my conclusion that the Defendant has followed best practices in introducing numerous, foreseeable new products that leverage the equity of its Thrive brand (i.e., as a brand offering products designed to help customers live healthier and happier lifestyles and look and feel better). As a consequence, consumers encountering Le-Vel's Thrive Skin skincare products in 2019 were likely to perceive these offerings as anticipated, natural extensions to the other health and wellness products successfully marketed by the Defendant under its Thrive umbrella brand, including health supplements and vitamins, core skin vitamin patches, skin vitamin gels, healthy snack foods and shakes. Consistent with this conclusion are sales and other data reflecting the significant, positive marketplace response to all Thrive-branded offerings and to the Thrive Skin skincare products marketed by the Defendant under its Thrive umbrella brand. It is also important to note that this extension from the Thrive-branded supplements initially launched by the Defendant (Thrive Experience) to the skincare products at issue in this matter (Thrive Skin) represents an established expansion of product offerings that consumers have seen and are acquainted with

Exhibit 1
Page 20

through some of the biggest and most respected vitamin and supplement brands in the country, as well as Le-Vel's like positioned competitors and, of course, Le-Vel founder Jason Camper's two prior supplement and skincare product companies.

41.     In contrast, my analysis regarding the Plaintiff's extension of its Thrive brand (¶33 - ¶39) leads me to conclude that it is less likely that consumers would have seen or anticipated Plaintiff's stark transition of its Thrive brand from what was initially grooming products (e.g., shaving oils) marketed primarily to males into unisex skincare products also targeted to female consumers.  As noted in this report (¶8), it is well-accepted that how a brand has been marketed in the past, and how consumers view the brand based on those past firm actions, will determine what new products they will view to be natural extensions of that brand. The difference in products and target markets associated with the Plaintiff's marketing efforts would make it difficult for consumers to view the skincare products subsequently offered by the Plaintiff under its Thrive brand as naturally extended from a brand positioned initially as a men's grooming.

_Michael J. Barone_

Dr. Michael J. Barone

March 22, 2021

19

Exhibit 1
Page 21

# REFERENCED WORKS

Complaint

Hoyer, Wayne D. and Deborah J. MacInnis (2008), *Consumer Behavior, 5ed.,* Mason, OH: South-Western.

Keller, Kevin Lane (2008), *Strategic Brand Management: Building, Measuring, and Managing Brand Equity, 3ed.,* Upper Saddle River, NJ:  Pearson Education, Inc.

Statista Survey, May 5 to 22, 2017

## APPENDIX:  CURRICULUM VITAE OF MICHAEL J. BARONE

### MICHAEL J. BARONE

Marketing Department, Room 162                 **P**: 502-852-3470
College of Business, University of Louisville         **F**:  502-852-7672
Louisville, KY  40292                **E:** michael.barone@louisville.edu

**EDUCATION**

Ph.D., Marketing, University of South Carolina, 1994
M.B.A., George Washington University, 1990
B.A., Economics, University of Michigan, 1984

**ACADEMIC EXPERIENCE**

Professor of Marketing and Brown-Forman Endowed Chair (07/18 - present), University of Louisville
Professor of Marketing and University Scholar (07/10 – 06/18), University of Louisville
Associate Professor of Marketing and University Scholar (07/07- 06/10), University of Louisville
Associate Professor of Marketing (4/00–06/07) & Dean's Faculty Fellow (6/05-06/07), Iowa State Univ.
Assistant Professor of Marketing, Iowa State University (6/97 – 4/00)
Assistant Professor of Marketing, Florida International University (FIU), 9/95 - 5/97
Assistant Professor of Marketing, Clark University, 9/94 – 6/95

**HONORS AND AWARDS**

*Research-Related*
Top Productive Researchers in the Premier AMA Journals, 2009-2013 (AMA DocSIG, 2014)
Top Productive Researchers in the Premier AMA Journals, 2010-2014 (AMA DocSIG, 2015)
Recipient, Research Award, UofL COB – 2010, 2013, 2014, 2015.
Top 25 Productive Advertising Researchers, 1997-2006 (*Journal of Advertising,* 2008).
Top Productive Researchers in Marketing, 2000-2007 (AMA DocSIG, 2008)
"High Honors" distinction, Honor Roll of Consumer Researchers (Blackwell, Miniard, & Engel 2006).
Recipient, Dean's Advisory Council Research Award, ISU COB - 1999, 2005.
Nominee, Dean's Advisory Council Research Award, ISU COB - 1998, 1999, 2000, 2001, 2005, 2006.
Nominee, Early Achievement in Research Award, ISU - 1999.
Nominee, Don Lehmann Award (best dissertation-based article in *JMR/JM*) - 1999.

*Teaching-Related*
Recipient, Graduate Teaching Award, UofL COB, 2010-2011.
Recipient, IMBA Professor the Year, UofL COB, 2009-2010.
Nominee, Faculty Favorite, UofL Delphi Center, 2007 – 2010, 2012, 2017.
Recipient, Delta Sigma Pi Marketing Professor of the Year - 2003.
Recipient, Business Council Outstanding Teacher Award, ISU College of Business - 2000.
Recipient, Business Council Teacher of the Month, ISU College of Business - September 2001.
Nominee, Veishea Faculty of the Year, ISU - 2000, 2001, 2004, 2006, 2007.
Nominee, Dean's Advisory Council UG Teaching Award, ISU Business College – 1999-2002, 2004, 2006.
ISU Interfraternity Council/Panhellenic Council Outstanding Faculty Member - 1999, 2000, 2001, 2003, 2005.

*Other*
Top Reviewer, *Journal of Consumer Psychology*, 2009, 2010, 2016.
Outstanding Reviewer, *Journal of Advertising*, 2004, 2011
Outstanding Reviewer (Honorable Mention), *Journal of Advertising*, 2008
Recipient, Faculty Excellence Award, UofL COB –2010, 2013.
Recipient, Dean's Advisory Council Business Impact Award, ISU College of Business (2006).
American Marketing Association Doctoral Consortium Fellow, 1993
Beta Gamma Sigma, George Washington University and University of South Carolina
Merit Scholarship Award, University of Michigan, 1981.

## JOURNAL ARTICLES

Kwon, Mina, Andrew Manikas, and **Michael J. Barone** (2020), "(Not) Near and Dear: COVID-19
Concerns Increase Consumer Preference for Products and Services that are Not 'Near Me,'" *Journal of the Association for Consumer Research,* forthcoming.

Kulow, Katina, Mina Kwon, and **Michael J. Barone** (2020), "Does Seeing Bad Make You Do Good? How
Witnessing Retail Transgressions Influences Responses to Cause Marketing Offers," *Journal of Business Research,* forthcoming.

Li, Xingbo**, Michael J. Barone**, Shailendra P. Jain, and Mina Kwon (2020), "The Challenge of Being a
Challenger: Social Dominance Orientation Shapes the Impact of "Challenger vs. Leader" Comparisons," *Journal of Consumer Psychology,* forthcoming.

**Barone, Michael J.,** Keith Coulter, and Xingbo Li (2020), "The Upside of Down:  How a Price's Vertical
Location Influences its Evaluation," *Journal of Retailing,* in press, https://doi.org/10.1016/j.jretai.2020.02.003

Kwon, Mina and **Michael J. Barone** (2020), "A World of Mistrust: Fake News, Mistrust Mindsets, and
Product Evaluations," *Journal of the Association for Consumer Research,* 5 (2), 206-219

Miao, Chao, **Michael J. Barone,** Shanshan Qian, and Ronald H. Humphrey (2019). "Emotional Intelligence
and Service Quality: A Meta-analysis with Initial Evidence on Cross-cultural Factors and Future Research Directions," *Marketing Letters, 30 (*3-4), 335-347*.*

**Barone, Michael J.,** Xingbo Li, Karen Page Winterich, and Keith B. Lyle (2018), "Social-Spatial Effects
in Pricing:  When and How Vertical Orientations Shape Processing of Price Comparisons*," Customer Needs and Solutions, 5,* 137-145.

**Barone, Michael J.,** TJ Bae, Shanshan Qian, and Jason D'Mello (2017), "Power and the Appeal of the
Deal:  How Consumers Value the Control Provided by Pay What You Want Pricing," *Marketing Letters,* 28 (3), 437-447.

**Barone, Michael J.,** Sasha Fedorikhin, and David E. Hansen (2017), "The Influence of Positive Affect
on Consideration Set Formation in Memory-Based Choice," *Marketing Letters,* 28 (1), 59-69.

**Barone, Michael J.** and Karen Page Winterich (2016), "When Does Green Make You Greedy or Go
Green?  The Influence of Green Color Primes on Consumers' Promotion Preferences," *Customer Needs and Solutions*, 3 (1), 3-10, **lead article**.

22

Exhibit 1
Page 24

DeCarlo, Thomas, Tirthankar Roy, and **Michael J. Barone** (2015), "How Sales Manager Experience and Historical Data Trends Affect Decision Making," *European Journal of Marketing,* 49 (9/10), 1484-1504.

Winterich, Karen Page, Robert E. Carter, **Michael J. Barone,** Ram Janakiraman, and Ram Bezawada (2015), "'Tis Better To Give Than Receive? How Gender, Age, and Residence Segments Vary in Their Choice of Discount- Versus Donation-Based Promotions," *Journal of Consumer Psychology,* 25 (4), 622-634.

**Barone, Michael J.,** Keith B. Lyle, and Karen Page Winterich (2015), "When Deal Depth Doesn't Matter: How Handedness Consistency Influences Consumer Response to Horizontal versus Vertical Price Comparisons," *Marketing Letters,* 26 (2), 213-223.

Logsdon, M. Cynthia , Gary Bennett, Rik Crutzen, LuAnn Martin, Diane Eckert, Ashley Robertson, John Myers, Roselyn Tomasulo, Jennifer Gregg, **Michael Barone**, Tania Lynch, Laura Flamini (2014), "Preferred Health Resources and Use of Social Media to Obtain Health and Depression Information by Adolescent Mothers," *Journal of Child and Adolescent Psychiatric Nursing,* DOI: 10.1111/jcap.12083

**Barone, Michael J.** and Robert D. Jewell (2013), "The Interactive Effects of Advertising Content and Context on Persuasion:  How Brand Innovativeness Creates Advertising Flexibility," *Journal of the Academy of Marketing Science, 42 (3),* 309-321.

Logsdon, M. Cynthia, **Michael Barone**, Tania Lynch, Ashley Robertson, John Myers, David Morrison, Sara York, and Jennifer Gregg (2013), "Testing of a Prototype Web Based Intervention for Adolescent Mothers on Postpartum Depression," *Applied Nursing Research,* 26, 143-145.

Miniard, Paul W., Shazad Mohammed, **Michael J. Barone,** and Cecilia Alvarez (2013), "Retailers' Use of Partially Comparative Pricing: From Across-Category to Within-Category Effects," *Journal of Marketing,* (77) July, 33-48.

**Barone, Michael J.** and Robert D. Jewell (2013), "The Innovator's License:  The Latitude to Deviate from Category Norms," *Journal of Marketing,* 70 (January), 120-134.

**Barone, Michael J.** and Robert D. Jewell (2013), "How Category Advertising Norms and Consumer Counter-Conformity Influence Comparative Advertising Effectiveness," *Journal of Consumer Psychology,* 22 (October), 496-506.

**Barone, Michael J**. and Thomas E. DeCarlo (2012), "Managers' Reliance on Performance Trends in Evaluating Employees:  The Moderating Roles of Evaluation Task and Firm Strategic Orientation," *Journal of Personal Selling & Sales Management,* 32 (2), 207-224.

DeCarlo, Thomas E. and **Michael. J. Barone** (2012), "The Interactive Effects of Sales Presentation, Consumer Suspicion, and Positive Mood on Salesperson Evaluations and Product Purchase Intentions," *Journal of Personal Selling and Sales Management,* 33 (1), 53-66.

Winterich, Karen Page and **Michael J. Barone** (2011), "Warm Glow or Cold, Hard Cash?  Social Identity Effects on Consumer Choice for Donation versus Discount Promotions," *Journal of Marketing Research,* 48 (October), 855-868.

23

Exhibit 1
Page 25

Barone, Michael J. and Tirthankar Roy (2010a), "**Does Exclusivity Always Pay Off? Exclusive Price Promotions and Consumer Response**," *Journal of Marketing,* 74 (March), 121-132.

Barone, Michael J. and Tirthankar Roy (2010b), "The Effect of Deal Exclusivity on Consumer Response to Targeted Price Promotions:  A Social Identification Perspective," *Journal of Consumer Psychology,* 20 (1), 78-89.

DeCarlo, Thomas E. and **Michael J. Barone** (2009), "With Suspicious (But Happy) Minds:  Mood's Ability to Neutralize the Effects of Suspicion on Persuasion," *Journal of Consumer Psychology,* 19(3), 326-333.

Laczniak, Russell N., R. Kenneth Teas and **Michael J. Barone** (2008), "It All Depends on How You Define Persuasion: A Rejoinder to Lawrence Gibson's Commentary,'" *Marketing Research,* 20 (Spring), 43-44.

