# Exhibit 1

## to the Declaration of
## Shauna E. Woods

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

THRIVE NATURAL CARE, INC.,

     Plaintiff,

v.

LE-VEL BRANDS, LLC,

     Defendant.

Case No.: 2:21-cv-2022

## EXPERT REPORT OF DR. MICHAEL J. BARONE

**Introduction and Qualifications**

1.     I am the Brown-Forman Professor of Marketing at the University of Louisville. I received a BA in Economics in 1984 from the University of Michigan, MBA from George Washington University in 1990, and Ph.D. in marketing (with psychology as a cognate area) from the University of South Carolina in 1994. I have been hired as an expert in a number of other matters as indicated in the curriculum vitae (C.V.) in Appendix A to this report. In this capacity, I have conducted surveys and offered critiques of surveys conducted by other experts.

2.     I have published over forty articles on branding and consumer psychology (listed in full on my C.V.), including a number of well-cited articles on brand extension strategies, that appear in the leading academic journals. Based on my publication record, I have been formally recognized as a leading researcher in marketing and consumer psychology. As a result of this expertise, I have also been appointed to the Editorial Review Boards, and have served as reviewer, for the leading marketing journals. In these roles, I have reviewed the methodologies and findings associated with literally hundreds of empirical studies, and journal editors have

relied upon my expertise in marketing strategy and consumer behavior in making decisions to accept or reject manuscripts.

3.     I am being compensated at a rate of $675 per hour for work on expert report preparation and at a rate of $775 per hour for time spent testifying. My compensation does not depend on the outcome of this case. I also understand that discovery is ongoing in this case; I therefore reserve the right to revise and/or supplement my report based on additional materials or information that may become available.

**Nature of the Assignment and General Conclusions**

4.     I was retained by the Defendant, Le-Vel Brands, LLC (hereafter, "Defendant") to provide an analysis of the degree to which its brand leverage strategy to introduce new products as extensions to the Thrive umbrella brand conforms to best practices based on extant understanding of brand extension strategies.  I also provide an analysis of the extent to which the strategy used by the Plaintiff, Thrive Natural Care, Inc. (hereafter, "Plaintiff") in extending its Thrive brand conforms to these standards.

5.     My analysis begins with a discussion of various marketplace growth strategies, including the use of brand extension strategies whereby new products are introduced under an established brand name. As such strategies are designed to leverage the equity or goodwill a brand has built up in the minds of its customers, I also define the concept of consumer-based brand equity. After reviewing advantages and disadvantages of this branding approach, I discuss how consumers are likely to react to brand extensions based on certain characteristics of the brands and the new products that are involved.

6.     These concepts are then applied in an analysis of the various brand extensions launched by both the Defendant and the Plaintiff. Based on this analysis, my conclusion is that

Exhibit 1
Page 4

the Defendant's approach to extending its Thrive umbrella brand across a variety of health and wellness products over time conforms to academic and conventional wisdom regarding best practices designed to increase consumer response to such new products. This analysis also indicates that the Plaintiff's approach to extending its Thrive brand from grooming/shaving products aimed primarily at males to skincare offerings targeted primarily towards females violates a number of these best practices and standards.

**The Use of Brand Extensions as a Growth Strategy for Firms**

7.    Companies often wish to grow in terms of revenues and profits. There are a number of strategies by which a firm can achieve this goal (Keller, 490-1), including (1) selling more of its current product to its current customers; (2) selling its current products to new customers; and (3) selling new products it develops to existing customers. When it involves the introduction of new products under an established brand name, this last option is referred to as a brand extension strategy.  If used appropriately, consumers will transfer the positive image they hold for established, successful brands to the extension (Hoyer and MacInnis, 97). As a consequence of this "transfer process", consumers will view the new product more favorably, and with greater trust and credibility, than they might otherwise (e.g., if it was introduced under a new or unknown brand name).

8.    This discussion indicates that whether brand extensions will succeed or not depends on consumers' knowledge and feelings regarding the brand, that is, it depends on consumer-based brand equity:  "the power of a brand lies in what customers have learned, felt, seen, and heard about the brand as a result of their experiences over time" (Keller, 49). To this end, consumers are particularly likely to purchase a new product introduced as an extension from a brand for which they have positive consumer-based brand equity. Importantly, how the brand is

3

Exhibit 1
Page 5

perceived by consumers will also define the products that consumers will accept as natural extensions from that brand: "Consumers will decide, based on their brand beliefs and attitudes, where they think the brand should go and grant permission (or not) to any marketing action or program" (Keller, 51). As a result, new products that are compatible with the equity consumers attach to a brand will be viewed as natural extensions of that brand, while others will not.

9.    Inherent in the use of brand extension strategies is that the new products are introduced to consumers who are aware of and hold a favorable image for the brand that appears on these extensions. The presence of this consumer-based brand equity can significantly reduce the cost of introducing new products for firms and the risk of adopting new products for consumers. Using a brand extension strategy to increase acceptance of new products among current customers can allow firms to enjoy the benefits of customer retention and brand loyalty (Keller, 72). Extending a brand with positive consumer-based brand equity can also help recruit target consumers from competing brands, introducing new customers into the brand franchise to expand the brand's footprint in the marketplace. Further, when extensions become successful in their own right, they can reinforce or enhance the brand's image and equity, and can increase the likelihood of success for future extensions (Keller, 495).

10.    However, brand extension strategies employed under other conditions can hold significant disadvantages for firms (Keller, 502). For example, poorly-conceived extensions that are not compatible with the brand's equity can create confusion regarding what the brand stands for in the minds of consumers.  Poorly-executed extensions that do not perform up to the standards and expectations consumers hold for the brand can also dilute the brand's equity and alienate its existing customers. Accordingly, this strategy should be used judiciously and under conditions that allow consumers to view the new products as naturally extending from the brand.

4

Exhibit 1
Page 6

11.     Guidelines from academic research (Keller, 523) indicate that extensions are more likely to be successful under certain conditions. One of the most-studied aspects of brand extension strategies indicates the extensions are more successful among consumers who view the brand favorably and who perceive a high level of "fit" to exist between the brand and the new product. This 'fit' is based on the overlap between the consumer-based equity that exists for the brand (that is, what consumers know about and associate with that brand) and the new product that is being introduced. When the new product involves a product category, attribute, and/or benefit that is compatible with the brand, consumers will likely believe that the extension naturally fits with the brand's equity. Similarly, perceptions of fit may be high when the brand and extension relate to similar usage situations or user groups (i.e., target markets) (Keller, 525).

