Stephen McArthur (State Bar No. 277712)
stephen@smcarthurlaw.com
Thomas Dietrich (State Bar No. 254282)
tom@smcarthurlaw.com
THE MCARTHUR LAW FIRM, P.C.
9465 Wilshire Blvd., Ste. 300
Beverly Hills, CA 90212
Telephone: (323) 639-4455

*Attorneys for Plaintiff Thrive
Natural Care, Inc.*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THRIVE NATURAL CARE, INC., <br><br> Plaintiff, <br><br> v. <br><br> LE-VEL BRANDS, LLC, <br><br> Defendant. | Case No. 2:21-CV-02022-DOC-KES <br><br> **PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** <br><br> Judge: Hon. David O. Carter <br> **Hearing Date**: April 12, 2021 <br> **Time**: 8:30 a.m. <br> **Courtroom**: 9D |

# TABLE OF CONTENTS

I.    Le-Vel Does Not Contest Most Issues Supporting an Injunction ............ 2

    A.    Thrive Holds Incontestable Federal Trademark Rights ...................... 2

    B.    Le-Vel Offers No Evidence to Contest Finding a Likelihood of
        Confusion Between THRIVE and THRIVE SKIN Marks ................. 3

II.   The Lanham Act Now Requires Presumption of Irreparable Harm
    for Thrive—Effective Date of New Law Was Immediate ...................... 5

III.  Le-Vel Cannot Prove It Has Senior Use Rights to THRIVE Mark
    on Skincare Products ............................................................................ 6

    C.    Le-Vel Agrees Thrive's Constructive Date of First Use of
        THRIVE Mark on Skincare Products Was September 11, 2012 ......... 7

    D.    Le-Vel Has Not Shown Any Market Penetration in Any
        Location Prior to Thrive's Constructive First Use Date ...................... 7

    E.    Natural Zone of Expansion Cannot Be Stretched as Le-Vel
        Claims ............................................................................................... 10

IV.   Thrive Will Continue to Be Severely Harmed Without An
    Injunction ............................................................................................ 16

    A.    Thrive's Harm Without an Injunction is and Will Continue to be
        Significant ......................................................................................... 16

    B.    Thrive Did Not Unreasonably Delay ................................................. 17

V.    Le-Vel's Knowing Infringement is Not a Shield to an Injunction .......... 19

VI.   Bond, if Any, Should Be Minimal ........................................................ 21

Conclusion ..................................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*Academy of Motion Picture Arts Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446 (9th Cir. 1991)................................................................................4

*Adidas Am., Inc. v. Skechers USA, Inc.*, 149 F. Supp. 3d 1222 (D. Or. 2016).........16

*Arc of Cal. v. Douglas*, 757 F.3d 975 (9th Cir. 2014)..............................................18

*Blackbird Techs., Inc. v. Joshi*, No. 5:15-cv-04272-EJD (N.D. Cal. Oct. 6, 2015).22

*Brookfield Comms., Inc. v. West Coast Ent. Corp.*, 174 F.3d 1036 n. 13 (9th Cir. 1999)..........................................................................................................7, 8, 15

*Brooklyn Brewery Corp. v. Black Ops Brewing, Inc.*, 156 F. Supp. 3d 1173 (E.D. Cal. 2016).............................................................................................19, 20

*Cadence Design Sys. v. Avant! Corp.*, 125 F.3d 824 (9th Cir. 1997).......................19

*Clark Freeman Corp. v. Heartland Co. Ltd.*, 811 F. Supp. 137 (S.D.N.Y. 1993)...14

*CreAgri, Inc. v. USANA Health Sciences, Inc.*, 474 F.3d 626 n.7 (9th Cir. 2007)....7

*Credit One Corporation v. Credit One Financial, Inc.*, 661 F. Supp. 2d 1134 (C.D. Cal. 2009)........................................................................................8, 10, 11, 15

*Fiji Water Co. Llc v. Fiji Mineral Water U.S. LLC*, 741 F. Supp. 2d 1165 (C.D. Cal. 2010)...................................................................................................22

*FW Omnimedia Corp. v. Toyota Motor Sales, U.S.A., Inc.*, No. 04-8624 GPS (JRx) (C.D. Cal. Dec. 8, 2004)............................................................................8

*Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962 (C.D. Cal. 2002)..............4, 8, 9, 11

*Golden Door, Inc. v. Odisho*, 646 F.2d 347 (9th Cir. 1980) .....................................4

*Gozlon-Peretz v. United States*, 498 U.S. 395 (1991)..............................................5

*Guess ?, Inc. v. Hermanos*, 993 F. Supp. 1277 (C.D. Cal. 1997) .....................18, 19

*iShow.com, Inc. v. Lennar Corp.*, No. C15-1550RSL (W.D. Wash. Mar. 17, 2017) ...................................................................................................12, 13, 15

*Kerzner Int'l Limited v. Monarch Casino Resort*, 675 F. Supp. 2d 1029 (D. Nev. 2009)..........................................................................................................11

*King Research, Inc. v. Shulton, Inc.*, 454 F.2d 66 (2d Cir. 1972) ...........................14

*Levi Strauss Co. v. Blue Bell, Inc.*, 778 F.2d 1352 (9th Cir. 1985)...........................4

*Moroccanoil, Inc. v. Zotos Int'l, Inc.*, 230 F. Supp. 3d 1161 (C.D. Cal. 2017).......22

*Newmark Realty Cap., Inc. v. BGC Partners, Inc.*, No. 16-CV-01702-BLF, 2018 WL 2573183 (N.D. Cal. Mar. 30, 2018)..............................................................12

*Ocean Garden, Inc. v. Marktrade Co.*,953 F.2d 500 (9th Cir. 1991) .....................18

*Optimal Pets, Inc. v. Nutri-Vet, LLC*, 877 F. Supp. 2d 953 (C.D. Cal. 2012). ....8, 10

*Ossur hf v. Manamed Inc.*, 331 F. Supp. 3d 1005 (C.D. Cal. 2017)......19, 20, 21, 22

*Physicians Formula Cosmetics Co. v. West Cabot Cosmetics, Inc.*, 857 F.2d 80 n. 1 (2d Cir. 1988)............................................................................................14

*Planetary Motion v. Techplosion*, 261 F.3d 1188 (11th Cir. 2001) .........................12

*Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118 (9th Cir. 2014) ............................4

*Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113 (9th Cir. 2005) ........................21

*Suja, Life, LLC v. Pines Int'l, Inc.*, No. 16-CV-985 (S.D. Cal. Oct. 24, 2016) .......18

*Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1326 amended, 775
F.2d 998 (9th Cir. 1985)..................................................................................21