Barone, Michael J., Andrew T. Norman, and Anthony D. Miyazaki (2007), "Consumer Response to Cause Related Marketing Strategies for Retail Goods:  Is More or Less Fit Better?" *Journal of Retailing,* 83 (4), 437-445.

Jewell, Robert D. and **Michael J. Barone** (2007), "Norm Violations and the Role of Marketplace Comparisons in Positioning Brands," *Journal of the Academy of Marketing Science,* 35, 550-559.

Laczniak, Russell N., **Michael J. Barone** and R. Kenneth Teas (2007), "On Determining Persuasion in a Copy Test Setting," *Marketing Research*, 19 (Winter), 30-36.

Miniard, Paul W., **Michael J. Barone**, Randall L. Rose, and Kenneth C. Manning (2006), "A Further Assessment of Indirect Comparative Advertising Claims of Superiority over All Competitors," *Journal of Advertising,* 35 (4), 53-64.

Barone, Michael J. (2005), "The Interactive Effects of Mood and Involvement on Brand Extension Evaluations," *Journal of Consumer Psychology,* 15 (3), 263-270.

Barone, Michael J., Valerie E. Taylor, and Joel E. Urbany (2005), "Advertising Signaling Effects for New Brands:  The Moderating Role of Perceived Brand Differences," *Journal of Marketing Theory & Practice*, 13 (1), 1-13, **lead article**.

Barone, Michael J., Kenneth C. Manning, and Paul W. Miniard (2004), "Consumer Response to Retailers' Use of Partially Comparative Pricing," *Journal of Marketing*, 68 (July), 37-47.

Barone, Michael J., Kay M. Palan, and Paul W. Miniard (2004), "Brand Usage and Gender as Moderators of the Deception Associated with Comparative Advertising," *Journal of Advertising,* 33 (Spring), 19-28.

Barone, Michael J. and Paul W. Miniard (2002), "Mood and Brand Extension Judgments:  Asymmetric Effects for Desirable versus Undesirable Brands," *Journal of Consumer Psychology*, 12 (4), 283-290**.**

Manning, Kenneth C., Paul W. Miniard, **Michael J. Barone**, and Randall L. Rose (2001), "Understanding the Mental Representations Created by Comparative Advertising," *Journal of Advertising,* 30(Summer), 27-39.

Barone, Michael J., Paul W. Miniard, and Jean B. Romeo (2000), "The Influence of Positive Mood on Brand Extension Evaluations," *Journal of Consumer Research*, 26 (March), 387-402.

**Barone, Michael J**., Anthony D. Miyazaki, and Kimberly A. Taylor (2000), "Does One Good Turn Deserve Another? Examining the Influence of Cause-Related Marketing Efforts on Consumer Choice," *Journal of the Academy of Marketing Science,* 28 (2), 250-264.

Li, Fuan, Paul W. Miniard, and **Michael J. Barone** (2000), "The Facilitating Influence of Consumer Knowledge on the Effectiveness of Daily Value Information," *Journal of the Academy of Marketing Science*, 28 (3), 425-436.

**Barone, Michael J**. and Paul W. Miniard (1999), "How and When Factual Ad Claims Can Mislead Consumers: Examining the Deceptive Consequences of *Copy x Copy* Interactions For Partial Comparative Ads," *Journal of Marketing Research*, 36 (February), 58-74.

**Barone, Michael J**., Randall L. Rose, Paul W. Miniard, and Ken C. Manning (1999), "Enhancing the Detection of Misleading Comparative Advertising," *Journal of Advertising Research*, 39 (September/October), 43-50.

**Barone, Michael J**., Terence A. Shimp, and David E. Sprott (1999), "Product Ownership as a Moderator of Self-Congruity Effects in Consumer Behavior," *Marketing Letters,* 10 (February), 75-86.

Miniard, Paul W., Randall L. Rose, Kenneth C. Manning, and **Michael J. Barone** (1998), "Tracking the Effects of Comparative and Noncomparative Advertising Using Relative and Nonrelative Measures: A Test of the Framing Correspondence Hypothesis," *Journal of Business Research*, 41 (February), 137-144.

**Barone, Michael J**., Terence A. Shimp, and David E. Sprott (1997a), "Mere Ownership Revisited: A Robust Effect?" *Journal of Consumer Psychology*, 6 (3), 257-284.

**Barone, Michael J**., Terence A. Shimp, and David E. Sprott (1997b), "A Commentary on the Mere Ownership Effect: 'More There Than Meets Their Eyes' or 'Less There Than They Would Have Us Believe?'" *Journal of Consumer Psychology*, 6 (3), 299-311.

Miniard, Paul W. and **Michael J. Barone** (1997), "The Case for Noncognitive Determinants of Attitude: A Critique of Fishbein and Middlestadt," *Journal of Consumer Psychology*, 6 (1), 77-92.

**Barone, Michael J**., Randall L. Rose, Kenneth C. Manning, and Paul W. Miniard (1996), "Another Look at the Impact of Reference Information on Consumer Impressions of Nutrition Information," *Journal of Public Policy and Marketing*, 15 (Spring), 55-62.

Miniard, Paul W., Randall L. Rose, **Michael J. Barone**, and Kenneth C. Manning (1993), "On the Need for Relative Measurements in Assessing Comparative Advertising Effects," *Journal of Advertising*, 22 (September), 41-57.

Rose, Randall L., Paul W. Miniard, **Michael J. Barone**, Kenneth C. Manning, and Brian D. Till (1993), "When Persuasion Goes Undetected: The Case of Comparative Advertising," *Journal of Marketing Research*, 30 (August), 315-330.

**Editorial Review Boards**

*Journal of Consumer Research* (Member), 2015 – Present
*Journal of Consumer Psychology* (Member), 2004 – Present
*Journal of the Academy of Marketing Science* (Member), 2008 – Present
*Journal of Retailing* (Member), 2020-Present.
*Marketing Letters* (Member), 2013 – Present
*Journal of Advertising* (Member), 2003 – 2010 (Resigned)
*Journal of Business Research* (Member), 2006 – 2009 (Resigned)
*Journal of Current Issues and Research in Advertising* (Member), 2009 – 2010 (Resigned)
*Academy of Marketing Science Review* (Member), 1999 – 2009.
*Journal of Consumer and Market Research* (Member), 1998 – 1999.

**Reviewer - Journals**
*Journal of Consumer Research* (2002-2014)
*Journal of Marketing Research* (1998-Present)
*International Journal of Research in Marketing* (2013-Present)
*Journal of Marketing* (2003-Present)
*Journal of Consumer Psychology* (2002-2004)
*Journal of the Academy of Marketing Science* (2006-2008)
*Marketing Letters* (2005-2013)
*Journal of Advertising* (2003-Present)
*Journal of Business Research* (2010-Present)
*Journal of Retailing* (1997-2019)
*Journal of Public Policy and Marketing* (1998-Present)
 *Journal of Information Technology* (1999-Present)
*European Journal of Social Psychology* (2003 – Present)
*Journal of Managerial Psychology* (2005-Present).

**Reviewer - Conference Proceedings**
Association for Consumer Research Conference (1995 – 2006, 2008-2011, 2017-2018)
Society for Consumer Psychology Conference (2000-2004, 2006-2009, 2019-Present)
American Marketing Association Conference (1996, 1998 – 2005, 2009-2010)
Advances in Marketing Science Conference (2010-2011)
European Marketing Academy Conference (2009-2011)
Marketing and Public Policy Conference (1999, 2002)
American Association of Advertising Conference (2002, 2004).

**Reviewer - Text Books**
*Principles of Marketing (1e)*, Peter Dickson et al. (Reviewed Pricing Chapter written by J. Urbany).

## INDUSTRY AND CONSULTING EXPERIENCE

### *Expert Witness*

Retained by Ray Quinney & Nebeker for expert consumer services re: Alfwear, Inc. *v. Kulkote, LLC.*

Retained by Finnegan, Henderson, Farabow, Garrett & Dunner, LLP for expert consulting services re: *Gibson Brands, Inc., v. Armadillo Distribution Enterprises, Inc.*

Retained by Hovey Williams LLP for expert consulting services re: *Sportspower, Ltd.. v.* Crowntec., Ltd. (consulting expert).

Retained by Kelly IP, LLP for expert consulting services re: *World Wildlife Fund, Inc. v. Panda Restaurant Group, Inc.*

Retained by Kelly IP, LLP for expert consulting services re: *Teton Gravity. LLC v. ETW Corp.*

Retained by Kelly IP, LLP for expert consulting services re: *Cobra Engineering, Inc. v. Harley Davidson USA* (consulting expert).

Retained by Morgan, Lewis, and Bockius, LLP for expert consulting services re: *Ocusoft, Inc. v. Walgreen Co. & Walgreens.com, Inc.*

Retained by Jaburg Wilk LLP for expert consulting services re: *Cox Communications, Inc., v. Gigablast, Inc.* (consulting expert).

Retained by BoyarMiller LLP for expert consulting services re: *Farouk Systems, Inc. v. AG Global Products LLC, d/b/a FHI Heat, LLC and Shauky Gulamani.*

Retained by Morgan, Lewis, and Bockius, LLP for expert consulting services re: *Certain Footwear Products* (U.S.I.T.C. Complaint).

Retained by Kelly IP, LLP for expert consulting services re: *S.C. Johnson and Sons, Inc. v. Stoner, Inc.*

Retained by Brennan, Manna, & Diamond, LLC for expert consulting services re: *David Mowder v. Permanent General Assurance Corporation of Ohio et al.*

Retained by Kelly IP, LLP for expert consulting services re: *Koninklijke Philips Electronics N.V. v. Hunt Control Systems, Inc.*

Retained by ORCInternational for expert consulting services re: *Verisign, Inc. v. Dot Agency Limited.*

Retained by Parker, Hudson, Rainer, and Dobbs LLP for expert consulting services re: *Swift v. Bancorp, Inc.*

Retained by Tomlinson, Rust, McKinstry, and Grable for expert consulting services re: *The Charles Machine Works, Inc. v. Vermeer Manufacturing Company.*

Retained by Jacobson Holman PLLC for expert consulting services re: *Perfetti Van Melle USA v. Cadbury Adams USA  LLC.*

27

Exhibit 1
Page 29

Retained by Tomlinson and O'Connell PC for expert consulting services re:  *H-D Michigan, Inc. and Harley-Davidson Motor Company Group, Inc. d/b/a Harley-Davidson Motor Company v. Ridley Motorcycle Co.*

Retained by Freeborn & Peters for expert consulting services re:  *Columbik & Associates, Inc. et al. v. John Burgess et al.*

Retained by Darby and Darby PC for expert consulting services re:  *The Procter & Gamble Company v. Colgate-Palmolive Company.*

Retained by McKee, Voorhees, and Sease, PLC for expert consulting services re:  *Wells' Dairy, Inc. v. Nestle S.A., Societe-Des Products Nestle, S.A., Nestle U.S.A., Inc., Nestle U.S.A. Prepared Foods Division, Inc, and Nestle Ice Cream, LLC.*

Retained by Darby and Darby PC and Goodwin Proctor LLP for expert consulting services re:  *Morgan Chase Group, Inc and Morgan Chase Trust Company v. The Chase Manhattan Corporation and J.P. Morgan Chase & Co., Incorporated.*

Retained by Schachter & Associates for expert consulting services re:  *Jason Bacher v. Wing Eyecare et al.*

Retained by LaMarca & Landry, P.C., for expert consulting services re:  *National Concrete Services, Inc. v. Menard, Inc.*

# Exhibit 2

## to the Declaration of Shauna E. Woods

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

THRIVE NATURAL CARE, INC.,

    Plaintiff,

v.

LE-VEL BRANDS, LLC,

    Defendant.

Case No.: 2:21-cv-2022

# EXPERT REBUTTAL REPORT OF SARAH BUTLER

## March 22, 2021

Exhibit 2
Page 31

# Table of Contents

I.   QUALIFICATIONS ............................................................................................ 3

II.  DOCUMENTS REVIEWED ............................................................................. 4

III. ASSIGNMENT AND SUMMARY OF OPINIONS ................................................ 5

IV. BACKGROUND ............................................................................................... 7

V.  THE WALLACE SURVEY ............................................................................... 9

VI. RESPONSE TO WALLACE SURVEY ............................................................ 11

    A.   Wallace Survey Is Leading and Biased. ....................................................... 12

    B.   Wallace Survey Fails to Replicate Market Conditions. .................................. 14

    C.   Wallace Survey Does Not Have A Proper Control ....................................... 28

    D.   Irrelevant Question Related to Emails.......................................................... 30

    E.   Wallace Survey Suffers from Data Quality Issues ........................................ 31

VII. CONCLUSIONS............................................................................................ 32

Exhibit 2
Page 32

# I.   QUALIFICATIONS

1.      I am a Managing Director at NERA Economic Consulting ("NERA"), where I am the Chair of the Survey and Sampling Practice and a member of the Intellectual Property, Product Liability, Antitrust, and Labor Practices. My business address is 4 Embarcadero Center, San Francisco, CA 94111. NERA is a firm providing expert statistical, survey, economic, and financial research analysis.