12.     The marketing literature further indicates that the success of brand extensions increases when the brand has had past success with extensions. Particularly when the brand has successfully launched intermediate extensions between the brand's initial products and the new extension, consumers will permit it to expand even further to other, related categories (Keller, 524).  Brand extensions are also likely to be successful when they are introduced by brands that are positioned more broadly vs. more narrowly, as well as by brands that consumers perceive to be high-quality, premium, and prestige-oriented (Keller, 525, 527).

**Analysis of the Defendant's Use of "Thrive" in Marketing its Products**

13.     It is my understanding that the Defendant has positioned it's Thrive brand "to encompass ultra-premium products and premium product lines, to be a new brand for a better lifestyle and premium-seeking consumers" (https://le-vel.com/Brand/Philosophy).  Relatedly, the Defendant uses the Thrive brand to market products containing highly effective and high quality

5

Exhibit 1
Page 7

ingredients designed to help people thrive, that is, to "live healthier, happier lives, both mentally and physically" (Hoffman Declaration, ¶3).

14.    The marketplace has been quite receptive to the Defendant's Thrive-branded products, making the Thrive brand "the most important and powerful asset Le-Vel owns" (Hoffman Declaration, ¶24). Indeed, the Thrive brand has attracted over 10 million customers who have accounted for over $2B in sales (https://le-vel.com/Home/Achievements). It is also my understanding that well over half of all purchasers of Thrive-branded products are repeat customers who have previously bought other products offered by the Defendant under its Thrive brand (Hoffman Declaration, ¶56). This ability to retain customers is typically indicative of a firm's offerings meeting or exceeding the expectations of its customers. The Defendant's ability to promote such repeat purchasing is also consistent with the levels of engagement exhibited by its customers with respect to the Thrive brand, as reflected in over 1 million Facebook followers and nearly 10 million views of its YouTube videos (Hoffman Declaration, ¶59).

15.    Reflecting the Defendant's positioning of the Thrive brand, I understand that it initially launched this brand in August 2012 with separate vitamins designed for both women (Thrive W) and men (Thrive M), and shortly thereafter, a protein/meal-replacement shake branded as Thrive that was marketed to both female and male consumers (Hoffman Declaration, ¶11). Both the vitamin capsules and shake products were each designed to help Le-vel's customers live happier, healthier lifestyles, and look and feel better (Hoffman Declaration, ¶16) . Based on the success of these initial products, it is my understanding that a third product for both females and males, a skin vitamin patch, was launched shortly afterwards as the Thrive DFT (Derma Fusion Technology) (Hoffman Declaration, ¶17). Once applied to the skin, the DFT provides a delivery system "designed to infuse the derma (skin) with our unique, premium grade

6

Exhibit 1
Page 8

THRIVE Lifestyle Formula … DFT promotes clean and healthy weight management and an overall healthy lifestyle (https://le-vel.com/Products/THRIVE/DFT). By introducing a product that customers would apply to their skin to receive benefits related to health and wellbeing, the introduction of the Thrive DFT vitamin skin patches began associating the Defendant's Thrive-branded products with the concept of both a person's skin and that individual's personal care and well-being.

16.     Collectively, these three products – the initial vitamins (Thrive W and Thrive M) and shakes (Thrive) along with the skin vitamin patch (Thrive DFT) – were collectively marketed under the umbrella of the Defendant's Thrive brand as the "Thrive Experience" (Hoffman Declaration, ¶19). A commonality among these three products, which were designed to be used in conjunction with one another, is that they were created to help both female and male consumers live thriving, healthy lifestyles and look and feel better (Hoffman Declaration, ¶19). In this way, the Defendant extended its initial Thrive W and M vitamins and Thrive shakes into a new category, Thrive DFT skin vitamin patches, which provided similar benefits (that is, fostering thriving and healthier lives) among similar customers (that is, females and males interested in achieving better health and wellbeing).

17.     In launching its Thrive Experience products, the Defendant employed numerous best practices for brand extensions noted earlier in this report (see ¶11 and ¶12):  (a) leveraging a brand's positive equity to introduce new products among current target customers (i.e., female and male consumers interested in living healthier lifestyles and looking and feeling better); (b) launching new offerings (Thrive DFT skin vitamin patches) that "fit" with products already marketed by the brand (Thrive W and Thrive M vitamins, Thrive shakes) that provide similar benefits (facilitating better health and wellbeing and looking and feeling better); and (c) offering

7

Exhibit 1
Page 9

a new product (Thrive DFT skin vitamin patches) after successful products sold under that brand (i.e., Thrive W and Thrive M vitamins and Thrive MW shakes).

18.      Reflecting the Defendant's use of brand extension strategies that conformed to best practices, it is my understanding that consumer acceptance of the Thrive Experience products was substantial. Upon launch of the Thrive Experience, sales of the firm's Thrive W and M vitamins, Thrive shakes, and Thrive DFT skin vitamin patch achieved sales of over ▮▮▮▮▮▮ from August 2012 through September 4, 2013 (Hoffman Declaration, ¶22). Sales of the Defendant's Thrive Experience products have continued to grow from ▮▮▮ in 2013 to ▮▮▮ today (Hoffman Declaration, ¶22). Thus, the three products that comprise the Thrive Experience were well-received by consumers in the marketplace, helping Le-Vel grow its customer base and naturally expanding its product line by adding other Thrive-branded products designed to help individuals live healthier, happier lifestyles and looking and feeling better (Hoffman Declaration, ¶23).

19.      The success of the Defendant's Thrive Experience products has served as a driver of Le-Vel's overall success, making the Thrive Experience "the backbone of Le-Vel's THRIVE business, and Le-Vel's most popular offering (Hoffman Declaration, ¶20). The success of its Thrive Experience offerings has helped Le-Vel become the fastest direct sales company to reach $1B in sales, with total sales of its Thrive products surpassing $2B in 2019 (Hoffman Declaration, ¶29).  I understand that the Defendant added other Thrive shake products and many different Thrive DFT skin vitamin patches, along with numerous other Thrive vitamins and supplements offering a variety of health and wellness benefits (e.g., Thrive TAC DFT, Thrive DFT Recharge) (Hoffman Declaration, ¶30, ¶31).

8

Exhibit 1
Page 10

20.     Following the success of Thrive Experience, it is my understanding that the Defendant launched additional product extensions under the Thrive umbrella brand, including Thrive Form, a skin vitamin designed to promote firm and healthy skin along with other benefits (https://le-vel.com/Products/THRIVE/SGTForm), as well as two additional gel products, Thrive Rest and Thrive Move, in 2015 and 2016 (Hoffman Declaration, ¶26).  In 2018, the company also introduced several Thrive-branded nutritious snacks (Thrive Bites) and protein bars (Thrive Pro) (Hoffman Declaration, ¶43).