*Wine Grp., LLC v. L. & R. Wine Co.*, No. 2:10-cv-02204-MCE-KJN (E.D. Cal. Sep.
7, 2012)............................................................................................................9

**Statutes**

H. Rept. 116-645 (TMA) 116th Congress (2019-2020)...........................................5

**Treatises**

2 J. Thomas McCarthy on Trademarks and Unfair Competition § 16:17 (5th ed.) ..7,
16, 17

With regard to Thrive's chances of success on the merits—Le-Vel hardly contests likelihood of confusion at all. That is because confusion between Thrive's THRIVE skincare products and Le-Vel's competing THRIVE SKIN skincare products is plainly obvious. Le-Vel's argument that Thrive only sold its products to men is wrong in light of Le-Vel's own evidence—showing, in 2015, that Thrive was advertising its products directly to women and selling female-focused products. Indeed, Thrive has sold the *majority* of its products to women for much longer than Le-Vel has been in the skincare business. The parties are now direct competitors and Le-Vel has promised that, unless an injunction issues, it has plans to ███ ███████████████████████████████████████████████████. An injunction is clearly necessary to stop Le-Vel from continuing to ███████ its infringement of Thrive's registered marks.

Le-Vel rests its defense on a claim that it has obtained common law trademark rights over the THRIVE mark for *skincare* products by allegedly giving away 91 samples of *vitamins* to its own promoters and salesmen prior to September 11, 2012—the date Plaintiff Thrive's constructive first use and national rights were locked in by filing its first trademark application. Le-Vel admits it never actually sold a single product until after Thrive's constructive first use date. Le-Vel's showing is not even close to sufficient to prove it achieved the significant market penetration needed to establish common law rights to the THRIVE mark for vitamins in any single geographic location, let alone nationwide. And without proof of market penetration for vitamins, Le-Vel cannot prove it gained any senior rights to use the THRIVE mark on skincare products under the "natural zone of expansion" test. Rather, Plaintiff Thrive has senior rights to use the THRIVE mark on skincare products, as of the date it filed its trademark application on September 11, 2012.

Le-Vel then tries to avoid an injunction by using its own intentional infringement as a shield. Le-Vel's damages expert claims that ████████

████████████████████████████████████████████████

████████████████████████████████. If that is so, there is no possible way Le-Vel could have been unaware of Plaintiff Thrive, whose skincare business and trademark registration would have been uncovered by a simple Google search. Le-Vel chose to infringe with eyes wide open. It chose to incur the costs of branding its skincare line THRIVE SKIN with knowledge that Thrive held an incontestable trademark registration for THRIVE on skincare products and had been using that mark on skincare products for years. Le-Vel thus chose to accept the consequences of intentional infringement—that it might be enjoined from infringing and have to incur costs to rebrand. Having accepted that risk, Le-Vel cannot now cry crocodile tears that a known outcome may come to pass.

## I.      Le-Vel Does Not Contest Most Issues Supporting an Injunction

Le-Vel does not contest Thrive's ownership of an incontestable trademark registration or substantially contest likelihood of confusion.

### A.      Thrive Holds Incontestable Federal Trademark Rights

Le-Vel does not contest in its opposition that Thrive is the owner of a registered, incontestable trademark for THRIVE on skincare products, U.S. Reg. No. 4,467,942. [Doc. 24-2 at 11] Nor does Le-Vel contest Thrive's ownership of a second federal trademark, U.S. Reg. No. 6,164,303, for the mark THRIVE on additional skincare products. Thrive's ownership of federal registrations is thus established.[1] And Le-Vel has not contested Thrive's registrations of the THRIVE

---

[1] While Le-Vel states in a footnote that it has filed a petition to cancel Thrive's registration with the USPTO, that petition has no chance of succeeding, as Le-Vel cannot prove Thrive committed fraud in obtaining the registration. To obtain a cancellation against an incontestable registration, Le-Vel would need to prove by clear and convincing evidence that Thrive filed false information about its first use in commerce while *knowing* that information was false, with specific intent to commit a fraud on the USPTO. *See, e.g.*, *M.C.I. Foods, Inc. v. Brady Bunte*, No. 92046056 (TTAB Sep. 13, 2010) (holding "a trademark registration is obtained fraudulently only if the applicant knowingly makes a false, material representation with the intent to deceive the USPTO" and "the very nature of the charge of fraud requires that it be proven 'to the hilt' with clear and convincing evidence. There is no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party."); *Lockstock Pubs., Inc. v. J. Thomas*

1  marks in the instant case.

2        **B.**    **Le-Vel Offers No Evidence to Contest Finding a Likelihood of
Confusion Between THRIVE and THRIVE SKIN Marks**

3

4        Le-Vel does not seriously contest that its use of THRIVE SKIN branding on

5  the accused skincare products is likely to cause confusion with Thrive's registered

6  THRIVE marks on skincare products. [*See id*. at 10-13] Indeed, Le-Vel's

7  opposition does not cite *Sleekcraft* or discuss the *Sleekcraft* factors *at all*. [*See id*.]

8        Instead, Le-Vel relies on obfuscation rather than evidence to argue that

9  Thrive sells only men's grooming products to male customers, while Le-Vel

10  allegedly sells mostly to female customers. But that is demonstrably wrong in light

11  of Le-Vel's own evidence—showing that, in 2015, Thrive was selling gender-

12  neutral energy scrub, face balm, and bodyshave oil and using women-focused hash

13  tags such as #NATURALBEAUTY and #GREENBEAUTY in its advertising.

14  [Doc. 22-3 at 76, 77, 99 (Thrive Instagram posts)] Indeed, like Le-Vel, Thrive sells

15  the *majority* of its products to women and has done so for years. [McIntosh Decl. ¶

16  3 and Ex. B] The parties are thus now direct competitors selling to the same target

17  market.