2.      Among my responsibilities, I conduct survey research and market research, and design and implement statistical samples for matters involving business and consumer decision making, consumer choice, and consumer behavior. In the course of my career, I have conducted research for leading corporations and government agencies on consumers, employees, and businesses. My work has been included in numerous lawsuits involving issues of patent infringement, false advertising, trademark and trade dress confusion, and secondary meaning, as well as in antitrust and employment-related litigation. I am a member of the American Association of Public Opinion Research, the American Statistical Association, the Intellectual Property Section of the American Bar Association, and the International Trademark Association (INTA).

3.      I have also worked as a market researcher conducting surveys of consumers and professionals, focus groups, and in-depth interviews. I worked as an independent consultant conducting research for the Department of Environment and Rural Affairs in the United Kingdom. I have taught courses focused on or involving research methodologies in both the United States and Europe. I hold a Master's Degree from Trinity College, Dublin and another Master's Degree from Temple University.

3

Exhibit 2
Page 33

4.      I have substantial experience conducting and using surveys to measure consumer opinions and behaviors regarding products and services including purchase processes, product attributes, branding and positioning, market segmentation, new product research, and communications strategies. During my career in academic and commercial research, I have personally facilitated a wide range of research including large-scale surveys, in-depth interviews, focus groups and observational studies.

5.      I have submitted expert reports, been deposed, and have testified at trial within the last five years. A list of my testimony is included on the copy of my current resume, which is attached as **Exhibit A**.

6.      NERA is being compensated for my services in this matter at my standard rate of $700 per hour. Members of the staff at NERA have worked at my direction to assist me in this engagement. No part of my compensation or NERA's compensation depends on the outcome of this litigation. Throughout this report, I have used the terms "I" and "my" to refer to work performed by me and/or others under my direction.

## II.   DOCUMENTS REVIEWED

7.      As part of my work, I reviewed the Complaint ("*Complaint*") and the report by Mr. Robert Wallace.[1] A list of the specific materials I reviewed can be found in **Exhibit B**.

---

[1] Complaint and Demand for Jury Trial, *Thrive Natural Care, Inc., v. Le-Vel Brands, LLC*, United States District Court Central District of California, Case No. 2:21-cv-2022, dated March 4, 2021 (hereinafter, "*Complaint*"); Expert Report of Rob Wallace in the Matter of Thrive Natural Care, Inc. v. Le-Vel Brands, LLC., dated March 2, 2021 (hereinafter, "*Wallace Report*").

4

Exhibit 2
Page 34

## III.   ASSIGNMENT AND SUMMARY OF OPINIONS

8.      I was retained by Defendant Le-Vel Brands, LLC ("Le-Vel") to review the survey and expert report submitted by Mr. Rob Wallace. Mr. Wallace indicates that Plaintiff asked him to design and conduct a survey to, "examine whether or not consumers, or potential consumers of skin care products who purchase such items on the Internet would be confused between 'Thrive' branded skin care products manufactured by the Plaintiff and 'Thrive Skin' branded skin care products manufactured by Defendant."[2]

9.      Mr. Wallace designed and conducted a survey of 600 respondents, including women and men between the ages of 18 and 65 years old who had purchased skin care products on the internet in the past six months and who also planned to do so again in the next six months. Once qualified, respondents were shown websites for several skin care products and asked questions intended to measure source and affiliation confusion.

10.     Based on my review of Mr. Wallace's survey I conclude the following:

- Mr. Wallace has used an inappropriate and biased survey design that simply measures respondents' ability to find similarities between pairs of products shown. Given the particular design of his survey, it is unsurprising that respondents can "match" Plaintiff's and Le-Vel's products based on the name. Such an approach does not reliably measure the potential for confusion in the real world.

---

[2] *Wallace Report*, ¶ 1.

5

Exhibit 2
Page 35

- Mr. Wallace's survey design is further unreliable as it does not realistically reflect how consumers would view or purchase the products shown. Notably, Mr. Wallace's survey wholly ignores the purchasing process a consumer of Le-Vel's products would undertake. The survey as designed cherry picks a product from an "Add-to-Cart" page from Le-Vel's internal Cloud Portal that is accessible to only Le-Vel customers with accounts. Access to such an internal page by customers without an existing involves numerous set-up steps, including the selection of a Le-Vel brand promoter and the entry of personal information. The survey did not, as it did with the other products featured in the survey, use Le-Vel's public-facing website content showing the featured Le-Vel product (assessable to potential new customers). A survey that does not replicate marketplace conditions cannot be used to infer likelihood of confusion in the real world.

- Mr. Wallace also does not have a proper control. The "internal controls" in the survey are insufficient and share no sound/name similarities with the at-issue products. There are numerous examples of products which could have been appropriate controls to measure guessing and to account for the extreme suggestiveness of the design, but Mr. Wallace does not use any of these.

- While I have not been provided with the data, there is some evidence that Mr. Wallace's survey contains respondents who were not attentive while taking the survey. When provided with the data, I can provide a more comprehensive review of the results.

6

Exhibit 2
Page 36

11.   Mr. Wallace's survey is a biased matching exercise that simply demonstrates respondents can identify the name similarity between the two products when asked to directly compare them. Such a design does not provide reliable evidence of the likelihood of confusion, particularly given the way Le-Vel's product is shown to respondents because it does not replicate the real-world context in which consumers would encounter that page. The remainder of this report provides a more detailed description of my review of Mr. Wallace's survey.

## IV.   BACKGROUND

12.   Plaintiff Thrive Natural Care, Inc. ("Plaintiff") is a Delaware corporation with its principal place of business at 42 Darrell Place, San Francisco, CA 94133.[3]

13.   Plaintiff describes its business as making natural skin care products using regenerative agriculture methods.[4] Plaintiff asserts it began selling skin care products in late 2013, and currently sells face washes and scrubs, lotions, moisturizers, sunscreens, face balms, shaving lotions, and grooming oils.[5] Plaintiff's products are sold online through the company's website, www.thrivecare.co, as well as on Amazon.com and Walmart.com, and in Whole Foods Markets on the West Coast.[6]

14.   Plaintiff asserts it has used the term "Thrive Tribe" since December 2013 and sends new customers an email with this term.[7]

---

[3] *Complaint*, ¶ 12.

[4] *Complaint*, ¶ 2.

[5] *Complaint*, ¶ 18.

[6] *Complaint*, ¶ 20.

[7] *Complaint*, ¶ 25.

7

Exhibit 2
Page 37

15.     I understand that in January 2014, Plaintiff was assigned U.S. Trademark Reg. No. 4,467,942 for THRIVE in International Class 003 for "Non-medicated skin care preparations, namely, facial lotions, cleansers and creams, creams and oils for cosmetic use, skin moisturizers; pre-shaving preparations; after shave lotions and creams,"[8] and in September 2020 was assigned U.S. Trademark Reg. No. 6,164,303 for additional products to include, "Body and non-medicated soaps and skin cleansing gels; cosmetic sun care preparations and sunscreens; shaving creams and gels; pre-shaving preparations; after shave lotions and creams."[9]

16.     Le-Vel is a Texas limited liability company with its principal place of business at 9201 Warren Parkway #200, Frisco, TX 75035.[10]

17.     Le-Vel sells a line of products under its THRIVE trademark[11] including vitamin capsules, protein shakes, and vitamin skin patches.[12] In April 2019, Le-Vel allegedly began to market and advertise another product under its THRIVE umbrella brand for skin care products under the name THRIVE SKIN. Currently, Le-Vel's THRIVE SKIN products include six products; (1) Peel Reduce Restore, (2) Infinite Daily Detox Purifying Bar, (3) Infinite Charcoal Activated Mask, (4) Infinite Hand and Foot Reparative Cream, (5) Infinite Skin & Hair Peptide Gel, and (6) Infinite Detox Body Scrub.[13]

18.     On March 4, 2021, Plaintiff filed a Complaint, alleging that Le-Vel's use of THRIVE SKIN is likely to cause, "confusion, deception, and mistake by creating the false and

---

[8] *Complaint*, ¶ 26.

[9] *Complaint*, ¶ 28.

[10] *Complaint*, ¶ 13.

[11] https://le-vel.com/

[12] *Complaint*, ¶ 4.

[13] *Complaint*, ¶ 40.

8

Exhibit 2
Page 38

misleading impression that LBL's [Le-Vel's] Infringing Products are manufactured or distributed by Thrive, are associated or connected with Thrive, or have the sponsorship, endorsement, or approval of Thrive."[14]

19.     On March 5, 2021, Plaintiff also filed a Motion for Preliminary Injunction further alleging the potential for consumer confusion.[15] In that Motion, Plaintiff cites the survey conducted by Mr. Wallace as evidence of the alleged likelihood of confusion.

## V.     THE WALLACE SURVEY

20.     Mr. Wallace was retained by Plaintiff to conduct a survey to "examine whether or not consumers, or potential consumers of skin care products who purchase such items on the Internet would be confused between 'Thrive' branded skin care products manufactured by the Plaintiff and 'Thrive Skin' branded skin care products manufactured by the Defendant."[16,17]

21.     Mr. Wallace designed and conducted an internet survey in which he interviewed 600 women and men between the ages of 18 and 65. To qualify for the survey, respondents needed to have purchased skin care products online in the past 6 months, and had to plan on doing so again in the next 6 months.[18]

22.     Once qualified, survey respondents were shown webpages for four products at the point where a purchaser would add the product for checkout: Plaintiff's Sensitive Skin Face Balm, Le-Vel's Thrive Skin Infinite CBD Correcting Serum, Ursa Major's Fortifying Face Balm,

---

[14] *Complaint*, ¶ 56.

[15] Plaintiff's Opening Brief in Support of Motion for Preliminary Injunction, *Thrive Natural Care, Inc., v. Le-Vel Brands, LLC,* United States District Court Central District of California, Case No. 2:21-cv-2022-DOC-KES, dated March 5, 2021.

[16] *Wallace Report*, ¶ 1.

[17] Mr. Wallace has also provided his opinions from a "branding industry perspective." *Wallace Report*, ¶ 4.

[18] *Wallace Report*, ¶ 31.

9

Exhibit 2
Page 39

and WLDKAT's Saffron + Oat Milk Glow Serum.[19] After asking respondents to confirm that the products shown were skin care products, Mr. Wallace showed respondents the products in pairs and asked two questions after each pair. Respondents were asked after viewing each pair, whether the two products, "come from the same company/manufacturer/source."[20] Respondents were then asked, "Why do you say that?"[21] Respondents who indicated that they thought the products were from different companies were asked whether they believed the companies were affiliated, connected, or associated with each other, and were again asked, "Why do you say that?"[22]

23.     Mr. Wallace then presented his respondents with the following "scenario" and question:

> After ordering a skin care product, you receive an email with prominent text stating "Welcome to the Thrive Tribe". After ordering a second skincare product, you receive a second email with prominent text stating "Welcome to the Thrive Tribe".
>
> Based on these emails, do you believe that the two products you ordered are from the same company or companies that are affiliated, connected or associated or from different companies that are not affiliated, connected, or associated?[23]

24.     Based on these questions,[24] Mr. Wallace estimates "confusion." He finds that 411 of his total 600 respondents thought that Plaintiff's and Le-Vel's products came from the same company (397, or 66.2 percent)[25] or believed they were from affiliated sources (14 or 2.3 percent), yielding a total of 68.5 percent confusion.[26] Mr. Wallace also averages the rates of same

---

[19] *Wallace Report*, Appendix 1, Thrive Survey Printout.pdf.

[20] *Wallace Report*, ¶ 51.

[21] *Wallace Report*, ¶ 52.

[22] *Wallace Report*, ¶ 53.

[23] *Wallace Report*, ¶ 54.

[24] Mr. Wallace does not analyze or appear to rely on the results from his email scenario question.

[25] *Wallace Report*, ¶ 59.

[26] *Wallace Report*, ¶ 63.

10

Exhibit 2
Page 40

company/association between Plaintiff and WLDKAT and Plaintiff and Ursa Major and uses these rates to modify his confusion estimate. There were 66 respondents, or 11 percent, who believed that Plaintiff's product and Ursa Major were from the same source or were affiliated, and the corresponding number for WLDKAT was 14.8 percent, averaging to 12.9 percent.[27] Mr. Wallace then subtracts this average rate of 12.9 percent from the 65.8 percent confusion between Plaintiff's and Le-Vel's products, to arrive at an adjusted rate of 55.6 percent.[28]

25.     Mr. Wallace concludes that, "there is significant actual confusion by consumers confusing the Plaintiff's well-established 'Thrive' brand with the Defendant's 'Thrive Skin' brand,"[29] and further states, "that this level represents significant confusion above the noise level and suggests that, when purchasing, consumers are likely to confuse the Plaintiff's skin care products with the Defendant's skin care products."[30]

## VI.  RESPONSE TO WALLACE SURVEY

26.     Mr. Wallace has designed research which does not conform to proper survey methodology, is highly leading and biased, and which does not have proper controls. Consequently, Mr. Wallace's conclusions based on these data are not supported and are unreliable.