21.     Although these consumable (gel and food) items represented different products than the vitamins and supplements the Defendant had successfully marketed in the past under the Thrive umbrella brand, these new offerings also met numerous criteria to be viewed by consumers as natural brand extensions. Specifically, Thrive Form, Thrive Rest, and Thrive Move gels, Thrive Bites snacks, and Thrive Pro protein bars were, similar to the Thrive Experience products, all designed to encourage greater customer health and wellbeing and looking and feeling better.

22.     In the context of the Thrive Experience offerings, these extensions –Thrive Form, Thrive Rest, and Thrive Move gels, Thrive Bites, and Thrive Pro – represented complementary products by which customers could achieve their goal of living thriving, healthy lifestyles and looking and feeling better.  The launch of these products was also supported by the Defendant's earlier successes in extending its Thrive umbrella brand—a factor known to improve the effectiveness of brand extension strategies (see ¶12). Likewise, the Defendant's development of Thrive as a premium, high quality brand (https://le-vel.com/Brand/Philosophy) also contributed to the successful launch of these product extensions (see ¶12).

9

Exhibit 1
Page 11

23.     Moreover, by providing benefits compatible with the Thrive Experience products, introducing these Thrive-branded gel and food products helped expand the Thrive umbrella brand beyond health supplements (including ingestible capsules), and beyond its core skin-based patches, to include additional consumable products. Because consumers are often more likely to accept extensions from brands that are positioned more broadly vs. narrowly (see ¶12), the success of these consumable gels and snack food offerings likely made consumers more receptive to seeing the Defendant employ its Thrive umbrella brand on a broader range of naturally-related products beyond those sold previously or currently under the Thrive brand.

**The Defendant's Launch of its Thrive Skin Line of Skincare Products**

24.     After the natural extension of the Thrive brand from health supplements and skin vitamin patches to various consumable products intermittently through 2018, it is my understanding that the Defendant launched a line of skincare products in April 2019 (Hoffman Declaration, ¶47).  In introducing these skincare products as Thrive Skin (Hoffman Declaration, ¶47), the Defendant leveraged the equity in its Thrive umbrella brand for skincare products as anticipated and natural extension of this brand. It is my understanding that the Defendant selected "Thrive Skin" as the brand for these skincare products because, by including both "Thrive" and "Skin", these new products would (a) continue the Thrive brand's association with "skin" and "care" that began with its core DFT patches and (b) signal the "skincare" products the Thrive brand would identify (Hoffman Declaration, ¶47; see also ¶15 of this report). To assure Defendant's Thrive Skin extension was embraced as such, Le-Vel elected to "mirror" the three-step set of products associated with its highly successful Thrive Experience (Thrive W and M vitamins, Thrive shakes, and Thrive DFT skin vitamin patch) (Hoffman Declaration, ¶50). Thus, when Thrive Skin was launched, it also included a three-step set of skincare products (Thrive

10

Exhibit 1
Page 12

Skin Peel, Thrive Skin Reduce, and Thrive Skin Restore) (Hoffman Declaration, ¶50). It is my understanding that following the introduction of the Defendant's skincare line, consumers did not miss the natural connection between the three-step set of products associated with both Thrive Experience and Thrive Skin (Hoffman Declaration, ¶50)

25.     Including its Thrive Skin products under the Thrive umbrella brand allowed consumers to view Thrive Skin offerings within the context of the other THRIVE offerings offered by Le-Vel – that is, as products containing highly effective and high quality ingredients that are designed to help people live healthier, happier lives and look and feel better (Hoffman Declaration, ¶3). This conclusion is supported by the presence of several factors known to encourage consumers to transfer the favorable knowledge and feelings they have for a brand over to an extension to increase purchase of that new product.

26.     First, as discussed in this report (see ¶11), this transfer of equity is likely to occur when a brand's customers overlap with individuals who are target consumers for the new product. To this end, it is my understanding that approximately three-quarters of customers of the Defendant's Thrive products are female (Hoffman Declaration, ¶58). Compatibly, skincare products are targeted primarily toward females, given that nearly twice as many females (65%) indicating daily usage of such products as males (37%) (Statista Survey, May 5 to 22, 2017). Thus, customers familiar with the Defendant's Thrive brand are also likely to be purchasers and users of skincare products. In this regard, I understand that two-thirds of customers purchasing Thrive Skin products had previously purchased other Thrive-branded products (for instance, its vitamins or food products) (Hoffman Declaration, ¶56).

27.     Second, an extension's success is likely to increase when consumers perceive some level of fit between the brand and the new product (see ¶11). The Thrive brand's

connection to skin and care dates back to Defendant's origins, as I understand that one of Le-Vel's founders, Mr. Jason Camper, was the former president of IsXperia and LifeCore Global—two supplement companies that naturally expanded into skincare products (Hoffman Declaration, ¶9)  I further understand that Mr. Camper drove the decision to expand into skincare while at those companies (Hoffman Declaration, ¶9)  And it is my understanding that the skincare suppliers to be used by Le-Vel were the skincare suppliers that Mr. Camper previously used while at his former supplement and skincare companies (Hoffman Declaration, ¶46)  Finally, I understand that numerous Le-Vel customers and promoters were customers and promoters from Mr. Camper's prior supplement and skincare businesses  (Hoffman Declaration, ¶10)  Accordingly, Thrive's initial customers and promoters were likely to expect some association between, on the one hand, Mr. Camper's new brand and, on the other, skin and care, through supplements and/or skincare. These very first skin product associations were quickly confirmed with the brand's launch of its Thrive Derma Fusion Technology (DFT) product, an adhesive patch that delivered vitamins and nutrients through the customer's skin to promote "clean and healthy weight management and an overall healthy lifestyle" (https://le-vel.com/Products/THRIVE/DFT).  The Thrive brand's connection to skin and care was continued with the introduction of its Thrive Form product in March 2016, a consumable vitamin gel promoting firm and healthy skin (https://le-vel.com/Products/THRIVE/SGTForm).

28.     Thus, the Defendant's history is one in which its Thrive brand appeared on skin products (e.g., Thrive DFT), having sold ███████ worth of such products, and a myriad of products with increasingly more direct connections to the care of skin (e.g., Thrive Skin).  As such, customers would have likely considered Le-Vel's launch of Thrive Skin as an expected natural and logical extension of the Thrive brand. Evidence of that is suggested by responses to a

"teaser" campaign the firm conducted in February 2019, just prior to the launch of Thrive Skin in April of that year (Hoffman Declaration, ¶51). In this campaign, the firm presented an infinity symbol with the words "is coming" directly below it along with the question, "What are your guesses?"  It is my understanding that some of the Defendant's Instagram followers posted comments indicating that they anticipated the launch of a skincare product under the Thrive umbrella brand before the consumers were even aware of the impending launch of Thrive Skin (Hoffman Declaration, ¶51).