18        The only other *Sleekcraft* factor that Le-Vel addresses is actual confusion.

19  While Le-Vel's expert quibbles Thrive's survey evidence showing a high rate of

20  actual confusion, that is not enough to avoid a finding of likelihood of confusion

21  under *Sleekcraft* for two reasons. *First*, "[e]vidence of actual confusion is not

22  _____

23  *Investments, Inc.*, No. 92057753 at *7-8 (TTAB Jan. 15, 2016) (holding that the
registrant's belief he was using the mark in commerce barred a finding of fraud, and
"whether this belief was accurate or reasonable is not relevant to the fraud

24  inquiry."). Le-Vel has no chance of succeeding in on its cancellation petition, as
Thrive's CEO has testified to his good faith in claiming a date of first use in

25  commerce as of the date he sent THRIVE-branded products to customers and
transported those goods in commerce. Filed with this response is documentary

26  evidence of Thrive's shipments of THRIVE-branded skincare products to Whole
Foods and Pharmaca markets, proving that Thrive's first use in commerce was

27  August 2013. [Declaration of Alex McIntosh filed herewith ("McIntosh Decl."), ¶ 2
and Ex. A]. Thus, it is impossible for Le-Vel to have any chance of meeting its high

28  burden and prevailing on this issue.

necessary to prevail on an infringement claim or to secure injunctive relief." *Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 999 (C.D. Cal. 2002); *see also Academy of Motion Picture Arts Sciences v. Creative House Promotions, Inc*., 944 F.2d 1446, 1456 (9th Cir. 1991) ("actual confusion is not necessary to a finding of likelihood of confusion under the Lanham Act"); *Levi Strauss Co. v. Blue Bell, Inc*., 778 F.2d 1352, 1360 (9th Cir. 1985) ("The absence of evidence of actual confusion need not give rise to an inference of no likelihood of confusion"); *Golden Door, Inc. v. Odisho*, 646 F.2d 347, 352 (9th Cir. 1980) (affirming the grant of an injunction for plaintiff despite the absence of evidence of actual consumer confusion).

*Second*, Le-Vel's expert attacks Thrive's survey on grounds that it showed survey-takers a screenshot of Le-Vel's point-of-sale page, which allegedly appears in the purchase process after a sign-in prompt for Le-Vel's website. But that is not an error. Many, if not most, e-commerce websites initially require a user to sign in before completing a purchase. For example, Amazon.com, Best Buy, Zappos, and Chewy.com all request a user's login and password before being able to reach the point-of-purchase page. [Declaration of Stephen McArthur filed herewith ("McArthur Decl.") Ex. A] It is the rare site where a user can make a purchase *without* first being asked to sign in. That is therefore not a basis to disregard Thrive's survey findings. As is proper, Thrive's survey showed its own, Le-Vel's, and the control products' point-of-sale pages as they would be seen by internet users purchasing each product.

Other than these two issues, Le-Vel ignores the *Sleekcraft* test and does not even attempt to argue there is no likelihood of confusion. Thrive has proven a likelihood of success on the merits of its trademark infringement claims. *See Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014) (plaintiff must demonstrate that (1) it has a protected ownership interest in its mark, and (2) defendant's use is likely to cause consumer confusion). That leaves at issue only Thrive's ownership of its mark and irreparable harm.

**II.** **The Lanham Act Now Requires Presumption of Irreparable Harm for Thrive—Effective Date of New Law Was Immediate**

Le-Vel argues that "prudence" counsels applying old Ninth Circuit case law which did not apply a presumption of irreparable harm when a plaintiff demonstrated a likelihood of success on the merits. [Doc. 24-2 at 14] Thrive believes, however, that prudence counsels that this Court should follow federal law.

The presumption of irreparable harm contained in the Trademark Modernization Act of 2020 ("TMA") was effective *immediately* upon the Act's signature into law on December 27, 2020. While other sections of the TMA expressly stated they were not effective until one year later, Section 6 amending 15 U.S.C. § 1115(a) to grant a plaintiff a presumption of irreparable harm contained no such future effective date. *See* H. Rept. 116-645 (TMA) 116th Congress (2019-2020) (Section 5 containing new procedures for trademark review by USPTO containing clause specifying effective date of one year from implementation; Section 6 regarding presumption of irreparable harm not containing any such future effective date language). Therefore, Section 6 to the TMA—and the presumption of irreparable harm in favor of trademark plaintiffs—was effective immediately. *See Gozlon-Peretz v. United States*, 498 U.S. 395, 404 (1991) (holding "[i]t is well established that, absent a clear direction by Congress to the contrary, a law takes effect on the date of its enactment" and that, where certain sections of a law contain express effective dates but others do not, sections without such dates are effective immediately because "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

While Le-Vel cherrypicked one article that expressed some uncertainty on this issue, most legal articles from reputable sources assert there is no question that the TMA immediately amended the relevant section of the Lanham Act. [*See*

McArthur Decl. Ex. B] Thus, "prudence" here requires that the Court must grant Thrive a presumption of irreparable harm if Thrive shows a likelihood of success on the merits of its trademark infringement claims. Accordingly, the old case law and argument cited by Le-Vel in its brief [Doc. 24-2 at 14-17] is irrelevant and should be disregarded as not analyzing irreparable harm under the now-applicable standard.

## III.    Le-Vel Cannot Prove It Has Senior Use Rights to THRIVE Mark on Skincare Products

Le-Vel's opposition to Thrive's motion rests almost entirely on the allegation that Le-Vel had established "superior common law rights" to the THRIVE mark on vitamins and shake mix, which rights would, via Le-Vel's extraordinary stretch of legal interpretation, carry over to skincare products under the "natural zone of expansion" test. [Doc. 24-2 at 1] But Le-Vel's claim is completely at odds with case law holding that Le-Vel has no common law rights at all unless it could prove (which it cannot) both that it had established significant market penetration *before* Thrive's September 11, 2012 constructive date of first use, and that vitamins and skincare lotions are closely related for trademark purposes.

In fact, the lynchpin of Le-Vel's defense requires that it convince the Court of two equally unlikely legal theories, both of which go against binding caselaw: (1) that 91 samples of a multivitamin given for free to its own salespeople establishes the requisite "market penetration" for common law rights in any given zip code, much less *nationwide*[2]; and (2) that those senior common law trademark rights to a multivitamin somehow translate to senior rights nationwide for skincare lotions and creams. Le-Vel has no realistic chance of winning either of these issues in this litigation. And it would have to win both to have the senior rights it claims.

/ / /

---

[2] The market penetration geography is analyzed on a zip code by zip code basis. *See Optimal Pets*, 877 F. Supp. 2d at 961-64.