---

[27] *Wallace Report*, ¶ 65.

[28] *Wallace Report*, ¶ 66.

[29] *Wallace Report*, ¶ 7.

[30] *Wallace Report*, ¶ 70.

11

Exhibit 2
Page 41

## A. Wallace Survey Is Leading and Biased.

27.     While Mr. Wallace says his survey is based on the accepted *Squirt* methodology,[31] the format he designed is improper. In fact, his survey exacerbates the well-known potential for bias created by showing consumers two products and asking about a potential relationship.

28.     In general, a *Squirt* methodology presumes that consumers see the at-issue goods proximately in the marketplace[32] and asks respondents to compare these products to determine whether there is a perceived association. In testing the likelihood of confusion in this way, the researcher must carefully craft the survey to avoid generating answers that are simply a response to a design which may suggest a relationship between the goods shown. A poorly designed *Squirt* survey which leads respondents to look for associations between products that they otherwise might not, creates estimates that are biased by demand effects. Demand effects are a known phenomenon in social science and survey research and occur when the design of the research alters or impacts participant behavior such that the results are biased and unreliable.

29.     Mr. Wallace's survey estimates are rendered unreliable by demand effects for several reasons. First, while respondents are shown four different products in the survey, they are only shown products in pairs and are asked whether the two products are related. In this way, Mr. Wallace's survey design "demands" that respondents look for similarities between only two products at a time, suggesting to a respondent that they look for some likely relationship. For

---

[31] *Wallace Report*, ¶ 26.

[32] As discussed in Section B, while Plaintiff's and Le-Vel's products can be seen online, the manner in which Mr. Wallace has displayed the products in the survey does not reflect how they would actually be seen.

12

Exhibit 2
Page 42

example, Mr. Wallace asks respondents to compare, out of context,[33] Plaintiff's and Le-Vel's products. It is unsurprising that respondents, influenced by the format, search for some obvious similarity as justification. As one author explains, "Once they form such a (demand-based) hypothesis, survey respondents may seeks clues (e.g., a similarity on a certain dimension or some other justification) that support the guess that the presented brands are related in some manner."[34]

30.     The paired format used by Mr. Wallace is known to be biased.[35] Instead of this flawed approach, Mr. Wallace could have easily conducted a survey using a more generally accepted *Squirt* format. For example, Mr. Wallace could have shown respondents an array of products and asked whether any were related. Alternatively, he could have shown Plaintiff's product and then presented an array and asked whether any were related to this first product shown. These alternative approaches help to ameliorate some of the suggestiveness of the *Squirt* approach.[36] Instead, Mr. Wallace selected an unacceptable, largely disregarded, biased design forcing a direct comparison between two products.

31.     Second, the demand effects created by Mr. Wallace's paired comparison are exacerbated by the language in his second question which specifically signals to respondents that that they should be identifying an association. Mr. Wallace's second question about affiliation actually suggests that the respondent's previous answer was incorrect and that she should try

---

[33] This is discussed further in Section B.

[34] Simonson, I. & Kivetz, R. (2012). "Demand Effects in Likelihood of Confusion Surveys," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Diamond, S. S. & Swann, J. B., American Bar Association, p. 251.

[35] "As to Squirt, the traditional format, with only two stimuli, often triggers **unacceptable demand effects**." Swann, J. B. (2012). "Likelihood of Confusion," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design,* Diamond, S. S. & Swann, J. B., American Bar Association, p. 54. (Emphasis added).

[36] There are other important methodological elements that should be included when using a *Squirt* format – Mr. Wallace's survey also fails in these respects (see paragraphs 40-43 of this report).

13

Exhibit 2
Page 43

again.[37] The use of such a biased question is wholly unnecessary and Mr. Wallace easily could have asked a neutral question of only those who had not answered affirmatively to the first question.

32.      Third, the demand effects in Mr. Wallace's survey are worsened by likely bias created by order effects. Order bias occurs when a particular option or image is always shown first which signals to respondents something about the desired answer.[38] Nowhere in Mr. Wallace's questionnaire is there any indication that he rotated the response options for any of his questions.[39] This is a standard and common approach, and a best practice in survey methodology, especially since rotating the order of response options on an internet survey is straightforward.[40]

## B.  Wallace Survey Fails to Replicate Market Conditions.

33.      Mr. Wallace's survey also fails to accurately represent the manner in which consumers might encounter the at-issue products in the real world. This real-world representation is essential in a survey to ensure that any estimates of likely confusion are a reasonable proxy for actual confusion that could occur. As one author explains:

> While the survey setting is necessarily artificial, the survey expert must make every reasonable effort to duplicate the marketplace conditions under which consumers are likely to encounter the mark at issue. At a minimum, this requires the survey expert to find out how the allegedly infringing product is typically encountered in the marketplace. The failure to discharge this obligation will often result in the exclusion of the survey.[41]

---

[37] **If you said different companies**, do you believe that these companies are affiliated, connected, or associated with each other?" *Wallace Report*, ¶ 53. (Emphasis added).

[38] *See*, Diamond, S. S. (2011). "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence; Federal Judicial Center; National Research Council, pp. 395-396, 420 (hereinafter, "*Diamond*").

[39] *Wallace Report*, Appendix 1.

[40] *Diamond*, p. 406.

[41] Edwards, G. K. (2012). "The Daubert Revolution and Lanham Act Surveys," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Diamond, S. S. & Swann, J. B., American Bar Association, p. 346 (hereinafter, "*Edwards*").

14

Exhibit 2
Page 44

34.     Mr. Wallace opines that the Plaintiff's and Le-Vel's products are targeted to the
"same consumers" and that these products, as well as the other two products shown in his survey,
can be found online.[42] Yet, the manner in which these products are presented in the survey,
particularly Le-Vel's product, misrepresents the actual market conditions and the manner in
which consumers might encounter these products in the real world.

35.     At the time Mr. Wallace designed his survey, he would have been aware that Le-
Vel sells its products only through a separate, non-public-facing online store to customers with
existing accounts.[43] In other words, the manner in which Mr. Wallace depicts Le-Vel's skin care
product in his survey could only occur if the purchaser already had an existing account (or signed
up for such an account). This is a meaningful distinction from the way the Plaintiff's products are
sold online (as well as the WLDKAT and Ursa Major products), which are not sold through a
separate non-public-facing site. In **Figure 1** below, I contrast how the products are displayed in
Mr. Wallace's survey and in **Figure 2**, I show, distinct from Mr. Wallace's survey, how an actual
consumer might arrive at the checkout point for Le-Vel's products.[44]

---

[42] *Wallace Report*, ¶¶ 20, 51.

[43] As demonstrated below in **Figure 2**, to arrive at the Le-Vel product shown in the Wallace Survey, customers have to set up an
account, and click through numerous screens, including selecting/being assigned to a brand promoter. Wallace does not disclose
in his reviewed documents list any documents about him (or others working with him) signing up with Le-Vel as a customer
prior to engaging in a purchase.

[44] https://le-vel.com/Products/THRIVE/Skin

15

Exhibit 2
Page 45

**Figure 1: Plaintiff and Le-Vel Product Pages Shown in Wallace Survey**



16

Exhibit 2
Page 46

**Figure 2: Pages a New Customer Would View to Get to Page Shown in Wallace Survey (Existing Customer Would Already Have Account Setup)**



17

Exhibit 2
Page 47



Powerful soothing and calming antioxidant

Supports collagen production &

**THRIVE SKIN**

# INFINITE CBD CORRECTING SERUM

Enriched with CBD Oil

18

Exhibit 2
Page 48



19

Exhibit 2
Page 49



Exhibit 2
Page 50



Exhibit 2
Page 51



Exhibit 2
Page 52



23

Exhibit 2
Page 53



Exhibit 2
Page 54



Exhibit 2
Page 55



36.      There are number of problems with Mr. Wallace's stimuli. First, Mr. Wallace does not include the actual web address for any of the product pages shown, including the omission of any of Le-Vel's URLs which feature the Le-Vel name.[45]

37.      Second and far more problematic is that deceptive nature of the stimuli comparison presented by Mr. Wallace. As shown above, the Le-Vel page shown to respondents in Mr. Wallace's survey is not externally facing and would not be accessible to consumers without first creating an account. Accessing Le-Vel's "Add-to-Cart" page for its Infinite CBD Correcting Serum requires several steps, as that page is from Le-Vel's internal Cloud Portal, requiring

---

[45] For example, Le-Vel's public-facing URL is https://le-vel.com/Products/THRIVE/Skin. Le-Vel's customer Cloud Portal URL is https://thrivevitamin.le-vel.com/Shop.

Exhibit 2
Page 56

additional steps from the home page or the THRIVE SKIN product splash page, including a sign-up process with the entry of personal information for any new customers. Thus, prior to being able to see Le-Vel's product on the "Add-to-Cart" page shown in the survey, a consumer in the real world would need to access Le-Vel's Cloud Portal, which requires an existing account with Le-Vel, a process which would likely dispel the type of "matching" confusion and demand effects Mr. Wallace generated by singularly showing the "Add-to-Cart" page out of context. Mr. Wallace's failure to replicate actual marketplace conditions renders his results unreliable.

38.     Furthermore, Mr. Wallace does not consider, and his survey design cannot account for, the likelihood that purchasers of Le-Vel's skincare products are already familiar with Le-Vel's THRIVE house brand. I understand that Le-Vel's THRIVE supplement products have been available and very successful since their introduction in 2012.[46] Specifically, I understand that approximately two thirds of consumers who have purchased Le-Vel's THRIVE SKIN product have ordered some other Le-Vel THRIVE product prior to such purchase.[47] In other words, the majority of purchasers of Le-Vel's skin care products are those who already know and are familiar with Le-Vel's THRIVE brand, have purchased other Le-Vel THRIVE products, and have existing accounts with Le-Vel.

39.     Mr. Wallace has not depicted in realistic fashion how consumers would encounter the at-issue products in the real world, and as a consequence, his results, even if they were reliable (which they are not) cannot serve as a measure of potential confusion. As explained clearly by one author, "A survey that uses stimuli that differs from what a consumer is actually likely to see

---

[46] Declaration of Drew S. Hoffman, Thrive Natural Care, Inc., v. Le-Vel Brands, LLC, United States District Court Central District of California, Case No. 2:21-cv-2022, dated March 22, 2021, ¶¶ 22-23, 29 (hereinafter, "*Hoffman Declaration*").

[47] *Hoffman Declaration,* ¶ 53.

27

Exhibit 2
Page 57

in the marketplace does not accurately test for actual consumer confusion and thus lacks probative value."[48] Mr. Wallace's survey results are simply an artefact of his biased design and inaccurate representation.

## C. Wallace Survey Does Not Have A Proper Control

40.      Mr. Wallace asserts that his study uses an "experimental" design,[49] but, in fact, he does not use this method. A proper experimental design would have separate, randomly assigned groups of respondents in which one group (the Test Group) would be assigned to see the stimuli at issue, and the other group (the Control Group), would see the exact same stimuli, but with the allegedly infringing information removed or modified. This type of experimental design would allow the researcher to determine the extent to which associations between Plaintiff's and Le-Vel's products were a result of the product name or could be attributed to something else, like the design of the survey or guessing. A Test and Control experimental design is a common, well-accepted methodology and is described in the very texts Mr. Wallace cites in his own report. Indeed, S. Diamond, cited by Mr. Wallace, explains:

> By adding one or more appropriate control groups, the survey expert can test directly the influence of the stimulus (…) For example, respondents assigned to the experimental condition view an allegedly deceptive commercial, and respondents assigned to the control condition either view a commercial that does not contain the allegedly deceptive material or do not view any commercial. Respondents in both the experimental and control groups answer the same set of questions about the allegedly deceptive message. The effect of the commercial's allegedly deceptive message is evaluated by comparing the responses made by the experimental group members with those of the control group members.[50]

---

[48] *Edwards*, p. 347

[49] *Wallace Report*, ¶¶ 2, 70.

[50] *Diamond*, p. 398.

28

Exhibit 2
Page 58

41.     The survey designed by Mr. Wallace does not utilize an experimental design. He
cannot isolate the impact of the name of the product from other elements in his study which may
be contributing to confusion. At best, Mr. Wallace has "internal" controls in his survey, but even
these are not properly employed. As described above, because Mr. Wallace has forced
respondents to make paired comparisons, he has no means by which to measure the impact of his
survey design, guessing, inattention, etc. on respondents comparing Plaintiff's and Le-Vel's
products. At best, he can only estimate that when shown some other, unrelated pair approximately
13 percent of respondents also believe those products are related.[51]

42.     Even if reliance on internal controls was appropriate here (which is it not), the
controls selected by Mr. Wallace are inadequate and do not appropriately control for the survey's
demand effects and the amount of guessing made by respondents. Further, Mr. Wallace provides
no explanation as to how he selected the other products shown in his survey. A proper control is
as close as possible to the product at issue without itself being infringing. As explained by an
author Mr. Wallace cites, "In designing a survey-experiment, the expert should select a stimulus
for the control group that shares as many characteristics with the experimental stimulus as
possible, with the key exception of the characteristic whose influence is being assessed."[52] Here,
Mr. Wallace has selected products with names that are not remotely similar to the at-issue name.
In contrast to the controls selected by Mr. Wallace, I can readily find numerous products with
similar names which likely would have served as better controls. A number of these examples
appear below in **Figure 3**.