29.     Also consistent with the notion that consumers were ready to embrace skincare products introduced under the Defendant's Thrive umbrella brand was the marketplace response to Thrive Skin. Since launching in 2019, sales of Thrive Skin products have exceeded ███. Within the first 24 hours of that product launch, I understand sales topped ███ (Hoffman Declaration, ¶53), reflecting that consumers (a) readily discerned and anticipated the "fit" between the Thrive umbrella brand's positioning around health/wellbeing and products promoting skin care and (b) understand the connection between the equity they held for the Thrive umbrella brand and these new skincare products. Based on this success of its Thrive Skin products, Le-Vel has further expanded its product line from the first three skincare products to various others, including creams, gels, and scrubs (le-vel.com/Products/THRIVE/Skin). I also understand that the marketplace receptivity to the Defendant's skincare products has resulted in plans to launch additional Thrive Skin products.

30.     Third, the expansion of the Defendant's Thrive brand from health supplements to skin care was not made all at once but, rather, represented a steady,  natural expansion of the Thrive brand that encompassed numerous other extensions. Given that numerous early Le-vel customers and promoters following Mr. Camper to the Thrive brand from his prior supplement

13

Exhibit 1
Page 15

and skincare business, these individuals would have likely been familiar with those earlier transitions executed by Mr. Camper with his earlier business from health supplements to skincare products. While these skincare products may have been a foreseeable expansion of the Thrive brand by certain consumers (see ¶28 of this report), that product expansion notably followed successful extensions from health supplements, consumable gels, nutritious snack foods that were all introduced under the umbrella of its Thrive brand. As noted elsewhere (¶12), the existence of such prior successful extensions increases consumers' receptivity to additional, related new products offered under that brand.

31.     These intermediate extensions involving consumables and healthy snack foods broadened perception of the Thrive brand beyond health supplements in positioning the brand more generally as a health and wellness brand so that consumers would anticipate the launch of additional new products, consistent with strategies used by Le-Vel's competitors, as noted below (¶32).  Having previously run supplement companies that expanded into skincare products, Le-Vel's founder was no doubt well acquainted with such an expansion as well as with the details of introducing skincare products by a supplement company.  The broadening of the Thrive brand allowed consumers to view other new products (such as Thrive Skin) as natural extensions of the brand, consistent with other competing or like companies (see this report, ¶12), as reflected in social media posts made by Thrive customers reflecting the complementary nature of Le-Vel's Thrive Skin products and other Thrive-branded products offered by the Defendant (Hoffman Declaration, ¶52). This consumer receptivity to Thrive Skin products, as reflected in sales of ███████ within 24 hours and exceeding ███████ since April 2019 (Hoffman Declaration, ¶53), also supports a conclusion that consumers viewed these skincare products as natural extensions to the Defendant's Thrive brand.

14

Exhibit 1
Page 16

32.     Consumers viewing skincare products as natural extensions from brands marketing health supplements come as no surprise. Indeed, in the marketplace, numerous prominent health supplement companies offer skincare products (e.g., GNC, Vitamin Shoppe, Goop, Garden of Life, Bluebonnet Nutrition), as have more like-positioned direct sales companies such as Beachbody, Isagenix, Herbalife, Amway, and Shaklee (Hoffman Declaration, ¶44). Accordingly, it is little wonder that consumers expect successful brands that market health supplements to also sell skincare products and to therefore view the skincare products as representing natural extensions from such brands.  In fact, the staggering sales of Thrive Skin from April 2019 to date (████) establish with little more that skincare was a very foreseeable and successful natural product expansion for Le-Vel's Thrive house brand, itself having generated ████ in total sales since 2012.

**Analysis of the Plaintiff's Use of "Thrive" in Marketing its Products**

33.     According to the Complaint (¶24), the Plaintiff, Thrive Natural Care, Inc., markets grooming products such as beard oil to men and also sells products such as sunscreen, cleansers, and moisturizers to both male and female consumers. Based on the Complaint (Complaint, ¶2) and the Plaintiff's website (www.thrivecare.co), Thrive was initially, and still is, positioned as a sustainable brand intended to appeal to consumers with an affinity for sustainably-sourced products (Complaint, ¶19). This positioning is built around several dimensions, including the use of agricultural methods that help regenerate ecosystems (Complaint, ¶2; www.thrivecare.co) and the use of natural ingredients from native plaints (Complaint, ¶19).

34.     Based on both the deployment and the marketing of these practices, the Plaintiff has "positioned Thrive on the leading edge of healthy, natural, and sustainable" (Complaint,

15

Exhibit 1
Page 17

¶19). This focus on natural products and sustainable practices, if acknowledged by the marketplace, would result in a consumer-based brand equity for the Plaintiff's Thrive brand that is quite different from the premium lifestyle positioning created by the Defendant for its Thrive brand, that is, as a premium lifestyle brand targeted to premium-seeking consumers seeking a better lifestyle (https://le-vel.com/Brand/Philosophy).

35.     It is my understanding that Plaintiff alleges first use of the Thrive brand in September 2013, at that time, marketing three grooming products (a face wash, shave oil, and face balm). Market research indicates that shaving-related products such as those initially sold by the Plaintiff under the Thrive brand (e.g., beard oil) are targeted heavily toward men: 70% of males (versus 0% of females) report using shaving products daily or several times a week (Statista Survey, May 5 to 22, 2017). This targeting and positioning of its Thrive brand to males is also apparent in the Plaintiff's historical marketing of its products with hashtags that clearly make reference to a male target market. A review of materials including the Plaintiff's website social media show that it targeted males through the use of various male-related hashtags in 2015 (e.g., #mensgrooming, #mensstyle, #mensskincare, #skincareformen), in 2016 (#men, #mengrooming, #mangrooming), in 2017 (#mensgrooming, #mengrooming, #menstyle), in 2018 (mensgrooming, #beardcare, #beardoil, #fathersday, #beards, #bearded), in 2019 (#mensgroomingproducts, #mengrooming, #mensproducts, #menskincare), and in 2020 (#fathersday, #fathersdaygift).

36.     In the Complaint (¶19), the Plaintiff alleges that it targets both males and females with its products. As support for its claim that it targets not only males with its beard oil products but also females with its sunscreen, cleansers, and moisturizers, the Plaintiff discusses an article it published on November 21, 2019 titled "I'm a Women and I Use Thrive Natural Care. Here's

16

Exhibit 1
Page 18

Why" (https://thrivecare.co/blogs/news). Nearly all of the other blogs posted to the Plaintiff's website reference products for males, feature images of products with males, refer to male athlete endorsers, and/or are posted with the tag 'Mens Grooming Products', making it difficult to discern to what degree it has positioned Thrive as a brand that "targets a unisex audience" (Complaint, ¶19).