**C.      Le-Vel Agrees Thrive's Constructive Date of First Use of THRIVE Mark on Skincare Products Was September 11, 2012**

Le-Vel acknowledges, as it must, that Thrive's constructive date of first use of its THRIVE mark in relation to skincare products was September 11, 2012. [Doc. 24-2 at 1] Under Ninth Circuit law, "the filing of an intent to use application constitutes constructive use of the mark, conferring a right of priority, nationwide in effect." *CreAgri, Inc. v. USANA Health Sciences, Inc*., 474 F.3d 626, 629 n.7 (9th Cir. 2007); *see also Brookfield Comms., Inc. v. West Coast Ent. Corp*., 174 F.3d 1036, 1051 n. 13 (9th Cir. 1999) ("Because 'MovieBuff' is a federally registered trademark, [plaintiff] is entitled to a presumptive first use date equivalent to the filing date of its trademark registration application"). "'Constructive use' means that which establishes a nationwide priority date with the same legal effect as the earliest actual use of a trademark at common law." 2 J. Thomas McCarthy on Trademarks and Unfair Competition § 16:17 (5th ed.). Thus, Thrive's nationwide priority date of first use of the THRIVE mark on skincare products is September 11, 2012—the date Thrive filed its first trademark application, which matured as the '942 Mark. [Doc. 8-2 Att. 1]

**D.      Le-Vel Has Not Shown Any Market Penetration in Any Location Prior to Thrive's Constructive First Use Date**

Le-Vel is not asserting it acquired common law rights by using the THRIVE name on skincare products before Thrive's first use date. Rather, Le-Vel's defense is based entirely on its alleged preceding use of the THRIVE name on vitamins and shake mix, which Le-Vel claims gave it common law trademark rights over the THRIVE mark on skincare products because the "natural zone of expansion" of vitamins and shake mix supposedly encompasses skincare lotion products. There is no legal support for Le-Vel's position for two reasons: (1) Le-Vel cannot prove it acquired any preceding common law rights on vitamins and shake mix; and (2) Le-Vel cannot meet its burden of showing skincare lotion products are within the

1   natural zone of expansion of a multivitamin and shake mix.

2       A "senior user" "has the right to enjoin 'junior' users from using confusingly

3   similar marks in the same industry and market or within the senior user's natural

4   zone of expansion." *Brookfield*, 174 F.3d at 1047. However, law in this Circuit is

5   clear that for a mark user to obtain senior common law trademark rights it "must

6   not only establish that it is the senior user, ***it must also show that it has legally***

7   ***sufficient market penetration in a certain geographic market to establish those***

8   ***trademark rights***." *Credit One Corporation v. Credit One Financial, Inc.*, 661 F.

9   Supp. 2d 1134, 1138 (C.D. Cal. 2009) (emphasis added); *see also FW Omnimedia*

10  *Corp. v. Toyota Motor Sales, U.S.A., Inc*., No. 04-8624 GPS (JRx), at *14 (C.D.

11  Cal. Dec. 8, 2004). A senior trademark user gains rights "only in areas in which it

12  has legally sufficient market penetration." *Optimal Pets, Inc. v. Nutri-Vet, LLC*, 877

13  F. Supp. 2d 953, 959 (C.D. Cal. 2012). "Sufficient market penetration is determined

14  by examining the trademark user's volume of sales and growth, number of persons

15  buying the trademarked product in relation to the number of potential purchasers,

16  and the amount of advertising in a given market." *Credit One*, 661 F. Supp. 2d at

17  1138.

18      Courts will not consider the natural zone of expansion without the party

19  claiming senior rights first proving it obtained sufficient market penetration to

20  acquire common law rights in its mark. "Awarding common law trademark rights

21  based on a 'zone of natural expansion' presupposes . . . that the trademark user has

22  already penetrated the market in at least some geographic areas and established a

23  presence there." *Glow*, 252 F. Supp. 2d at 985. "[I]t is only ***after*** existing zones of

24  market penetration are determined that natural zones of expansion can be

25  identified." *Id*. (emphasis added). Despite this primary requirement, Le-Vel never

26  once mentions the term "market penetration" in its Opposition or attempts to make

27  a showing that it could meet its burden here.

28      Moreover, any relevant market penetration by Le-Vel must have occurred

before Thrive filed its trademark application. "The filing of a trademark application freezes the geographic scope of the prior user's claim." *Wine Grp., LLC v. L. & R. Wine Co*., No. 2:10-cv-02204-MCE-KJN, at *39 (E.D. Cal. Sep. 7, 2012) (citing *Quiksilver, Inc. v. Kymsta Corp*., 466 F.3d 749, 762 (9th Cir. 2006)). "Upon the filing of the application, a prior user's claim to the right to use the design subject to the trademark is limited 'to those areas where [it] then enjoyed recognition based on its reputation, advertising, and sales.'" *Id*.

Here, even if Court accepts all Le-Vel's offered evidence of prior use and draws all inferences in Le-Vel's favor, Le-Vel still cannot meet the burden of proving it acquired common law rights to the THRIVE mark before Thrive's first use date of September 11, 2012. Le-Vel's evidence consists of 91 invoices dated August 24, 2012, to September 11, 2012, showing that Le-Vel gave away single samples of its multivitamin and shake mix to its own brand promoters for free. [Doc. 24-3 ¶ 12, Ex. 1] Le-Vel admits it did not actually sell any THRIVE-branded supplements until September 15, 2012—after Thrive's constructive date of first use. [Doc. 24-3 ¶ 14] ("Le-Vel made its first cash sale of its THRIVE products on September 15, 2012"). Le-Vel has also not offered any evidence that it advertised its THRIVE supplements online before Thrive's constructive first use date. [*Id*. (screen captures dated September 15, 2012)] Finally, Le-Vel released its THRIVE DFT topical patches in 2013, long *after* Thrive's constructive date of first use in 2012. [*See id*. ¶¶ 16-17]. Accordingly, Le-Vel's discussion of topical patches is irrelevant to its first use analysis.

Le-Vel's showing that it gave away 91 samples of vitamins and shake mix prior to September 12, 2011, is not nearly enough to establish legally sufficient market penetration in any geographic area. *See, e.g.*, *Glow*, 252 F. Supp. 2d at 984 (finding no market penetration despite sales in all 50 states and substantial advertising because the party claiming common law rights had presented no evidence of the "volume or level of sales in any location, nor how [its] market

penetration compares with that of competitors"); *Credit One*, 661 F. Supp. 2d at 1137 (finding no market penetration in areas where an office had closed and there was no basis to believe sales had occurred); *Optimal Pets*, 877 F. Supp. 2d at 962 (finding no market penetration because the party claiming common law rights had no sales in 34 states, in 8 of the 16 states where there were sales those sales were under $80, and the two states with "big ticket" sales all originated in a single zip code). Never has a court found legally sufficient market penetration on as little evidence as Le-Vel offers. By September 11, 2012, Le-Vel admittedly had zero sales, zero purchasers, and zero, or hardly any, advertising. *Cf. Credit One*, 661 F. Supp. 2d at 1138 (listing factors considered in analysis). Le-Vel has not cited a single case in support of market penetration. It did not even mention market penetration, perhaps hoping that Thrive or the Court would forget about this necessary requirement if Le-Vel simply kept mum on it.