_____

[51] *Wallace Report*, ¶ 65.

[52] *Diamond*, p. 399.

29

Exhibit 2
Page 59

Figure 3: Other Brands with Similar Names

| Brand Name |
| --- |
| Naked & Thriving |
| Privé |
| ReVive |
| St. Ives |
| Thalgo |
| Theorie |
| Therabody |
| Theraseal |
| Thesis |
| Thibiant |
| Thymes |

43.     The use of a proper control is a key element to ensure that the results from a proper *Squirt* design are reliable. Of course, here Mr. Wallace has not used a proper *Squirt* format, he does not use an experimental design, and his control products cannot provide a reliable measure of the extent to which respondents may be guessing about some potential association.

## D. Irrelevant Question Related to Emails

44.     Mr. Wallace does not analyze the results of a question related to purported emails sent from Le-Vel to new customers featuring the language, "Welcome to the Thrive Tribe." It is unclear how this is in any way a relevant question. Mr. Wallace does not explain what "confusion" or relevant material this question is intended to measure. Moreover, the question itself is so poorly phrased and unclear that the results are meaningless. As worded, it is entirely unclear if the first and second purchase referenced are made from the same company or different companies, or from different websites or places. A respondent could easily assume that the scenario is describing two purchases from the same company and thus there is no confusion, but simply an assumption based on the language of the question. Moreover, there is utterly no context

30

Exhibit 2
Page 60

for these hypothetical purchases, no actual email shown, and no description as to why the company would be emailing the respondent at all or what prompted the email. The bizarre, unclear, abstract nature of this question renders whatever data Mr. Wallace has collected with this question, irrelevant.

45.     Even assuming that Mr. Wallace were to have analyzed and presented the data from this flawed question, the results would have been even further biased. Presented at the end of the survey, this question is additionally biased by context effects and demand effects. Respondents have already been shown the "pair" of products with Thrive in the name, which certainly suggests that the respondent should say that the companies are affiliated, connected, or associated.

## E.  Wallace Survey Suffers from Data Quality Issues

46.     In addition to the numerous problems with Mr. Wallace's survey that I have outlined above, it is clear that the design he implemented was confusing to respondents and created data quality issues. A number of respondents provided answers indicating that were not giving reliable answers because they were frustrated with the repetition and design of the survey itself. Some examples are below:[53]

- "This survey doesn't make any sense. the question you ask cannot be answered. I will be leaving this survey;"

- "You keep asking this, but they are TWO DIFFERENT BRANDS. It literally has 2 different brand names;"

- "this is really redundant...could we get to the point???;"

- "are you going to keep asking the same question over and over? these could be made by the same company;"

---

[53] *Wallace Report*, Appendix 1, Thrive Final Raw Data.xlsx.

31

Exhibit 2
Page 61

- "OMG. Why do you keep asking this? They don't share the same manufacturer name;" and,

- "Why do you keep asking the same thing over and over?"

47.     Mr. Wallace did not pre-test his survey and used an unacceptable design which obviously caused several respondents to provide answers indicating that their answers were the result of the survey itself rather than their actual perceptions of the products.

## VII. CONCLUSIONS

48.     Mr. Wallace used an inappropriate and biased survey design which cannot reliably measure the potential for confusion, if any, in the real world. The research conducted simply asks respondents to look for reasons to "match" the two products shown. His survey is further unreliable because the way in which Le-Vel's product is shown does not realistically reflect or accurately represent how consumers would see that product before the featured add-to-cart page. Additionally, Mr. Wallace has no reliable control to measure the impact of his biased design. He has selected products which share no similarity in name to the at-issue products, thereby artificially depressing rates of guessing and survey noise. As a whole, Mr. Wallace's survey simply demonstrates that when consumers are shown a pair of products with a similar name, they can infer from the survey design that the researcher is looking for a "match." Such research does not provide any reliable information as to what confusion, if any, would exist in the real world.

49.     My opinions and conclusions as expressed in this report are to a reasonable degree of professional and scientific certainty. My conclusions have been reached through the proper application of survey methods, and using standard methodologies relied upon by experts in the field of survey and market and consumer research. My opinions will continue to be informed

32

Exhibit 2
Page 62

by any additional material that becomes available to me. I reserve the right to update and or

supplement my opinions if Plaintiff provides additional information. I declare under penalty of

perjury that the foregoing is true and correct.

Sarah Butler, Managing Director
Mill Valley, CA
March 22, 2021

33

Exhibit 2
Page 63

# Exhibit A

Exhibit 2
Page 64

**NERA**
Economic Consulting

**Sarah Butler**
Managing Director

National Economic Research Associates, Inc
4 Embarcadero, Suite 400
San Francisco, CA 94111
+ 1 415 291 1000 Fax + 1 415 291 1010
Direct dial: + 1 415 291 1022
sarah.butler@nera.com
www.nera.com

# SARAH BUTLER, M.A.
## MANAGING DIRECTOR

Ms. Butler is an expert in survey research, market research, sampling, and statistical analysis. She has applied her expertise in a wide range of litigation and strategic business cases. Her litigation and project experience includes survey research, market research, the design of samples, and the statistical and demographic analysis of large data files in a number of areas including:

Intellectual Property

- Trademark and Trade Dress Infringement:  Design, analysis, and critique of surveys used to measure consumer confusion, secondary meaning, and dilution in trademark and trade design infringement cases.

- False and Misleading Advertising: Design, analysis and critique of surveys used to measure consumer perceptions and the materiality of advertising claims.

- Patent Infringement:  Sample designs and surveys to the value of patented feature of a larger product and to establish rates at which infringing material exist in populations of products.

- Copyright infringement:  Sampling plans and analysis of the rates of infringing material in populations of shared information (such as through websites or other sharing medium).

Mass Torts/Class Actions

- Conduct surveys and design samples providing evidence on issues of commonality and consumers' awareness of key documents or facts and reliance on representations.

- Analyze large databases of claims files to generate invoices, estimate future liabilities and calculate policy shares for insurer liabilities in asbestos, tobacco and pharmaceuticals.

- Design, analyze and critique surveys and sampling plans used to evaluate employment and promotion records. Review and design surveys for purposes of estimating key facts

Exhibit 2
Page 65

Sarah Butler

in labor class actions including time to complete activities, exempt/nonexempt activities, and meal and rest break issues.

Antitrust

- Design, analysis and critique of surveys and other market research used as evidence of consumer purchasing and switching behavior in the areas of CPG, entertainment, automobiles, public transportation, sports and consumer electronics.

- Design, analysis and critique of surveys used to demonstrate consumer price sensitivities and willingness to pay.

Prior to joining NERA, Ms. Butler worked in market research, conducting survey research, focus groups and in-depth interviews.

## Education

**Temple University**
Applied Sociology, coursework, exams and dissertation proposal complete (2005).

**Temple University**
M.A. Sociology, (2000).

**Trinity College, Dublin Ireland**
M.Phil. (1997).

**Wellesley College**
B.A. Sociology and History (with honors). (1995).

## Professional Experience

July 2006 - Present        **Senior Consultant – Managing Director**
                           NERA Economic Consulting
                           San Francisco, California, USA

Oct 2005 – May 2006        **Special Consultant**
                           NERA Economic Consulting
                           London, England

Jan 2003 – Oct 2005        **Senior Analyst - Consultant**
                           NERA Economic Consulting
                           Philadelphia, Pennsylvania, USA

Sarah Butler

| 2002 - 2003 | **Consultant**<br>Integrated Marketing Associates<br>Bryn Mawr, PA, USA |
| --- | --- |
| Oct 1998 - Jan 2002 | **Research Associate – Analyst**<br>NERA Economic Consulting<br>Philadelphia, Pennsylvania, USA |
| Sept 1998 – May 2003 | **Adjunct Professor**<br>Temple University<br>Philadelphia, Pennsylvania, USA |
| Jan 1997 – Feb 1998 | **Manager of Member Research**<br>Society for Neuroscience<br>Washington DC, USA |

## Expert Analysis and Testimony

Clear Imaging Research, LLC v. Samsung Electronics Co. LTD and Samsung Electronics America.* United States District Court for the Eastern District of Texas Marshall Division. Report in patent matter. [Expert Report: December 23, 2020. Deposition: January 8, 2021.]

Patagonia, Inc. and Patagonia Provisions, Inc. v. Anheuser-Busch, LLC dba Patagonia Brewing Co.* United States District Court for the Central District of California Western Division, Los Angeles. Rebuttal report evaluating likelihood of confusion claims. [Expert Report: December 4, 2020.]

In the Matter of Certain Audio Players and Controllers, Components Thereof, and Products Containing the Same. United States International Trade Commission, Washington DC. Surveys to evaluate consumer interest in patented features of wireless speaker products. [Expert Report: November 13, 2020. Deposition: December 2, 2020.]

Vicky Maldonado, et. al., v. Apple, Inc.* United States District Court, Northern District of California, San Francisco Division. Rebuttal conjoint survey testing damages claims. [Expert Report: March 13, 2020. Deposition: November 19, 2020]

Jason DeCarlo v. Costco Wholesale Corporation and MBNR.* United States District Court Southern District of California. Survey and expert report to evaluate consumer perceptions of optometrists located at Costco. [Expert Report: November 13, 2020.]

Javier Cardenas et al., Plaintiffs v. Toyota Motor Corporation et al., Defendants.* United States District Court Southern District of Florida. Survey and expert report to evaluate impact of

Exhibit 2<br>Page 67

disclosure about allegedly defective product feature. [Expert Report: October 20, 2020. Deposition: November 10, 2020.]

Nirvana LLC v. Marc Jacobs International LLC.* United States District Court Central District of California. Survey related to secondary meaning. [Expert Report: September 8, 2020. Deposition: October 20, 2020.]

Girl Scouts of the United States of America* v. Boy Scouts of America. United States District Court Southern District of New York. Review of survey report in a likelihood of confusion matter. [Expert Report: September 9, 2020. Deposition: October 16, 2020.]

TreeHouse Foods, Inc., Bay Valley Foods, LLC, and Strum Foods, Inc.,* v. Keurig Green Mountain, Inc. United States District Court for the Southern District of New York. Surveys related to false advertising, and antitrust claims. Report on testing evidence. [Expert Reports: August 28, 2020.]

American Dairy Queen Corporation v. W. B. Mason Co. Inc.* United States District Court for the District of Minnesota. Surveys related to fame, dilution, and likelihood of confusion. [Expert Report: August 28, 2020. Deposition: October 26, 2020.]

Seven Networks, LLC v. Apple Inc.* United States District Court for the Eastern District of Texas Marshall Division. Conjoint survey and expert report related to mobile phone features. [Expert Report: July 13, 2020. Deposition: July 23, 2020.]

Brian Gozdenovich et al., v. AARP Inc., AARP Services, Inc., AARP Insurance Plan, UnitedHealth Group, Inc., and UnitedHealthCare Insurance Company.* United States District Court District of New Jersey. Expert rebuttal report of survey related to estimating value. [Expert Report: July 9, 2020.]

Barbara Lewis, et al., v. Rodan & Fields, LLC.* United States District Court Northern District of California Oakland Division. Survey and expert report to assess consumer perception about eyelash serum. [Expert Report: July 2, 2020. Deposition: July 20, 2020.]

Austin Rugg v. Johnson & Johnson Consumer Inc.* United States District Court Norther District of California San Jose Division. Survey and expert report in a false advertising matter. [Expert Report: June 22, 2020.]

New NGC, Inc. d/b/a National Gypsum Company, NGC Industries, LLC, and National Gypsum Properties,* LLC v. Alpinebay, Inc. Survey and expert report to evaluate likelihood of consumer confusion. [Expert Report: June 18, 2020. Deposition: August 6, 2020]

Glaxo Group Limited* v. Respirent Pharmaceuticals Co., LTD. United States District Court Southern District of New York. Survey and expert report on likelihood of consumer confusion. [Expert Report: June 15, 2020.]

Exhibit 2
Page 68

Sarah Butler

Caryn Gorzo, et al., v. Rodan & Fields, LLC.* The Superior Court of California County of San Francisco. Survey and expert report to assess consumer perception about eyelash serum. [Expert Report: June 15, 2020.]

Kaifi LLC v. AT&T Inc.; AT&T Corp.; AT&T Communications, LLC; AT&T Mobility, LLC; and AT&T Services, Inc.* United States District Court Eastern District of Texas Marshall Division. Survey and expert report related to patent infringement matter. [Expert Report: June 1, 2020. Deposition: June 8, 2020.]