37.    Several factors complicate the Plaintiff's transition of its Thrive brand from one that initially focused on men's grooming products (e.g., shaving oils) to one that can be extended to encompass the sunscreens, cleansers, and moisturizers it claims to target to female consumers (Complaint, ¶19). As discussed earlier (¶11), there are several important determinants of a brand extension's success, including:  (a) that consumers are familiar with and have positive knowledge and feelings about the brand that is to be extended (i.e., that consumer-based brand equity exists) and (b) that the new product is seen as "fitting" the brand's equity, including the consumers and products with which it is associated.

38.    As noted elsewhere in this report (see ¶26 and ¶35), shaving products such as the beard oil initially sold by the Plaintiff under the Thrive brand are targeted heavily toward men, with the majority (70%) of males (versus 0% of females) reporting frequent use of these products (Statista Survey, May 5 to 22, 2017). In contrast, the use of skincare products skew heavily toward females, with nearly twice as many females (65%) indicating daily usage versus males (37%) (Statista Survey, May 5 to 22, 2017).

39.    Thus, there would seem to be little natural overlap in the customer segments initially targeted by Plaintiff with its Thrive-branded grooming products (males) in relation to those consumers it subsequently sought to engage with its Thrive-branded skincare products. Importantly, the rationale for using a brand extension strategy is that placing an existing brand on

17

Exhibit 1
Page 19

a new product will leverage the brand's familiarity and equity with current customers to facilitate adoption of that new product. This is difficult to achieve when the new products (skincare offerings) and new customer segment (females) are very different from the initial product (grooming products such as shaving oils) and initial customer segment (males) upon which the brand has developed its equity. Accordingly, expanding a brand's equity that has been built on male grooming products into gender-neutral products targeted at a unisex demographic would require a significant brand repositioning as opposed to representing a natural extension of the brand's existing equity with customers.

**Conclusions**

40.     Based on the analysis offered in this report (¶13 - ¶32), it is my conclusion that the Defendant has followed best practices in introducing numerous, foreseeable new products that leverage the equity of its Thrive brand (i.e., as a brand offering products designed to help customers live healthier and happier lifestyles and look and feel better). As a consequence, consumers encountering Le-Vel's Thrive Skin skincare products in 2019 were likely to perceive these offerings as anticipated, natural extensions to the other health and wellness products successfully marketed by the Defendant under its Thrive umbrella brand, including health supplements and vitamins, core skin vitamin patches, skin vitamin gels, healthy snack foods and shakes.  Consistent with this conclusion are sales and other data reflecting the significant, positive marketplace response to all Thrive-branded offerings and to the Thrive Skin skincare products marketed by the Defendant under its Thrive umbrella brand. It is also important to note that this extension from the Thrive-branded supplements initially launched by the Defendant (Thrive Experience) to the skincare products at issue in this matter (Thrive Skin) represents an established expansion of product offerings that consumers have seen and are acquainted with

Exhibit 1
Page 20

through some of the biggest and most respected vitamin and supplement brands in the country, as

well as Le-Vel's like positioned competitors and, of course, Le-Vel founder Jason Camper's two

prior supplement and skincare product companies.

41.     In contrast, my analysis regarding the Plaintiff's extension of its Thrive brand

(¶33 - ¶39) leads me to conclude that it is less likely that consumers would have seen or

anticipated Plaintiff's stark transition of its Thrive brand from what was initially grooming

products (e.g., shaving oils) marketed primarily to males into unisex skincare products also

targeted to female consumers.  As noted in this report (¶8), it is well-accepted that how a brand

has been marketed in the past, and how consumers view the brand based on those past firm

actions, will determine what new products they will view to be natural extensions of that brand.

The difference in products and target markets associated with the Plaintiff's marketing efforts

would make it difficult for consumers to view the skincare products subsequently offered by the

Plaintiff under its Thrive brand as naturally extended from a brand positioned initially as a men's

grooming.

Dr. Michael J. Barone

March 22, 2021

19

Exhibit 1
Page 21

## REFERENCED WORKS

Complaint

Hoyer, Wayne D. and Deborah J. MacInnis (2008), *Consumer Behavior, 5ed.,* Mason, OH:
South-Western.

Keller, Kevin Lane (2008), *Strategic Brand Management: Building, Measuring, and Managing
Brand Equity, 3ed.,* Upper Saddle River, NJ:  Pearson Education, Inc.

Statista Survey, May 5 to 22, 2017

20

Exhibit 1
Page 22

## APPENDIX:  CURRICULUM VITAE OF MICHAEL J. BARONE

### MICHAEL J. BARONE

| | |
|---|---|
| Marketing Department, Room 162 | **P**: 502-852-3470 |
| College of Business, University of Louisville | **F**: 502-852-7672 |
| Louisville, KY  40292 | **E:** michael.barone@louisville.edu |

**EDUCATION**

Ph.D., Marketing, University of South Carolina, 1994
M.B.A., George Washington University, 1990
B.A., Economics, University of Michigan, 1984

**ACADEMIC EXPERIENCE**

Professor of Marketing and Brown-Forman Endowed Chair (07/18 - present), University of Louisville
Professor of Marketing and University Scholar (07/10 – 06/18), University of Louisville
Associate Professor of Marketing and University Scholar (07/07- 06/10), University of Louisville
Associate Professor of Marketing (4/00–06/07) & Dean's Faculty Fellow (6/05-06/07), Iowa State Univ.
Assistant Professor of Marketing, Iowa State University (6/97 – 4/00)
Assistant Professor of Marketing, Florida International University (FIU), 9/95 - 5/97
Assistant Professor of Marketing, Clark University, 9/94 – 6/95

**HONORS AND AWARDS**

***Research-Related***
Top Productive Researchers in the Premier AMA Journals, 2009-2013 (AMA DocSIG, 2014)
Top Productive Researchers in the Premier AMA Journals, 2010-2014 (AMA DocSIG, 2015)
Recipient, Research Award, UofL COB – 2010, 2013, 2014, 2015.
Top 25 Productive Advertising Researchers, 1997-2006 (*Journal of Advertising,* 2008).
Top Productive Researchers in Marketing, 2000-2007 (AMA DocSIG, 2008)
"High Honors" distinction, Honor Roll of Consumer Researchers (Blackwell, Miniard, & Engel 2006).
Recipient, Dean's Advisory Council Research Award, ISU COB - 1999, 2005.
Nominee, Dean's Advisory Council Research Award, ISU COB - 1998, 1999, 2000, 2001, 2005, 2006.
Nominee, Early Achievement in Research Award, ISU - 1999.
Nominee, Don Lehmann Award (best dissertation-based article in *JMR/JM*) - 1999.