The undisputed evidence shows that Thrive filed its first trademark application, which matured as the '942 Mark, on September 11, 2012. By that date, Le-Vel was not selling any product in any location. As a matter of law, Le-Vel could not have achieved any significant market penetration in any zip code or region with its THRIVE-branded vitamins or shake mix. Le-Vel thus cannot prove it holds any common law rights senior to Thrive's, much less that Le-Vel achieved any sort of requisite market penetration throughout the entire United States before Thrive's seniority date of September 11, 2012. *See Credit One*, 661 F. Supp. 2d at 1138. The Court should therefore reject Le-Vel's contention that it could possibly hold common law rights to the THRIVE mark on vitamins or shake mix which predate Thrive's constructive date of first use of its THRIVE mark on skincare products.

### E.   Natural Zone of Expansion Cannot Be Stretched as Le-Vel Claims

Because Le-Vel cannot prove sufficient market penetration prior to Thrive's priority date, the Court need not conduct the natural zone of expansion analysis. *See*

*Glow*, 252 F. Supp. 2d at 985. But even if the Court did review this issue, Le-Vel's defense cannot succeed. The "zone of natural expansion is generally defined narrowly." *Credit One*, 661 F. Supp. 2d at 1138 (quoting *Glow*, 252 F. Supp. 2d at 984). "The doctrine is normally invoked by senior users seeking to expand their *federal* statutory trademark rights into areas where a junior user is already using the mark under the protection of the *common law.* " *Kerzner Int'l Limited v. Monarch Casino Resort*, 675 F. Supp. 2d 1029, 1049 (D. Nev. 2009) (emphasis added). The court in *Kerzner* rejected an argument similar to Le-Vel's where a party claiming senior rights "turns the doctrine on its head, seeking to leverage its state trademark rights to expand the geographic area in which it is entitled to trademark protections in derogation of [a federal registration owner's] federal rights." *Id*. The court noted it had not discovered "any authority for so applying the natural zone of expansion doctrine" and that "[e]ven in the more usual circumstance, most courts have rejected the senior user's arguments on the facts, narrowly defining the senior user's zone of natural expansion." *Id*. at 1049 and n.11.

Here, Thrive is the holder of federal rights in the THRIVE mark for skincare products. It would be an unsupportable misuse of the zone of expansion doctrine to find that Le-Vel—who admittedly had no federal rights in relation to skincare products as of Thrive's priority date or ever—could disregard Thrive's federal rights and expand however it wishes simply because Le-Vel allegedly gave away a few samples of vitamins and shake mix to its own brand promoters days before Thrive filed its trademark application. Holding for Le-Vel would vastly increase the powers of alleged common law rights holders at the expense of those who have made the effort to obtain federal trademark registrations. That is not the law.

In addition, the zone of expansion test only covers "closely related" goods "(such as pancake batter and pancake syrup) or where a senior user would normally and reasonably be expected to expand into another product line (from bicycle tires to auto tires, for example) . . . ." *iShow.com, Inc. v. Lennar Corp*., No. C15-

1550RSL, at *3 (W.D. Wash. Mar. 17, 2017) (quoting 4 McCarthy on Trademarks and Unfair Competition § 24:20). "[A] trademark owner cannot by the normal expansion of its business extend the use or registration of its mark to *distinctly different* goods or services not comprehended by its previous use . . . where the result could be a conflict with *valuable intervening rights established by another through extensive use . . .* of the same or similar mark for like or similar goods and services." *Planetary Motion v. Techplosion*, 261 F.3d 1188, 1201 (11th Cir. 2001) (quoting *Carnival Brand Seafood Co. v. Carnival Brands, Inc.*, 187 F.3d 1307, 1311 (11th Cir. 1999)). Whether goods are considered closely related under the natural zone of expansion test does not depend on Le-Vel's CEO's self-serving testimony that he always wanted to move into skincare. Rather, it relies on whether there would have existed a likelihood of confusion between Le-Vel's vitamins and shake mix and Thrive's skincare lotion products when they were first introduced. As Le-Vel's own cited case law states, "to apply the doctrine [of natural zone of expansion], the senior user must show a likelihood of confusion between the use of the senior user's mark on its original products and the use of the junior user's mark on the products which the senior user allegedly would have naturally expanded to sell." *Newmark Realty Cap., Inc. v. BGC Partners, Inc.*, No. 16-CV-01702-BLF, 2018 WL 2573183, at *17 (N.D. Cal. Mar. 30, 2018); *see also iShow.com*, No. C15-1550RSL, at *3 (same). In other words, Le-Vel, as the alleged senior user, would need to show consumers would have been likely to confuse its multivitamin with Thrive's skincare lotion products, at the time Thrive began its business.

Le-Vel has not even attempted to make this showing. Therefore, the Court cannot properly apply the zone of expansion test in this case. *See Newmark*, 2018 WL 2573183, at *17-18 (denying defendant's claim to prior use rights where defendant failed to argue *Sleekcraft* analysis supported confusion between its originally offered service and plaintiff's later offered service). The Court can reach this conclusion without conducting *any* weighing of the evidence offered by the

parties. There is simply no evidence to support Le-Vel's claim, and no basis to apply the zone of natural expansion test.

If the Court were to inquire further, there is substantial evidence that vitamins and skincare products are not so closely related that "a senior user would normally and reasonably be expected to expand" from one product line to the other. *See iShow.com*, No. C15-1550RSL, at *3. The USPTO puts vitamins and skincare products in different classes of goods for trademark examination and registration purposes. *See* Trademark Manual of Examining Procedure § 1401.02(a) (available at https://tmep.uspto.gov/RDMS/TMEP/current#/current/TMEP-1400d1e1.html) (skincare and cosmetics fall into International Class 3 and vitamins and shake mix supplements into International Class 5). Le-Vel has filed to register numerous vitamin-related marks containing the term "thrive," but the USPTO has not rejected those applications over Thrive's preexisting THRIVE mark registration. Indeed, the USPTO has approved the registration of dozens of trademarks by different applicants for identical marks, one applicant for the mark on skincare products and the other applicant for the mark on supplements or vitamins. [McArthur Decl. Ex. C (report identifying similar marks with different owners on these goods)].