CFA Institute v. American Society of Pension Professionals & Actuaries, et. al.* United States District Court for the Western District of Virginia, Charlottesville Division. Rebuttal survey evaluating claims of likelihood of confusion. [Expert Report: April 14, 2020. Deposition: May 14, 2020.]

Match Group LLC* v. Bumble Trading Inc., Bumble Holding, LTD., Badoo Trading Limited, Magic Lab Co., Worldwide Vision Limited, Badoo Limited, Badoo Software Limited, and Badoo Technologies Limited. United States District Court for the Western District of Texas, Waco Division. Secondary meaning survey and rebuttal report. [Expert Report: March 3, 2020. Rebuttal Report: March 27, 2020. Deposition: May 20, 2020.]

ClearPlay, Inc. v. Dish Network, L.L.C. and Echostar Technologies, L.L.C.* United States District Court, District of Utah, Central Division. Expert report evaluating surveys used to inform allocation in patent infringement matter. [Expert Report: February 21, 2020.]

Toya Edwards and Jamal Erakat, et al., v. Walmart, Inc.* United States District Court, Central District of California. Survey and expert report to evaluate label statements on acetaminophen products. [Expert Report: January 23, 2020. Deposition: February 7, 2020.]

Ohio State Troopers Association, Inc., et al., & Miguel Porras v. Point Blank Enterprises, Inc.* United States District Court, Southern District of Florida. Survey and expert report to evaluate impact of disclosure about allegedly defective product feature. [Expert Report: January 17, 2020. Deposition: January 27, 2020.]

In re: Windstream Holdings, Inc., et al., Debtors. Windstream Holdings Inc., et. al.* v. Charter Communications, Inc. and Charter Communications Operating, LLC. United States Bankruptcy Court, Southern District of New York. Chapter 11, Case No. 19-22312 (RDD). Review of survey report in a bankruptcy matter. [Expert Report: December 5, 2019.]

Paul Stockinger, et al., v. Toyota Motor Sales, U.S.A., Inc.* United States District Court, Central District of California. Survey and expert report to evaluate impact of disclosure about allegedly defective product feature. [Expert Report: October 21, 2019. Deposition: November 5, 2019.]

Thomas Allegra, et. al.* v. Luxottica Retail North America, d/b/a LensCrafters, United States District Court, Eastern District of New York, Brooklyn Division. Survey to evaluate consumers' willingness to pay for Accufit measurement system. [Expert Report: September 10, 2019. Deposition: December 5, 2019.]

<u>Sazerac Brands, LLC* v. Bullshine Distillery, LLC.</u> In the United States Patent and Trademark Office Before the Trademark and Trial Appeal Board. Opposition No. 91227653. Survey to assess consumer perception and association with alcohol brand. [Expert Report: September 4, 2019. Deposition: October 30, 2019.]

<u>Collin Shanks v. Jarrow Formulas, Inc.</u>* United States District Court Central District of California. Survey of coconut oil purchasers and response to conjoint survey in false advertising matter. [Expert Report: August 4, 2019.]

<u>X One* v. Uber Technologies, Inc.</u> United States District Court Northern District of California. Survey of ride share app features. [Expert Report: August 2, 2019. Deposition: September 19, 2019.]

<u>Belcher Pharmaceuticals, LLC v. Hospira, Inc.</u>* United States District Court for the Middle District of Florida, Tampa Division. Review of survey in false advertising matter. [Expert Report: June 28, 2019. Deposition: July 11, 2019.]

<u>NIKE, Inc. v. Skechers U.S.A., Inc.</u>* United States District Court, Central District of California. Survey and expert report related to design patent infringement. [Expert Report: June 20, 2019. Deposition: September 12, 2019.]

<u>State of Washington* v. TVI, INC., d/b/a Value Village.</u> State of Washington King County Superior Court. Survey and expert report evaluating consumer perceptions of for-profit thrift store and donation center. [Expert Report: May 24, 2019. Deposition: July 17, 2019. Trial testimony: October 8, 2019.]

<u>Vital Pharmaceuticals, Inc. v. Monster Energy Company and Reign Beverage Company, LLC.</u>* United States District Court Southern District of Florida. Survey and expert report related to consumer perception of names associated with energy drinks. [Expert Report: May 23, 2019. Deposition: July 15, 2019.]

<u>Mahindra & Mahindra, Ltd. and Mahindra Automotive North America, Inc.* v. FCA US LLC.</u> United States District Court, Eastern District of Michigan. Survey and expert report on secondary meaning. [Expert Report: May 10, 2019. Deposition: May 30, 2019. ITC Trial testimony: August 22, 2019.]

<u>Rex Real Estate I., L.P., v. Rex Real Estate Exchange, Inc.</u>* United States District Court for the Eastern District of Texas, Sherman Division. Survey and expert report in trademark matter. [Expert Report: April 24, 2019.]

<u>adidas America, Inc., et al. v. Forever 21 Inc., et al.</u>* United States District Court District of Oregon Portland Division. Survey and expert report in trade dress matter. [Expert Report: April 4, 2019.]

Sarah Butler

Crystal Hilsley vs. Ocean Spray Cranberries, Inc.*, Arnold Worldwide LLC. United States District Court Western District Southern District of California. Survey, expert report and rebuttal in false advertising matter. [Expert Report: April 1, 2019. Deposition: May 26, 2019.]

Erin Allen et al. v. Conagra Foods Inc.* United States District Court Northern District of California San Francisco Division. Survey, expert report and rebuttal in false advertising matter. [Expert Report: March 30, 2019. Deposition: April 25, 2019. Rebuttal Report: May 6, 2020. Deposition: May 30, 2020.]

Tortilla Factory, LLC vs. GT's Living Foods, LLC*. United States District Court for The Central District of California. Expert report in false advertising matter. [Expert Report: March 29, 2019.]

Obagi Cosmeccuticals LLC* v. ZO Skin Health, Inc. and Zein E. Obagi, M.D. JAMS Arbitration Proceeding. Survey and expert report in arbitration. [Expert Report: March 13, 2019. Deposition: April 18, 2019. Arbitration testimony: May 17, 2019.]

Lodestar Anstalt v. Bacardi & Company Limited, Bacardi U.S.A., Inc., and Bacardi Limited.* United States District Court Central District of California, Western Division. Survey and expert report in trademark matter. [Expert Report: January 11, 2019. Deposition: April 5, 2019.]

James Pudlowski, Louis C. Cross, III, Gail Henry, Steve Henry v. St. Louis Rams, LLC, St. Louis Rams Partnership, ITB Football Company, LLC*. United States District Court for the Eastern District of Missouri Eastern Division. Survey and affidavit to evaluate consumer perceptions of information related to the Los Angeles Rams. [Affidavit: January 11, 2019.]

People of the State of California vs. The Hertz Corporation, American Traffic Solutions, Inc., ATS Processing Services, L.L.C., American Traffic Solutions Consolidated, L.L.C., PlatePass, L.L.C.* Superior Court of the State of California County of San Francisco. Survey and expert report on unfair competition and false advertising issues. [Deposition: January 10, 2019.]

Riley Johannessohn, Daniel C. Badilla, James Kelley, Ronald Krans, Kevin R. Wonders, William Bates, James Pinion* v. Polaris Industries, Inc. United States District Court District of Minnesota. Conjoint survey and expert report related to ATVs. [Expert Report: November 16, 2018. Expert Rebuttal Report: March 21, 2019. Deposition: January 15, 2019.]

Spangler Candy Company vs. Tootsie Roll Industries, LLC*. United States District Court Northern District of Ohio Western Division Toledo. Survey and expert report in trademark matter. [Expert Report: November 5, 2018. Deposition: December 4, 2018.]

Kaylee Browning and Sarah Basile v. Unilever United States, Inc.* United States District Court Central District of California. Expert Report in false advertising matter. [Expert Report: November 5, 2018. Deposition: November 19, 2018.]

Sarah Butler

American Automobile Association of Northern California, Nevada & Utah and A3 Mobility LLC v. General Motors LLC and Maven Drive LLC*. United States District Court Northern District of California San Jose Division. Survey and expert reports to evaluate likelihood of confusion. [Expert Report: November 1, 2018. Expert Rebuttal Report: November 28, 2018. Deposition: December 6, 2018.]

Merck & Co., Inc., and Merck Sharp & Dohme Corp. v. Merck KGaA*. United States District Court District of New Jersey. Expert report to evaluate likelihood of confusion. [Expert Report: October 30, 2018. Deposition: February 6, 2019.]

Scott R. Bernard v. Public Power, LLC*. In the Circuit Court of Cook County, Illinois County Department, Chancery Division. Survey and expert report to evaluate unfair and deceptive trade practices. [Expert Report: October 17, 2018.]

MZ Wallace Inc. v. Sue Fuller, d/b/a/ The Oliver Thomas, and Black Diamond Group, Inc.* United States District Court Southern District of New York. Survey and expert report to evaluate likelihood of confusion. [Expert Report: September 14, 2018. Deposition: October 22, 2018.]

Kristian Zamber v. American Airlines, Inc.* United States District Court Southern District of Florida Miami Division. Survey and expert report to evaluate unfair and deceptive trade practices. [Expert Report: September 10, 2018. Deposition: October 19, 2019.]

Thomas Blitz v. Monsanto Company.* United States District Court Western District of Wisconsin. Survey and expert report to evaluate liability and harm claims related to consumer perceptions in labeling matter. [Expert Report: July 30, 2018. Deposition: August 8, 2018.]

State of Washington* v. Johnson & Johnson, Ethicon, Inc. Ethicon US, LLC. King County Superior Court State of Washington. Survey and expert report to evaluate unfair and deceptive trade practices. [Expert Report: July 27, 2018.]

Newmark Realty Capital, Inc.* v. BCG Partners, Inc. United States District Court Northern District of California San Jose Division. Expert report in trademark matter. [Expert Report: July 6, 2018. Supplemental Report: July 20, 2018. Deposition: September 18, 2018.]

Steven A. Conner DPM, P.C. v. Optum 360, LLC.* United States District Court Eastern District of Pennsylvania. Expert report in Telephone Consumer Protection Act case. [Expert Report: June 28, 2018. Deposition: July 17, 2018.]

Advice Interactive Group, LLC* v. Web.Com Group, Inc. United States District Court for the Middle District of Florida Jacksonville Division. Expert report in copyright apportionment case. [Expert Rebuttal Report: June 18, 2018. Deposition: June 29, 2018.]

State of Washington* v. Comcast Cable Communications Management, LLC, et. al. State of Washington King County Superior Court. Survey and expert report to evaluate unfair and deceptive trade practices. [Expert Report: June 4, 2018. Deposition: July 31, 2018. Trial Testimony: December 11-12, 2018.]

Sarah Butler

Global Brand Holdings, LLC* v. Church & Dwight Co., Inc. United States District Court Southern District of New York. Survey and expert report in trademark infringement matter. [Expert Report: May 21, 2018.  Rebuttal Report: June 15, 2018. Deposition: July 11, 2018.]

Josephine James Edwards v. Hearst Communications, Inc.* United States District Court for the Southern District of New York. Survey and expert report to evaluate consumer perceptions of information sharing. [Expert Report: April 16, 2018. Deposition May 25, 2018.]

Forever 21, Inc.* v. Gucci America, Inc., and Guccio Gucci S.p.A. United States District Court Central District of California Western Division. Survey and expert report in trade dress claims matter. [Expert Report: March 23, 2018. Supplemental Report: April 12, 2018. Deposition May 30, 2018.]

Masterbuilt Manufacturing, LLC v. Wal-Mart Stores, Inc.* United States District Court for the Middle District of Georgia Columbus Division. Expert report in patent infringement matter relating to consumer demand. [Expert Report: February 23, 2018. Deposition: March 27, 2018.]

Strategic Partners, Inc.* v. Koi Design, LLC. United States District Court Central District of California. Survey and expert report in trademark infringement matter. [Expert Report: February 13, 2018.]

Hard Rock Café International (USA), Inc., and Tarsadia Hotels v. RockStar Hotels, Inc.* United States District Court for the Southern District of Florida Fort Lauderdale Division. Survey and expert report in trademark infringement matter. [Expert Report: February 12, 2018.]

Ghostbed, Inc. and Werner Media Partners, LLC d/b/a Nature's Sleep, LLC v. Casper Sleep, Inc., Red Antler, LLC and ICS, Inc.* United States District Court for the Southern District of Florida. Survey of awareness of mattress companies and advertising slogans. [Expert Report: January 2, 2018. Deposition: January 23, 2018.]

Shelia Dashnaw, et. al. v. New Balance Athletics, Inc.* United States District Court Southern District of California. Review of expert report and contingent valuation/conjoint survey to evaluate consumer perceptions in false advertising claim. [Expert Report: November 8, 2017. Deposition: November 28, 2017.]