***Teaching-Related***
Recipient, Graduate Teaching Award, UofL COB, 2010-2011.
Recipient, IMBA Professor the Year, UofL COB, 2009-2010.
Nominee, Faculty Favorite, UofL Delphi Center, 2007 – 2010, 2012, 2017.
Recipient, Delta Sigma Pi Marketing Professor of the Year - 2003.
Recipient, Business Council Outstanding Teacher Award, ISU College of Business - 2000.
Recipient, Business Council Teacher of the Month, ISU College of Business - September 2001.
Nominee, Veishea Faculty of the Year, ISU - 2000, 2001, 2004, 2006, 2007.
Nominee, Dean's Advisory Council UG Teaching Award, ISU Business College – 1999-2002, 2004, 2006.
ISU Interfraternity Council/Panhellenic Council Outstanding Faculty Member - 1999, 2000, 2001, 2003, 2005.

Exhibit 1
Page 23

*Other*
Top Reviewer, *Journal of Consumer Psychology*, 2009, 2010, 2016.
Outstanding Reviewer, *Journal of Advertising*, 2004, 2011
Outstanding Reviewer (Honorable Mention), *Journal of Advertising*, 2008
Recipient, Faculty Excellence Award, UofL COB –2010, 2013.
Recipient, Dean's Advisory Council Business Impact Award, ISU College of Business (2006).
American Marketing Association Doctoral Consortium Fellow, 1993
Beta Gamma Sigma, George Washington University and University of South Carolina
Merit Scholarship Award, University of Michigan, 1981.

## JOURNAL ARTICLES

Kwon, Mina, Andrew Manikas, and **Michael J. Barone** (2020), "(Not) Near and Dear: COVID-19 Concerns Increase Consumer Preference for Products and Services that are Not 'Near Me,'" *Journal of the Association for Consumer Research,* forthcoming.

Kulow, Katina, Mina Kwon, and **Michael J. Barone** (2020), "Does Seeing Bad Make You Do Good? How Witnessing Retail Transgressions Influences Responses to Cause Marketing Offers," *Journal of Business Research,* forthcoming.

Li, Xingbo, **Michael J. Barone**, Shailendra P. Jain, and Mina Kwon (2020), "The Challenge of Being a Challenger: Social Dominance Orientation Shapes the Impact of "Challenger vs. Leader" Comparisons," *Journal of Consumer Psychology,* forthcoming.

**Barone, Michael J.,** Keith Coulter, and Xingbo Li (2020), "The Upside of Down:  How a Price's Vertical Location Influences its Evaluation," *Journal of Retailing,* in press, https://doi.org/10.1016/j.jretai.2020.02.003

Kwon, Mina and **Michael J. Barone** (2020), "A World of Mistrust: Fake News, Mistrust Mindsets, and Product Evaluations," *Journal of the Association for Consumer Research,* 5 (2), 206-219

Miao, Chao, **Michael J. Barone,** Shanshan Qian, and Ronald H. Humphrey (2019). "Emotional Intelligence and Service Quality: A Meta-analysis with Initial Evidence on Cross-cultural Factors and Future Research Directions," *Marketing Letters, 30 (*3-4), 335-347.

**Barone, Michael J.,** Xingbo Li, Karen Page Winterich, and Keith B. Lyle (2018), "Social-Spatial Effects in Pricing:  When and How Vertical Orientations Shape Processing of Price Comparisons*," Customer Needs and Solutions, 5,* 137-145.

**Barone, Michael J.,** TJ Bae, Shanshan Qian, and Jason D'Mello (2017), "Power and the Appeal of the Deal:  How Consumers Value the Control Provided by Pay What You Want Pricing," *Marketing Letters, 28 (3),* 437-447.

**Barone, Michael J.,** Sasha Fedorikhin, and David E. Hansen (2017), "The Influence of Positive Affect on Consideration Set Formation in Memory-Based Choice," *Marketing Letters,* 28 (1), 59-69.

**Barone, Michael J.** and Karen Page Winterich (2016), "When Does Green Make You Greedy or Go Green?  The Influence of Green Color Primes on Consumers' Promotion Preferences," *Customer Needs and Solutions*, 3 (1), 3-10, **lead article**.

Exhibit 1
Page 24

DeCarlo, Thomas, Tirthankar Roy, and **Michael J. Barone** (2015), "How Sales Manager Experience and Historical Data Trends Affect Decision Making," *European Journal of Marketing,* 49 (9/10), 1484-1504.

Winterich, Karen Page, Robert E. Carter, **Michael J. Barone,** Ram Janakiraman, and Ram Bezawada (2015), "'Tis Better To Give Than Receive? How Gender, Age, and Residence Segments Vary in Their Choice of Discount- Versus Donation-Based Promotions," *Journal of Consumer Psychology,* 25 (4), 622-634.

**Barone, Michael J.,** Keith B. Lyle, and Karen Page Winterich (2015), "When Deal Depth Doesn't Matter: How Handedness Consistency Influences Consumer Response to Horizontal versus Vertical Price Comparisons," *Marketing Letters,* 26 (2), 213-223.

Logsdon, M. Cynthia , Gary Bennett, Rik Crutzen, LuAnn Martin, Diane Eckert, Ashley Robertson, John Myers, Roselyn Tomasulo, Jennifer Gregg, **Michael Barone**, Tania Lynch, Laura Flamini (2014), "Preferred Health Resources and Use of Social Media to Obtain Health and Depression Information by Adolescent Mothers," *Journal of Child and Adolescent Psychiatric Nursing,* DOI: 10.1111/jcap.12083

**Barone, Michael J.** and Robert D. Jewell (2013), "The Interactive Effects of Advertising Content and Context on Persuasion:  How Brand Innovativeness Creates Advertising Flexibility," *Journal of the Academy of Marketing Science, 42 (3),* 309-321.

Logsdon, M. Cynthia, **Michael Barone**, Tania Lynch, Ashley Robertson, John Myers, David Morrison, Sara York, and Jennifer Gregg (2013), "Testing of a Prototype Web Based Intervention for Adolescent Mothers on Postpartum Depression," *Applied Nursing Research,* 26, 143-145.

Miniard, Paul W., Shazad Mohammed, **Michael J. Barone,** and Cecilia Alvarez (2013), "Retailers' Use of Partially Comparative Pricing: From Across-Category to Within-Category Effects," *Journal of Marketing,* (77) July, 33-48.

**Barone, Michael J.** and Robert D. Jewell (2013), "The Innovator's License:  The Latitude to Deviate from Category Norms," *Journal of Marketing,* 70 (January), 120-134.

**Barone, Michael J.** and Robert D. Jewell (2013), "How Category Advertising Norms and Consumer Counter-Conformity Influence Comparative Advertising Effectiveness," *Journal of Consumer Psychology,* 22 (October), 496-506.