The USPTO's opinion that the products are not in the same class is borne out in the marketplace. The most popular skincare companies—Neutrogena, Olay, Nivea, Este Lauder, Aesop, Curel, CeraVe, Dove, Cetaphil, Jergens—do not make or sell vitamins. [McIntosh Decl. ¶ 5 and Ex. C]. Conversely, the largest vitamin companies—Nature Made, Centrum, Vitafusion—do not sell skincare products. [*Id*. Ex. D] The products are not complementary, do not use the same or similar materials, and are not found near each other in physical stores that sell both. [*Id*. ¶ 5] Despite Le-Vel's CEO's alleged preexisting knowledge of the skincare industry, it *still* took Le-Vel over six years to expand from selling vitamins and shake mix to selling skincare products. [Doc. 24-3 ¶¶ 11-14, 47] Other courts have found goods are not closely related in similar circumstances. *See, e.g., Physicians Formula*

*Cosmetics Co. v. West Cabot Cosmetics, Inc.*, 857 F.2d 80, 82 n. 1 (2d Cir. 1988) (defendant's prior use of mark on hard-bar soap did not extend to give defendant priority to use similar mark in connection with cosmetics and skin creams, and so intervening user with respect to cosmetics and skin creams had priority); *Clark Freeman Corp. v. Heartland Co. Ltd.*, 811 F. Supp. 137, 142 (S.D.N.Y. 1993) (where plaintiff had senior rights to HEARTLAND mark with respect to women's boots, those rights did not extend to give plaintiff priority over defendant's intervening use of HEARTLAND with respect to shirts, sweaters, trousers, and jackets, because at the time the intervening use began, "there was no real likelihood that plaintiffs would bridge the gap by applying the 'Heartland' label to the types of products defendants were selling"). If soaps are not related to skincare products, then neither are Le-Vel's vitamins. If boots are not related to shirts, sweaters, trousers, or jackets, then Le-Vel's vitamins are not related to skincare lotions and creams.

In addition, Le-Vel's evidence showing the same manufacturer sells two different products under different brand names does not support that those goods are related under the zone of expansion test. *See King Research, Inc. v. Shulton, Inc.*, 454 F.2d 66, 68 (2d Cir. 1972) (holding that plaintiff owner of SHIP-SHAPE mark for brush cleaner could not rely on its sales of toiletry products which "to date have been under other names" as evidence that defendant's toiletries sold under the SHIP SHAPE mark were within plaintiff's natural zone of expansion). While Le-Vel has offered screenshots showing several other multi-level marketing companies sell vitamins and skincare products, those exhibits show that even those sellers generally do not use the same *brand* for both types of products. [*See* Doc. 22-3, Ex. 2 (Amway sells Nutrilite brand vitamins and Artistry brand skin products); Ex. 5 (Isagenix sells AMPED brand vitamins and Rejuvity brand skin products); Ex. 6 (Jeunesse sells AM/PM brand vitamins and Luminesce brand skin products); Ex. 7 (Melaleuca sells Vitality brand vitamins and Sei Bella brand skin products); Ex. 8

(Nikken sells Kenzen brand vitamins and True Elements brand skin products); Ex. 9 (Shaklee sells Life Shake and Vitalizer brand vitamins and YOUTH brand skin products)]. Le-Vel's evidence of these other brands thus does not support Le-Vel's claim that it could normally and reasonably be expected to carry over its THRIVE branding from vitamins to skincare products.

Lastly, Le-Vel's evidence that retail stores such as GNC and Vitamin Shoppe sell supplements and skincare products under the same roof is also irrelevant. [Doc. 22-3, Exs. 10 and 11] Those stores are akin to a grocery store or Amazon—merely selling two products in the same store, virtual or physical, does not make those products so closely related that "a senior user would normally and reasonably be expected to expand into another product line . . . ." *iShow.com*, No. C15-1550RSL, at *3. If that were so, one could claim almost any goods are so related. Le-Vel is seeking an unprecedentedly broad extension of the zone of expansion test—both in terms of its applicability to an alleged common law rights owner with no market penetration in any area, and its coverage of unrelated products. Finding for Le-Vel would clearly violate the principle that the Court must apply to zone of expansion test "narrowly." *Credit One*, 661 F. Supp. 2d at 1138. Le-Vel has not met, and could never meet, its burden to show that the natural zone of expansion test should be considered here. And even if it were, lotions and creams are not within the natural zone of expansion for a seller of vitamins and shake mix. Thrive has thus satisfied the first element of the Lanham Act infringement analysis—Thrive has valid senior rights to the THRIVE marks on skincare products. *See Brookfield*, 174 F.3d at 1046. And Le-Vel has conceded the second element of the infringement test—that its use of the THRIVE SKIN mark on skincare products creates a likelihood of confusion with Thrive's THRIVE marks for identical types of skincare products. Thrive has therefore met its burden of proving it is likely to succeed on the merits of its trademark infringement claims.

/ / /

## IV.   <u>Thrive Will Continue to Be Severely Harmed Without An Injunction</u>

As explained above, because it has shown a likelihood of success on the merits, Thrive is entitled a presumption of irreparable harm under the TMA. The cases cited by Le-Vel do not take this into account and are of questionable applicability. Even Le-Vel's own evidence—███████████████████████████ ████████████████████████████████—shows that Thrive needs this Court to grant a preliminary injunction to protect its brand and its business.

### A.   Thrive's Harm Without an Injunction is and Will Continue to be Significant

Le-Vel relies in its opposition solely on cases where a plaintiff had to affirmatively prove irreparable harm [Doc. 24-2 at 19-21] That is no longer the law. Further, Thrive has offered evidence that, due to Le-Vel's infringements, Thrive has suffered a loss of control over its trademarks, reputation, and goodwill. [Doc. 8-1 at 22-23; Doc. 8-2 ¶¶ 19-27] Thrive now has to pay a prohibitively exorbitant amount for online advertising because Le-Vel (as it admits) has flooded the market, and Thrive must contend with a direct competitor using its marks, particularly a competitor with a history of extremely negative reviews from *unbiased* sources. [*See id.*] That is a "quintessentially irreparable injury." *Adidas Am., Inc. v. Skechers USA, Inc.*, 149 F. Supp. 3d 1222, 1249 (D. Or. 2016); McCarthy on Trademarks, § 30:47.70.

Le-Vel's expert claims Thrive has exaggerated Le-Vel's negative reputation because allegedly Le-Vel has received positive comments in ███████████████ ████████████████████████████████████████ Doc. 24-9 ¶ 52 (emphasis added) (citing to zero evidence)] Given that Le-Vel's customers *are* its promoters and vice versa, and Le-Vel is a billion-dollar player in the MLM industry, these certainly are not unbiased sources like the ones from which Thrive actually submitted evidence. Le-Vel's only other argument is that Le-Vel donates a lot of money to charity [*Id.*] That is hardly

an indicator of a good reputation amongst consumers. [*See* McArthur Decl. Ex. D (articles referring to "reputation-washing" by companies like Perdue Pharma, Enron, Walmart, and Smith & Wesson)] Le-Vel's reputation and direct competition against Thrive using Thrive's own marks has caused and will continue to cause significant irreparable harm to Thrive.