State of Arizona v. Volkswagen AG, et. al.* Superior Court of the State of Arizona – Maricopa County. Declaration and research on purchasing behavior for luxury, specifically Porsche buyers. Survey of advertising materials and material impact on purchasing decisions. [Expert Report: November 10, 2017. Expert Report: December 14, 2017]

Tri-Union Seafoods, LLC v. Otis McAllister, Inc.* United States Patent and Trademark Office before the Trademark Trial and Appeal Board. Survey and expert report on market parameters and customer perceptions. [Expert Report: September 27, 2017.]

9

Exhibit 2
Page 73

Sarah Butler

Martin Schneider, et. al. v. Chipotle Mexican Grill, Inc.* United States District Court Northern District of California. Review of expert report and contingent valuation/conjoint survey to evaluate consumer perceptions in false advertising claim. [Expert Report: September 15, 2017. Deposition: November 22, 2017.]

ADT LLC, and ADT US Holdings, Inc., v. Vivint, Inc.* United States District Court Southern District of Florida Palm Beach Division. Expert report on sampling and data analysis. [Expert Report: July 24, 2017. Deposition: August 18, 2017.]

Michael Kors, L.L.C.* v. Chunma USA, Inc. United States District Court Central District of California. Expert report on likelihood of confusion. [Expert Report: August 4, 2017. Deposition: October 31, 2017.]

Weems Industries, Inc. v. Plews, Inc.* United States District Court for Northern District of Iowa, Cedar Rapids Division. Expert report on likelihood of confusion. [Expert Report: May 1, 2017. Deposition: August 1, 2017.]

Trevor Singleton et. al. v. Fifth Generation, Inc. d/b/a Tito's Handmade Vodka.* United States District Court for the Northern District of New York. Survey and expert report on false advertising issues. [Expert Report: April 21, 2017. Deposition: July 10, 2017.]

Mars Incorporated and Mars, Petcare US, Inc. v. The J. M. Smucker Company and Big Heart Pet, Inc.* United States District Court for the Eastern District of Virginia. Survey and expert report on likelihood of confusion. [Expert Report: April 6, 2017. Deposition: June 30, 2017.]

Professional Liability Insurance Services, Inc. v. U.S. Risk, Inc. and Crystal Jacobs.* United States District Court for Western District of Texas, Austin Division. Expert report on likelihood of confusion. [Expert Report: April 4, 2017. Deposition: June 22, 2017.]

Luxe Hospitality Company, Inc.* v. SBE Entertainment Group. United States District Court Central District of California. Survey and expert report on genericness. [Expert Report: March 6, 2017. Deposition: March 30, 2017.]

Desiccare, Inc. v. Boveda, Inc.* and Charles Rutherford. United States District Court for the Central District of California. Survey and expert report on false advertising issues. [Expert Report: December 5, 2016. Deposition: January 25, 2017.]

Scat Enterprises, Inc. v. FCA US LLC.* United States District Court for the Central District for California Western Division. Survey and expert report on likelihood of confusion. [Expert Report: November 21, 2016.]

YETI Coolers, LLC v. RTIC Coolers, LLC.* United States District Court Western District of Texas, Austin Division. Survey and expert report on secondary meaning. Rebuttal of reports on fame, secondary meaning and likelihood of confusion. [Expert Report: November 18, 2016. Deposition: January 13, 2017.]

Sarah Butler

Lifeway Foods Inc. v. Millennium Products, Inc. d/b/a GT'S Kombucha/ Synergy Drinks/ CocoKeifer LLC.* United States District Court Central District of California. Rebuttal report to Plaintiff's counsel's survey. [Expert Report: October 17, 2016.]

adidas America, Inc. et. al. v. Skechers USA, Inc.* District of Oregon. Portland Division. Surveys and expert reports to evaluate secondary meaning, likelihood of confusion, and brand recognition. [Expert Report: October 14, 2016. Deposition: January 10, 2016. Expert Report: November 6, 2015. Deposition: November 24, 2015. Preliminary Injunction testimony: December 15, 2015.]

In the Matter of Certain Potassium Chloride Powder Products. United States International Trade Commission, Washington DC. Survey to evaluate false advertising claims associated with pharmaceuticals. [Expert Report: October 13, 2016.]

AMID, Inc.* v. Medic Alert Foundation United States, Inc. d/b/a Medic Alert Foundation and Justin Noland. Southern District of Texas. Houston Division. Expert report in trade dress infringement matter. [Expert Report: September 22, 2016. Preliminary Injunction Hearing Testimony: October 11, 2016.]

Surgiquest, Inc. v. Lexion Medical LLC*. District Court of Delaware. Expert report evaluating evidence in false advertising matter. [Expert Report: August 19, 2016. Deposition: October 7, 2016. Trial testimony: April 10, 2017.]

GIT-R-DONE Productions Inc.* v. GITERDONE C Store LLC. Southern District of Mississippi. Southern Division. Survey and expert report evaluating recognition and association of phrase with celebrity. [Expert Report: July 29, 2016.]

State of Oregon* v. Living Essentials LLC and Innovation Ventures LLC. Circuit Court of the State of Oregon. Survey and analysis used as evidence in false advertising matter. [Trial Testimony: July 6, 2016. Rebuttal testimony: July 19, 2016.]

Teferi Abebe Bikila. et. al. v. Vibram USA, Inc. et. al.* District of Washington at Tacoma. Survey and expert report to evaluate awareness and potential confusion related to athlete endorsement. [Expert Report: June 21, 2016. Rebuttal Report: August 23, 2016.]

Noah Silver-Sky, Fabian Lozano, and Jorge Rodriguez; and ROES 1-400 v. SRAC Holdings I, INC., Strategic Restaurants Acquisition Company, LLC, Strategic Restaurants Acquisition Company II, LLC, Strategic Restaurants Acquisition Corp.* American Arbitration Association – Commercial Arbitration Tribunal. Statistical sample, analysis, and expert report on the impact and commonality of edits to workers time. [Expert Report: May 23, 2016. Deposition: August 30, 2016.]

Homeland Housewares, LLC and Nutribullet, LLC v. SharkNinja Operating LLC.* Central District of California, Western Division. Survey and expert report to evaluate misleading advertising claims. [Expert Report: February 19, 2016. Deposition: April 18, 2016.]

Sarah Butler

QuickChek Corporation* v. Gold Associates, Inc. District of New Jersey. Survey and Report on likelihood of confusion. [Preliminary Report: January 5, 2016.]

TOD'S S.p.A.* v. Mycoskie, LLC Respondent. United States Patent and Trademark Office - TTAB. Survey and Expert report on likelihood of confusion. [Expert Report: December 15, 2015.]

Razor USA LLC* vs. Vizio, INC. Central District of California. Survey and expert report to evaluate likelihood of confusion. [Expert Report: August 13, 2015. Deposition: September 14, 2015.]

In Connection with Sprint Communications Company L.P. and Sprint Spectrum L.P.* v. Comcast Cable Communication LLC et al. Eastern District of Pennsylvania. Conjoint survey and expert report to evaluate consumer preferences for particular features of cable packages. [Expert Report: June 17, 2015. Reply Report: July 29, 2015. Deposition: April 14, 2015.]

Select Comfort Corporation; and Select Comfort SC Corporation* v. John Baxter; Dires LLC; Scott Stenzel; and Craig Miller and Digi Craft Agency and Direct Commerce. District of Minnesota. Survey and expert report for evidence of secondary meaning. [Expert Report: May 20, 2015. Deposition: June 16, 2015. Trial testimony: October 9, 2017.]

In the Matter of Certain Footwear Products. United States International Trade Commission, Washington DC. Survey to evaluate secondary meaning associated with footwear. [Expert Report: April 17, 2015. Rebuttal Report: May 13, 2015. Deposition: May 19, 2015. Testimony before the International Trade Commission: August 6, 2015.]

Circle Click Media LLC, Metro Talent LLC, and CTNY Insurance Group v. Regus Management Group, LLC, Regus Business Centre LLC, Regus PLC and HQ Global Workplaces LLC.* Northern District of California. Survey of business consumers used to address class certification and false advertising claims. [Expert Report: April 1, 2015. Deposition: May 6, 2015.]

In re Determination of Royalty Rates and Terms for Ephemeral Recording and Digital Performance of Sound Recordings. Before the United States Copyright Board. Survey and Expert Report on consumer substitution of various music listening options. [Expert Report: February 24, 2015. Deposition: March 27, 2015. Hearing Testimony: May 29, 2015.]

Larry Butler, Joseph Leonard, Kevin Barnes, Victor Matos, Alfred Blair, and Martin Champion, Individually and On Behalf of All Others Similarly Situated* v. Sears, Roebuck and CO. Northern District of Illinois – Eastern Division. Surveys, statistical analysis and Expert Report on issues of experienced rates and consumer preference for machines with product defects. [Expert Report: February 2, 2015.]

* Retaining party

Sarah Butler

## Publications and Presentations

"A tale of two cups: Acquired distinctiveness and survey evidence before the TTAB." (May-June 2020), with Healey Whitsett. *The Trademark Reporter.*

"Survey response bias and the 'privacy paradox': Evidence from a discrete choice experiment." (May, 2020), with Garrett Glasgow in *Applied Economics Letters.* DOI: 10.1080/13504851.2020.1770183.

NAD Panel – "Consumer Perception Survey Design Safeguards & Pitfalls." National Advertising Division Annual Meeting, New York, NY (September, 2019).

INTA Panel – "Surveys in the Brave New World: Designing and Using Survey Evidence in the Age of Online Shopping, Influencers and Hashtags." Annual Meeting, Boston MA (May, 2019).

"The value of non-personally identifiable information to consumers of online services: evidence from a discrete choice experiment," (2016) with Garrett Glasgow in *Applied Economics Letters*, DOI: 10.1080/13504851.2016.1197357.

"Using Survey Methods to Demonstrate the Value of Personal Information and Privacy" (May 2015) *Panel on Privacy, Security and IRBs – American Association for Public Opinion Research,* Annual Meeting, Hollywood Florida.

"Battle of the Experts—Deploying the Proper Scientific Methodology for Supporting or Challenging Claims" (March 13, 2015) invited panelist at the *Advanced Forum on Resolving & Litigating Advertising Disputes.*

"Effective Use of Surveys in Trademark Litigation," (August, 2014) *Knowledge Group Webinar.*

"The Use of Statistical Sampling Post-Duran," (August, 2014) *Law360.*

"The Value of Personal Information to Consumers of Online Services: Evidence from a Discrete Choice Experiment," (June 19, 2014). *National Economic Research, Inc.*

"An assessment of the nonmarket benefits of the Water Framework Directive for households in England and Wales," with Metcalfe, Baker, Andrews, Atkinson, Bateman, Carson, East, Gueron, Sheldon and Train in *Water Resources Research,* 48:W10516. (Paper awarded Editor's Choice Award for 2013).

ABA Webinar "The Use of Surveys in Advertising Substantiation" (June 23, 2011).

"Meeting the New Standards for Reasonable Royalties," (February, 2011) with Mario Lopez. *Law360.*

"Survey Evidence in False Advertising Cases," (Winter, 2010). *The Antritrust Trial Practice Newsletter.*

"The Use of Surveys in Litigation: Recent Trends," (April, 2010) with Kent Van Liere. National Economic Research Associates, Inc.

"Emerging Issues in the Use of Surveys in Trademark Infringement on the Web," with Kent Van Liere. Paper published in the *Advanced Trademark & Advertising Law Conference* proceedings, September 2007, Seattle, WA.

"An Analysis of the Hypothetical Situations in Willingness to Pay Studies." Paper presented at the July 2006 Thematic Seminar "Quality Criteria in Survey Research," hosted by World Association for Public Opinion Research, Lake Como, Italy.

"Use of Surveys in Intellectual Property Disputes," (2005) with Eugene P. Ericksen, in *Economic Approaches to Intellectual Property Policy, Litigation and Management Issues,* Gregory K. Leonard and Lauren J. Stiroh (eds.) National Economic Research Associates, Inc.

"Response Rate Standards: Lessons from the 2004 Presidential Polls." Paper presented at the 2005 Annual Meeting of American Association of Public Opinion Research, Miami Beach, FL.

"Using Surveys to Determine Damages in Patent Infringement Cases" presented at *Calculating and Proving Patent Damages* workshop, March 2004 Charlotte, NC.

"Using Surveys to Determine Damages in Patent Infringement Cases" presented at *Calculating and Proving Patent Damages* workshop, January 2004 San Diego, CA.

"Using Surveys to Determine Damages in Patent Infringement Cases" presented at *Calculating and Proving Patent Damages* workshop, June 2003, McLean, VA.

## Professional Associations

Member, American Association of Public Opinion Research and World Association for Public Opinion Research, Member, American Statistical Association, Member, American Bar Association, Intellectual Property Section, Member, International Trademark Association (INTA), Reviewer for *Trademark Reporter*, Member, American Marketing Association.

Exhibit 2
Page 78

# Exhibit B

Exhibit 2
Page 79

**Exhibit B**

**Materials Considered**

<u>Court Documents</u>

- Complaint and Demand for Jury Trial, *Thrive Natural Care, Inc., v. Le-Vel Brands, LLC*, United States District Court Central District of California, Case No. 2:21-cv-2022, dated March 4, 2021.