**Barone, Michael J**. and Thomas E. DeCarlo (2012), "Managers' Reliance on Performance Trends in Evaluating Employees:  The Moderating Roles of Evaluation Task and Firm Strategic Orientation," *Journal of Personal Selling & Sales Management,* 32 (2), 207-224.

DeCarlo, Thomas E. and **Michael. J. Barone** (2012), "The Interactive Effects of Sales Presentation, Consumer Suspicion, and Positive Mood on Salesperson Evaluations and Product Purchase Intentions," *Journal of Personal Selling and Sales Management,* 33 (1), 53-66.

Winterich, Karen Page and **Michael J. Barone** (2011), "Warm Glow or Cold, Hard Cash?  Social Identity Effects on Consumer Choice for Donation versus Discount Promotions," *Journal of Marketing Research,* 48 (October), 855-868.

Exhibit 1
Page 25

Barone, Michael J. and Tirthankar Roy (2010a), "**Does Exclusivity Always Pay Off? Exclusive Price Promotions and Consumer Response**," *Journal of Marketing,* 74 (March), 121-132.

Barone, Michael J. and Tirthankar Roy (2010b), "The Effect of Deal Exclusivity on Consumer Response to Targeted Price Promotions:  A Social Identification Perspective," *Journal of Consumer Psychology,* 20 (1), 78-89.

DeCarlo, Thomas E. and **Michael J. Barone** (2009), "With Suspicious (But Happy) Minds:  Mood's Ability to Neutralize the Effects of Suspicion on Persuasion," *Journal of Consumer Psychology,* 19(3), 326-333.

Laczniak, Russell N., R. Kenneth Teas and **Michael J. Barone** (2008), "It All Depends on How You Define Persuasion: A Rejoinder to Lawrence Gibson's Commentary,'" *Marketing Research,* 20 (Spring), 43-44.

Barone, Michael J., Andrew T. Norman, and Anthony D. Miyazaki (2007), "Consumer Response to Cause Related Marketing Strategies for Retail Goods:  Is More or Less Fit Better?" *Journal of Retailing,* 83 (4), 437-445.

Jewell, Robert D. and **Michael J. Barone** (2007), "Norm Violations and the Role of Marketplace Comparisons in Positioning Brands," *Journal of the Academy of Marketing Science,* 35, 550-559.

Laczniak, Russell N., **Michael J. Barone** and R. Kenneth Teas (2007), "On Determining Persuasion in a Copy Test Setting," *Marketing Research*, 19 (Winter), 30-36.

Miniard, Paul W., **Michael J. Barone**, Randall L. Rose, and Kenneth C. Manning (2006), "A Further Assessment of Indirect Comparative Advertising Claims of Superiority over All Competitors," *Journal of Advertising,* 35 (4), 53-64.

Barone, Michael J. (2005), "The Interactive Effects of Mood and Involvement on Brand Extension Evaluations," *Journal of Consumer Psychology,* 15 (3), 263-270.

Barone, Michael J., Valerie E. Taylor, and Joel E. Urbany (2005), "Advertising Signaling Effects for New Brands:  The Moderating Role of Perceived Brand Differences," *Journal of Marketing Theory & Practice*, 13 (1), 1-13, **lead article**.

Barone, Michael J., Kenneth C. Manning, and Paul W. Miniard (2004), "Consumer Response to Retailers' Use of Partially Comparative Pricing," *Journal of Marketing*, 68 (July), 37-47.

Barone, Michael J., Kay M. Palan, and Paul W. Miniard (2004), "Brand Usage and Gender as Moderators of the Deception Associated with Comparative Advertising," *Journal of Advertising,* 33 (Spring), 19-28.

Barone, Michael J. and Paul W. Miniard (2002), "Mood and Brand Extension Judgments:  Asymmetric Effects for Desirable versus Undesirable Brands," *Journal of Consumer Psychology*, 12 (4), 283-290.

Manning, Kenneth C., Paul W. Miniard, **Michael J. Barone**, and Randall L. Rose (2001), "Understanding the Mental Representations Created by Comparative Advertising," *Journal of Advertising,* 30(Summer), 27-39.

Barone, Michael J., Paul W. Miniard, and Jean B. Romeo (2000), "The Influence of Positive Mood on Brand Extension Evaluations," *Journal of Consumer Research*, 26 (March), 387-402.

24

Exhibit 1
Page 26

**Barone, Michael J**., Anthony D. Miyazaki, and Kimberly A. Taylor (2000), "Does One Good Turn Deserve Another?  Examining the Influence of Cause-Related Marketing Efforts on Consumer Choice," *Journal of the Academy of Marketing Science,* 28 (2), 250-264.

Li, Fuan, Paul W. Miniard, and **Michael J. Barone** (2000), "The Facilitating Influence of Consumer Knowledge on the Effectiveness of Daily Value Information," *Journal of the Academy of Marketing Science*, 28 (3), 425-436.

**Barone, Michael J**. and Paul W. Miniard (1999), "How and When Factual Ad Claims Can Mislead Consumers:  Examining the Deceptive Consequences of *Copy x Copy* Interactions For Partial Comparative Ads," *Journal of Marketing Research*, 36 (February), 58-74.

**Barone, Michael J**., Randall L. Rose, Paul W. Miniard, and Ken C. Manning (1999), "Enhancing the Detection of Misleading Comparative Advertising," *Journal of Advertising Research*, 39 (September/October), 43-50.

**Barone, Michael J**., Terence A. Shimp, and David E. Sprott (1999), "Product Ownership as a Moderator of Self-Congruity Effects in Consumer Behavior," *Marketing Letters,* 10 (February), 75-86.

Miniard, Paul W., Randall L. Rose, Kenneth C. Manning, and **Michael J. Barone** (1998), "Tracking the Effects of Comparative and Noncomparative Advertising Using Relative and Nonrelative Measures:  A Test of the Framing Correspondence Hypothesis," *Journal of Business Research*, 41 (February), 137-144.

**Barone, Michael J**., Terence A. Shimp, and David E. Sprott (1997a), "Mere Ownership Revisited:  A Robust Effect?" *Journal of Consumer Psychology*, 6 (3), 257-284.

**Barone, Michael J**., Terence A. Shimp, and David E. Sprott (1997b), "A Commentary on the Mere Ownership Effect:  'More There Than Meets Their Eyes' or 'Less There Than They Would Have Us Believe?'" *Journal of Consumer Psychology*, 6 (3), 299-311.

Miniard, Paul W. and **Michael J. Barone** (1997), "The Case for Noncognitive Determinants of Attitude:  A Critique of Fishbein and Middlestadt," *Journal of Consumer Psychology*, 6 (1), 77-92.

**Barone, Michael J**., Randall L. Rose, Kenneth C. Manning, and Paul W. Miniard (1996), "Another Look at the Impact of Reference Information on Consumer Impressions of Nutrition Information," *Journal of Public Policy and Marketing*, 15 (Spring), 55-62.