Le-Vel itself admits that harm to Thrive will grow significantly without an injunction. According to Le-Vel's damages expert:

[Doc. 24-9 ¶ 36 (emphasis added)] Thus, by Le-Vel's own evidence, ███████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████. That is crystal clear evidence that an injunction is needed to prevent Thrive—the owner of federal trademark rights to the THRIVE mark for skincare products—from completely losing its rights to a much larger player. Without an injunction, Le-Vel admits it will ████████████████████████████████████████████ ██████████████████████ There would be no possibility of "un-ringing" that bell to compensate Thrive after the fact. *See* McCarthy on Trademarks, § 30:47.70 ("A likelihood of damage to reputation is by its nature 'irreparable.' Like trying to un-ring a bell, trying to 'compensate' after the fact for damage to business goodwill and reputation cannot constitute a just or full compensation.").

**B.**     **Thrive Did Not Unreasonably Delay**

Le-Vel again relies on case law where no presumption of harm was granted in arguing Thrive unreasonably delayed seeking a preliminary injunction. But that is not so. The Ninth Circuit has explained that "delay is but a single factor to

consider in evaluating irreparable injury" and "courts are loath to withhold relief solely on that ground." *Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014). Delay is "not particularly probative in the context of ongoing, worsening injuries." *Id*. (explaining that where "the magnitude of the potential harm becomes apparent gradually, [it] undermin[es] any inference that the plaintiff was 'sleeping on its rights.'"). Further, courts should not consider in analysis of delay the time after which a plaintiff sent a cease-and-desist letter and conducted an investigation and negotiations. *See Guess ?, Inc. v. Hermanos*, 993 F. Supp. 1277, 1286 (C.D. Cal. 1997) (citing McCarthy on Trademarks at § 31:15 ("The trademark owner should be allowed a reasonable time to make an out-of-court protest and give the potential defendant time to respond so that the matter might be settled without the need for litigation."); *Ocean Garden, Inc. v. Marktrade Co*.,953 F.2d 500 (9th Cir. 1991) (settlement negotiations excuse six-month delay from filing complaint to moving for preliminary injunction)). *Suja, Life, LLC v. Pines Int'l, Inc*., No. 16-CV-985, at *28 (S.D. Cal. Oct. 24, 2016) (finding a delay of one year "does not weigh against a finding of irreparable harm" where "[t]he delay in filing the motion for preliminary injunction was due to good faith discussions and negotiations regarding settlement between the parties.").

Here, Thrive sent Le-Vel a cease-and-desist letter on October 27, 2020, shortly after Thrive discovered the infringing products and noticed that the online advertising market was being flooded with ads for Le-Vel's THRIVE SKIN products. Le-Vel responded by alleging it had senior use rights—an allegation which Thrive attempted to investigate by requesting evidence from Le-Vel several times. Le-Vel strung Thrive along as long as possible, promising to respond to these requests but never actually doing so. Finally, when it was clear no substantive response was forthcoming, Thrive filed suit and immediately sought a preliminary injunction. That is not enough delay for the Court to find Le-Vel has rebutted the presumption of irreparable harm in Thrive's favor. *See Guess*, 993 F. Supp. at 1286

(finding no undue delay where plaintiff discovered infringement "sometime in 1996," sent a cease-and-desist letter on November 22, 1996, engaged in negotiations with the defendant until filing suit on August 22, 1997, and moved for a preliminary injunction on October 2, 1997).  The *Guess* court held "[t]he nine month delay from the cease-and-desist letter to the filing of suit is a reasonable time for Plaintiff to have allowed Defendants to respond to its request and pursue settlement avenues." *Id*. That court was more concerned about the 41 days that passed between the plaintiff filing suit and seeking a preliminary injunction. *Id*. Here, *one* day passed between those two events—and that only because Thrive was waiting for a judge to be assigned before filing its motion so it could follow the Court's procedural rules for setting a hearing. There is thus no basis to deny Thrive an injunction when it first tried to stop Le-Vel's infringement without litigation and then necessarily investigated its claims before filing suit.

## V.   <u>Le-Vel's Knowing Infringement is Not a Shield to an Injunction</u>

Le-Vel's final argument to avoid an injunction is essentially this: ████████ █████████████████████████████████████████████████████████████ ████████████████████████. But Le-Vel has overlooked the longstanding principle that "Defendants 'cannot complain of the harm that will befall [them] when properly forced to desist from [their] infringing activities.'" *Ossur hf v. Manamed Inc*., 331 F. Supp. 3d 1005, 1017 (C.D. Cal. 2017) (quoting *Triad Sys. Corp. v. Southeastern Express Co*., 64 F.3d 1330, 1338 (9th Cir. 1995)); *see also Brooklyn Brewery Corp. v. Black Ops Brewing, Inc*., 156 F. Supp. 3d 1173, 1186 (E.D. Cal. 2016) (giving no weight to defendant where "[a]ny harm suffered by Defendant will result from being enjoined from engaging in unlawful trademark infringement."). "[A] defendant who knowingly infringes another's [intellectual property] cannot complain of the harm that will befall it when properly forced to desist from its infringing activities." *Cadence Design Sys. v. Avant! Corp*., 125 F.3d 824, 829 (9th Cir. 1997).

1    Le-Vel's entire argument on the balance of hardships factor is that Le-Vel

2  will lose money if it is enjoined from continuing to sell infringing THRIVE SKIN

3  products. [Doc. 24-2 at 22-23] That is exactly the type of harm that is *not* to be

4  considered in whether to grant a preliminary injunction. *See Ossur*, 331 F. Supp. 3d

5  at 1017; *Brooklyn Brewery*, 156 F. Supp. 3d at 1186. Further, Le-Vel's own

6  evidence supports that it went into this situation with eyes wide open as to the risk

7  of infringement. Specifically, Le-Vel's damages expert testified that ███████████

8  ████████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████

10  ████████████████████████████████████ [Doc. 24-9 ¶ 24] Further,

11  Le-Vel owns many trademarks for supplements and its CEO calls its THRIVE

12  brand "one of the most important and powerful assets Le-Vel owns . . . ." [Doc. 24-

13  3 ¶ 24] Had Le-Vel merely conducted a Google search in 2017 for "thrive

14  skincare," it would have found Plaintiff Thrive's website. Had Le-Vel merely

15  conducted a search of the USPTO's online trademark database, it would have found

16  Thrive's issued trademark registration and second pending application. There is no

17  possible way Le-Vel ████████████████████████████████ before

18  launching its THRIVE SKIN products without doing a Google search and a basic

19  trademark search. Thus, there is no way Le-Vel was ignorant of Thrive and its

20  registered THRIVE marks when Le-Vel began selling THRIVE SKIN products.