- Plaintiff's Opening Brief in Support of Motion for Preliminary Injunction, *Thrive Natural Care, Inc., v. Le-Vel Brands, LLC*, United States District Court Central District of California, Case No. 2:21-cv-2022-DOC-KES, dated March 5, 2021.

<u>Expert Reports and Declarations</u>

- Expert Report of Rob Wallace in the Matter of Thrive Natural Care, Inc. v. Le-Vel Brands, LLC., dated March 2, 2021.

- Declaration of Drew S. Hoffman, *Thrive Natural Care, Inc., v. Le-Vel Brands, LLC*, United States District Court Central District of California, Case No. 2:21-cv-2022, dated March 22, 2021.

<u>Survey Literature</u>

- Diamond, S. S. (2011). "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence; Federal Judicial Center; National Research Council, pp. 395-420.

- Edwards, G. K. (2012). "The Daubert Revolution and Lanham Act Surveys," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Diamond, S. S. & Swann, J. B., American Bar Association, pp. 346-347.

- Simonson, I. & Kivetz, R. (2012). "Demand Effects in Likelihood of Confusion Surveys," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Diamond, S. S. & Swann, J. B., American Bar Association, p. 251.

- Swann, J. B. (2012). "Likelihood of Confusion," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design,* Diamond, S. S. & Swann, J. B., American Bar Association, p. 54.

<u>Websites</u>

- https://le-vel.com/

- https://le-vel.com/Products/THRIVE/Skin

1

Exhibit 2
Page 80

- https://thrivecare.co/

- https://thrivevitamin.le-vel.com/Shop

# Exhibit C

Exhibit 2
Page 82



THE BRAND    THRIVE    ACHIEVEMENTS    CUSTOMER    CLOUD OFFICE



peel | reduce | restore

THE MOST ADVANCED CBD SKINCARE SYSTEM

THRIVE

SKIN



▶ THRIVE SKIN OVERVIEW

▶ HOW TO USE THRIVE SKIN

Exhibit 2
Page 83

   Terms   Contact

  

English Español

©2021 LE-VEL — The trademarks appearing throughout this site belong to Le-Vel Brands, LLC and are registered, pending registration, or protected by common law rights or otherwise are used with the permission of others or constitute fair use.



**THRIVE SKIN**

# INFINITE CBD CORRECTING SERUM

Enriched with CBD Oil

A balance of nature, science and CBD innovation, working harmoniously to provide a luxurious high performance Facial Serum. Excellent for all skin types, this proprietary Serum helps reduce the negative results of oxidative stress (such as redness, fine lines, and skin roughness), increases moisture and reduces the appearance of lines and wrinkles.

Powerful soothing and calming antioxidant

Supports collagen production & surface cell turnover

Helps reduce negative results of oxidative stress, such as redness, fine lines, and skin roughness

Increases moisture and reduces the appearance of lines and wrinkles

SYSTEM OVERVIEW
ENZYME PEEL
CORRECTING SERUM
MOISTURIZING ELIXIR

DETOX PURIFYING BAR
CHARCOAL ACTIVATED MASK
HAND AND FOOT CREAM
SKIN AND HAIR PEPTIDE GEL
DETOX BODY SCRUB



THRIVE SKIN PRODUCT PDF
INFINITE CBD
CORRECTING SERUM

SHOP FOR THRIVE

* These statements have not been evaluated by the Food and Drug Administration. This product is not intended to cure or prevent any disease. Keep of out reach of children. Not suitable for individuals under 18 years of age. If you are pregnant or breastfeeding consult a doctor before using this product. If you are taking any medication, or have any type of medical issue, consult with a doctor before using this product.

Case 2:21-cv-02022-DOC-KES   Document 22-2   Filed 03/22/21   Page 87 of 95   Page ID #:995

The Brand ▾   Thrive ▾   Achievements   Customer   Cloud Office





the world's only premium
lifestyle product line...

THRIVE BY LeVel

## Customer Login

Username

Password

**Login**

Forgot Password? | Promoter Login

This login form is for **Customers Only**. Promoters can **Login here**.



Don't have an account yet?

Becoming a Le-Vel Customer is free and easy!

**Get Started**

   Terms   Contact

  

English Español

©2021 LE-VEL — The trademarks appearing throughout this site belong to Le-Vel Brands, LLC and are registered, pending registration, or protected by common law rights or otherwise are used with the permission of others or constitute fair use.

Exhibit 2
Page 85

  

# Find a Le-Vel Promoter

To order THRIVE products, we'll connect you with a Le-Vel Promoter first.

Start with selecting your country:

| | |
|---|---|
| Australia | Canada |
| United Kingdom | New Zealand |
| United States | Brunei Darussalam |
| Hong Kong | Indonesia |
| Malaysia | Philippines |
| Singapore | Thailand |
| Viet Nam | |

 Terms   Contact

  

English Español

©2021 LE-VEL — The trademarks appearing throughout this site belong to Le-Vel Brands, LLC and are registered, pending registration, or protected by common law rights or otherwise are used with the permission of others or constitute fair use.

Exhibit 2
Page 86

# Find a Le-Vel Promoter



Please confirm your referring Promoter:

● I **was** referred by a Le-Vel Promoter

○ I **was not** referred by a Le-Vel Promoter. **Please assign me one.**

○ I **was not** referred by a Le-Vel Promoter. **I would like to search for one.**

Back     Continue

Terms   Contact

English  Español

©2021 LE-VEL — The trademarks appearing throughout this site belong to Le-Vel Brands, LLC and are registered, pending registration, or protected by common law rights or otherwise are used with the permission of others or constitute fair use.

Exhibit 2
Page 87



Find a Le-Vel Promoter

CONGRATULATIONS! Your promoter is [redacted]
Please create your Customer account below.

[redacted]

Become a customer...

First Name

Last Name

Phone Number

+1 (123) 456-7890

Instagram Username

@username

Facebook Username

Email Address

Choose Username

Password

Confirm Password

Back | Create Customer Account

Le-Vel Terms Contact

Eng...

©2021 LE-VEL — The trademarks appearing throughout this site belong to Le-Vel Brands, LLC and are registered, pending registration, or protected by common law rights or otherwise are used with the permission of others or constitute fair use.

Welcome! Your Account Was Created.

**Welcome Test!** We are so glad you're here. You've just joined millions around the globe who are THRIVING. Bettye Shelton, a Le-Vel Brand Promoter, should be reaching out shortly to answer any questions you have regarding the company and our award winning products.

**In the meantime,** don't wait to start the THRIVE Experience. Here are two great options just for you:

**2-WEEK** THRIVE Experience / $100



Get ready for an amazing two weeks of filling your nutritional gaps and getting your health on track! The THRIVE Experience was designed for nutritional support, weight management, appetite management support, lean muscle support, mental acuity, joint support and more.

**ENOUGH THRIVE FOR 2 WEEKS**

Learn more about the THRIVE Experience

ORDER NOW

**4-WEEK** THRIVE Experience / $150



You deserve it! Commit to self care with a full month of the THRIVE Experience. Designed for nutritional support, weight management, appetite management support, lean muscle support, mental acuity, joint support and more, the THRIVE Experience will make you look and feel like never before.

**ENOUGH THRIVE FOR 4 WEEKS**

Learn more about the THRIVE Experience

ORDER NOW



WHAT IS THRIVE?



Terms   Contact

f ⌄ y ⌄ ⌄ ⌄

English Español

©2015 LE-VEL — The trademarks appearing throughout this site belong to Le-Vel Brands, LLC and are registered, pending registration, or protected by common law rights or otherwise are used with the permission of others or constitute fair use.

Exhibit 2
Page 89



## THRIVE Experience Packs

### THRIVE Experience - 2 Week Pack

Price: **$100.00**

| Autoship Program | Today's Order |
|---|---|
| ^ | ^ |
| 0 | 0 |
| v | v |

VIEW DETAILS

### THRIVE Experience - 4 Week Pack

Price: **$150.00**

$44 IN FREE

SEE BELOW FOR DETAILS

| Autoship Program | Today's Order |
|---|---|
| ^ | ^ |
| 0 | 0 |
| v | v |

VIEW DETAILS

### THRIVE Experience - Couples 4 Week Pack

Price: **$300.00**

$88 IN FREE

SEE BELOW FOR DETAILS

| Autoship Program | Today's Order |
|---|---|
| ^ | ^ |
| 0 | 0 |
| v | v |

VIEW DETAILS

## THRIVE Experience 1, 2, 3

## THRIVE Plus Line

## THRIVE SKIN

## Other Items

| | |
|---|---|
| Autoship Program (0): | USD $0.00 |
| Today's Order (0): | USD $0.00 |

Empty Cart    Continue Order



Terms   Contact



©2021 LE-VEL — The trademarks appearing throughout this site belong to Le-Vel Brands, LLC and are registered, pending registration, or protected by common law rights or otherwise are used with the permission of others or constitute fair use.

Exhibit 2
Page 90



THRIVE Experience Packs

THRIVE Experience 1, 2, 3

THRIVE Plus Line

THRIVE SKIN

THRIVE SKIN - 3 Step System
Price $105.00
Autoship Program 0 | Today's Order 0

VIEW DETAILS

THRIVE SKIN - Skincare Sample Kit
Price $75.00
Autoship Program 0 | Today's Order 0

VIEW DETAILS

THRIVE SKIN - Infinite CBD Enzyme Peel
Price $62.00
Autoship Program 0 | Today's Order 0

VIEW DETAILS

THRIVE SKIN - Infinite CBD Correcting Serum
Price $62.00
Autoship Program 0 | Today's Order 0

VIEW DETAILS

THRIVE SKIN - Infinite CBD AM/PM Moisturizing Elixir
Price $62.00
Autoship Program 0 | Today's Order 0

VIEW DETAILS

THRIVE SKIN - Infinite Daily Detox Purifying Bar
Price $44.00
Autoship Program 0 | Today's Order 0

VIEW DETAILS

THRIVE SKIN - Infinite Charcoal Activated Mask
Price $38.00
Autoship Program 0 | Today's Order 0

VIEW DETAILS

THRIVE SKIN - Infinite Hand & Foot Reparative Cream
Price $28.00
Autoship Program 0 | Today's Order 0

VIEW DETAILS

THRIVE SKIN - Infinite Skin & Hair Peptide Gel
Price $56.00
Autoship Program 0 | Today's Order 0

VIEW DETAILS

THRIVE SKIN - Infinite Detox Body Scrub
Price $32.00
Autoship Program 0 | Today's Order 0

VIEW DETAILS

Other Items

Le-Vel

Autoship Program (0) USD $0.00
Today's Order (0) USD $0.00
Empty Cart | Continue Order



THRIVE Experience Packs

THRIVE Experience 1, 2, 3

THRIVE Plus Line

THRIVE SKIN

**THRIVE SKIN - 3 Step System**

Price $185.00

Autoship Program 0 | Today's Order 0

VIEW DETAILS

**THRIVE SKIN - Skincare Sample Kit**

Price $75.00

Autoship Program 0 | Today's Order 0

VIEW DETAILS

**THRIVE SKIN - Infinite CBD Enzyme Peel**

Price $62.00

Autoship Program 0 | Today's Order 0

VIEW DETAILS

**THRIVE SKIN - Infinite CBD Correcting Serum**

Price $62.00

Autoship Program 0 | Today's Order 0

VIEW DETAILS

**THRIVE SKIN - Infinite CBD Correcting Serum**

A balance of nature science and CBD innovation, working harmoniously to provide a luxurious high performance Facial Serum. Excellent for all skin types, this proprietary Serum helps reduce the negative results of oxidative stress (such as redness, fine lines, and skin roughness), increases moisture and reduces the appearance of lines and wrinkles.

**THRIVE SKIN - Infinite CBD AM/PM Moisturizing Elixir**

Price $62.00

Autoship Program 0 | Today's Order 0

VIEW DETAILS

**THRIVE SKIN - Infinite Daily Detox Purifying Bar**

Price $44.00

Autoship Program 0 | Today's Order 0

VIEW DETAILS

**THRIVE SKIN - Infinite Charcoal Activated Mask**

Price $38.00

Autoship Program 0 | Today's Order 0

VIEW DETAILS

**THRIVE SKIN - Infinite Hand & Foot Reparative Cream**

Price $28.00

Autoship Program 0 | Today's Order 0

VIEW DETAILS

**THRIVE SKIN - Infinite Skin & Hair Peptide Gel**

Price $56.00

Autoship Program 0 | Today's Order 0

VIEW DETAILS

**THRIVE SKIN - Infinite Detox Body Scrub**

Price $32.00

Autoship Program 0 | Today's Order 0

VIEW DETAILS

Other Items

leVel

Autoship Program (0): USD $0.00
Today's Order (0): USD $0.00

Empty Cart | Continue Order

# Exhibit 3

## to the Declaration of Shauna E. Woods

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**