Miniard, Paul W., Randall L. Rose, **Michael J. Barone**, and Kenneth C. Manning (1993), "On the Need for Relative Measurements in Assessing Comparative Advertising Effects," *Journal of Advertising*, 22 (September), 41-57.

Rose, Randall L., Paul W. Miniard, **Michael J. Barone**, Kenneth C. Manning, and Brian D. Till (1993), "When Persuasion Goes Undetected:  The Case of Comparative Advertising," *Journal of Marketing Research*, 30 (August), 315-330.

**Editorial Review Boards**

*Journal of Consumer Research* (Member), 2015 – Present
*Journal of Consumer Psychology* (Member), 2004 – Present
*Journal of the Academy of Marketing Science* (Member), 2008 – Present
*Journal of Retailing* (Member), 2020-Present.
*Marketing Letters* (Member), 2013 – Present
*Journal of Advertising* (Member), 2003 – 2010 (Resigned)
*Journal of Business Research* (Member), 2006 – 2009 (Resigned)
*Journal of Current Issues and Research in Advertising* (Member), 2009 – 2010 (Resigned)
*Academy of Marketing Science Review* (Member), 1999 – 2009.
*Journal of Consumer and Market Research* (Member), 1998 – 1999.

**Reviewer - Journals**
*Journal of Consumer Research* (2002-2014)
*Journal of Marketing Research* (1998-Present)
*International Journal of Research in Marketing* (2013-Present)
*Journal of Marketing* (2003-Present)
*Journal of Consumer Psychology* (2002-2004)
*Journal of the Academy of Marketing Science* (2006-2008)
*Marketing Letters* (2005-2013)
*Journal of Advertising* (2003-Present)
*Journal of Business Research* (2010-Present)
*Journal of Retailing* (1997-2019)
*Journal of Public Policy and Marketing* (1998-Present)
*Journal of Information Technology* (1999-Present)
*European Journal of Social Psychology* (2003 – Present)
*Journal of Managerial Psychology* (2005-Present).

**Reviewer - Conference Proceedings**
Association for Consumer Research Conference (1995 – 2006, 2008-2011, 2017-2018)
Society for Consumer Psychology Conference (2000-2004, 2006-2009, 2019-Present)
American Marketing Association Conference (1996, 1998 – 2005, 2009-2010)
Advances in Marketing Science Conference (2010-2011)
European Marketing Academy Conference (2009-2011)
Marketing and Public Policy Conference (1999, 2002)
American Association of Advertising Conference (2002, 2004).

**Reviewer - Text Books**
*Principles of Marketing (1e)*, Peter Dickson et al. (Reviewed Pricing Chapter written by J. Urbany).

## INDUSTRY AND CONSULTING EXPERIENCE

### *Expert Witness*

Retained by Ray Quinney & Nebeker for expert consumer services re: Alfwear, Inc. *v. Kulkote, LLC.*

Retained by Finnegan, Henderson, Farabow, Garrett & Dunner, LLP for expert consulting services re: *Gibson Brands, Inc., v. Armadillo Distribution Enterprises, Inc.*

Retained by Hovey Williams LLP for expert consulting services re: *Sportspower, Ltd.. v.* Crowntec., Ltd. (consulting expert).

Retained by Kelly IP, LLP for expert consulting services re: *World Wildlife Fund, Inc. v. Panda Restaurant Group, Inc.*

Retained by Kelly IP, LLP for expert consulting services re: *Teton Gravity. LLC v. ETW Corp.*

Retained by Kelly IP, LLP for expert consulting services re: *Cobra Engineering, Inc. v. Harley Davidson USA* (consulting expert).

Retained by Morgan, Lewis, and Bockius, LLP for expert consulting services re: *Ocusoft, Inc. v. Walgreen Co. & Walgreens.com, Inc.*

Retained by Jaburg Wilk LLP for expert consulting services re: *Cox Communications, Inc., v. Gigablast, Inc.* (consulting expert).

Retained by BoyarMiller LLP for expert consulting services re: *Farouk Systems, Inc. v. AG Global Products LLC, d/b/a FHI Heat, LLC and Shauky Gulamani.*

Retained by Morgan, Lewis, and Bockius, LLP for expert consulting services re: *Certain Footwear Products* (U.S.I.T.C. Complaint).

Retained by Kelly IP, LLP for expert consulting services re: *S.C. Johnson and Sons, Inc. v. Stoner, Inc.*

Retained by Brennan, Manna, & Diamond, LLC for expert consulting services re: *David Mowder v. Permanent General Assurance Corporation of Ohio et al.*

Retained by Kelly IP, LLP for expert consulting services re: *Koninklijke Philips Electronics N.V. v. Hunt Control Systems, Inc.*

Retained by ORCInternational for expert consulting services re: *Verisign, Inc. v. Dot Agency Limited.*

Retained by Parker, Hudson, Rainer, and Dobbs LLP for expert consulting services re: *Swift v. Bancorp, Inc.*

Retained by Tomlinson, Rust, McKinstry, and Grable for expert consulting services re: *The Charles Machine Works, Inc. v. Vermeer Manufacturing Company.*

Retained by Jacobson Holman PLLC for expert consulting services re: *Perfetti Van Melle USA v. Cadbury Adams USA  LLC.*

27

Exhibit 1
Page 29

Retained by Tomlinson and O'Connell PC for expert consulting services re:  *H-D Michigan, Inc. and Harley-Davidson Motor Company Group, Inc. d/b/a Harley-Davidson Motor Company v. Ridley Motorcycle Co.*

Retained by Freeborn & Peters for expert consulting services re:  *Columbik & Associates, Inc. et al. v. John Burgess et al.*

Retained by Darby and Darby PC for expert consulting services re:  *The Procter & Gamble Company v. Colgate-Palmolive Company.*

Retained by McKee, Voorhees, and Sease, PLC for expert consulting services re:  *Wells' Dairy, Inc. v. Nestle S.A., Societe-Des Products Nestle, S.A., Nestle U.S.A., Inc., Nestle U.S.A. Prepared Foods Division, Inc, and Nestle Ice Cream, LLC.*

Retained by Darby and Darby PC and Goodwin Proctor LLP for expert consulting services re:  *Morgan Chase Group, Inc and Morgan Chase Trust Company v. The Chase Manhattan Corporation and J.P. Morgan Chase & Co., Incorporated.*

Retained by Schachter & Associates for expert consulting services re:  *Jason Bacher v. Wing Eyecare et al.*

Retained by LaMarca & Landry, P.C., for expert consulting services re:  *National Concrete Services, Inc. v. Menard, Inc.*

28

Exhibit 1
Page 30