21  The only reasonable inference is that Le-Vel knew of Thrive and its federal

22  trademark rights, and made a calculated business decision to ignore them. Le-Vel

23  thus accepted the risk that it might be enjoined for infringement even before it

24  entered the skincare market.

25    Le-Vel also had notice that Thrive was claiming trademark infringement

26  upon receiving Thrive's cease-and-desist letter in October 2020. Le-Vel could have

27  mitigated its alleged harm and begun a transition to different branding. Instead, Le-

28  Vel doubled down on infringement and continued to expand and ███████████

PLAINTIFF'S REPLY ISO MTN.
FOR PRELIM. INJUNCTION
Case No. 2:21-CV-02022-DOC-KES

███████████████████████ based on the infringing THRIVE SKIN brand. Le-Vel had five months between receiving the cease-and-desist letter and the filing of the preliminary injunction to begin rebranding or to negotiate with Thrive for a sell-off transitory period. It did neither. Instead, it simply stonewalled Thrive. For these reasons, Le-Vel's protestations it might suffer financial harm because its calculated risk to infringe might be enjoined cannot weigh against granting an injunction in Thrive's favor.

Le-Vel also contends it will lose money because it cannot rebrand. Again, its own evidence shows otherwise. As noted above, Le-Vel has submitted evidence from six other MLMs that sell skincare products under different brands than vitamins. [Doc. 22-3, Exs. 2, 5, 6, 7, 8, 9] This evidence proves that Le-Vel's assertion that it cannot rebrand its skincare products is false—almost every other company, to the extent they sell both, uses different brands for vitamins and skincare products. There is no reason Le-Vel could not do the same and select a new name that does not infringe Thrive's trademarks. Overall, Le-Vel has not provided any evidence of cognizable harm that tips the balance of equities in its favor. A preliminary injunction to stop Le-Vel's current infringement and ████████ ████████████████ is necessary to prevent further irreparable harm to Thrive's business goodwill and reputation.

## VI.   **Bond, if Any, Should Be Minimal**

Le-Vel's request for a $1 million bond is untethered from the reality of this situation and merely an attempt to further burden Thrive. The amount of bond is within the Court's discretion. *See Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005). This case is not *Apple v. Samsung*. It is Thrive—a small company of six employees—against Le-Vel—a multi-billion-dollar MLM. Thrive has also proven a high likelihood of success on the merits, which favors a "minimal bond or no bond at all." *Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1326 amended, 775 F.2d 998 (9th Cir. 1985); *Ossur*, 331 F. Supp. 3d at 1017

(finding a "modest bond appropriate" and setting bond at $10,000 where plaintiff proved high likelihood of success on trademark infringement claims); *Blackbird Techs., Inc. v. Joshi*, No. 5:15-cv-04272-EJD, at *12 (N.D. Cal. Oct. 6, 2015) (holding no bond was required and explaining the court may "decline to impose an undertaking [of a bond] upon the demonstration of a strong likelihood of success on the merits."). And Le-Vel has not offered any serious reason it could not recoup its costs by resuming sales of skincare products under a noninfringing mark. *See Moroccanoil, Inc. v. Zotos Int'l, Inc*., 230 F. Supp. 3d 1161, 1179 (C.D. Cal. 2017).

Burdening Thrive with a million-dollar bond that it may not be able to pay would be tantamount to denying injunctive relief entirely. That would, in effect, reward Le-Vel for intentionally infringing on a grand scale, which is not the purpose of the bond requirement. *See Ossur*, 331 F. Supp. 3d at 1017; *Fiji Water Co. Llc v. Fiji Mineral Water U.S. LLC*, 741 F. Supp. 2d 1165, 1184 (C.D. Cal. 2010) (ordering bond of $20,000 on injunction requiring complete cessation of use of infringing trade dress). As explained, Le-Vel's purported harms are the product of its knowing, intentional choice to infringe and choice not to mitigate damages after receiving a cease-and-desist letter from Thrive. Thrive, as a small company and owner of legitimate senior trademark rights, should not be forced to pay the price for Le-Vel's willful infringement and repudiation of Le-Vel's own responsibilities. A modest bond of $10,000 is therefore appropriate in this case.

## Conclusion

Le-Vel knowingly chose to take the risk of infringing Thrive's registered THRIVE marks for skincare products. Le-Vel admits it will continue to infringe and ████████████████████████████ unless an injunction issues. Thrive has shown a likelihood of success on it the merits of its trademark infringement claims, which is supported by a presumption of irreparable harm and its showing of actual irreparable harm. All of the facts and the law therefore fully support issuing an injunction Thrive's favor.

DATED:  March 29, 2021                    Respectfully submitted,

                                          THE MCARTHUR LAW FIRM, PC

                                          By: */s/ Stephen McArthur*
                                              Stephen McArthur
                                              Thomas Dietrich
                                              *Attorneys for Plaintiff Thrive*
                                              *Natural Care, Inc.*

1

## CERTIFICATE OF SERVICE

2

Case Name: *Thrive Natural Care, Inc. v. Le-Vel Brands, LLC*
Case No. 2:21-CV-02022-DOC-KES

3

IT IS HEREBY CERTIFIED THAT:

4

5

      I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 9465 Wilshire Blvd., Ste. 300, Beverly Hills, CA 90212. I am not a party to the above-entitled action.

6

      I have caused service of the following documents, described as:

7

8

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

9

on the following parties by electronically filing the foregoing on March 29, 2021, with the Clerk of the District Court using its ECF System, which electronically notifies them.

10

11

KENDALL BRILL & KELLY LLP          *Attorneys for Defendant*
Alan Jay Weil (63153)

12

ajweil@kbkfirm.com
Shauna E. Woods (300339)

13

swoods@kbkfirm.com
10100 Santa Monica Blvd., Suite 1725

14

Los Angeles, California 90067
Telephone: 310.556.2700

15

16

FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
Mark Sommers (pro hac vice forthcoming)

17

mark.sommers@finnegan.com
Patrick Rodgers (pro hac vice forthcoming)

18

patrick.rodgers@finnegan.com
901 New York Avenue, NW,

19

Washington, DC 20001-4413
Telephone: (202) 408-4064

20

Morgan E. Smith (SBN 293503)
morgan.smith@finnegan.com

21

3300 Hillview Avenue
Palo Alto, CA 94304

22

Telephone: (650) 849-6600

23

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

24

25

Date:   3/29/2021        By:  */s/ Stephen McArthur*

26

                                Stephen McArthur

27

28

PLAINTIFF'S REPLY ISO MTN.
FOR PRELIM. INJUNCTION
Case No. 2:21-CV-02022-DOC-KES