FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
Mark Sommers (*pro hac vice*)
  *mark.sommers@finnegan.com*
Patrick Rodgers (*pro hac vice*)
  *patrick.rodgers@finnegan.com*
901 New York Avenue, NW,
Washington, DC 20001-4413
Telephone: (202) 408-4064
Facsimile: (202) 408-4400

Morgan E. Smith (293503)
  *morgan.smith@finnegan.com*
Daniel R. Mello Jr. (325714)
  *daniel.mello@finnegan.com*
3300 Hillview Avenue
Palo Alto, CA 94304
Telephone: (650) 849-6600
Facsimile: (650) 849-6666

KENDALL BRILL & KELLY LLP
Alan Jay Weil (63153)
  *ajweil@kbkfirm.com*
Amanda D. Barrow (313583)
  *abarrow@kbkfirm.com*
10100 Santa Monica, Suite 1725
Los Angeles, California 90067
Telephone:  (310) 556-2700
Facsimile:  (310) 556-2705

*Attorneys for Defendant and Counterclaim
Plaintiff Le-Vel Brands, LLC*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| THRIVE NATURAL CARE, INC., | Case No. 2:21-CV-02022-DOC-KES |
| Plaintiff and Counterclaim Defendant, | **LE-VEL'S NOTICE OF AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| LE-VEL BRANDS, LLC, | REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL |
| Defendant and Counterclaim Plaintiff. | Judge:   Hon. David O. Carter |
| | Crtrm:   10A |
| | Date:     July 25, 2022 |
| | Time:     8:30 a.m. |
| | Action Filed:  March 4, 2021 |

**TO THE HONORABLE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

Please take notice that on July 25, 2022 at 8:30 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable David O. Carter, located in the Ronald Reagan Federal Building and United States Courthouse, 411 West Fourth Street, Santa Ana, California 92701, Defendant and Counterclaim Plaintiff Le-Vel Brands, LLC will and hereby does move this Court pursuant to Fed. R. Civ. P. 56(a) for summary judgment on (1) its affirmative defense of priority under Section 7(c) of the Lanham Act, 15 U.S.C. § 1057(c)(1) (Dkt. 71 ¶ 88); (2) Le-Vel's Count 1(b) for abandonment of the '942 Registration under 15 U.S.C. §§ 1064, 1127 (*id.* ¶¶ 212-221); and (3) Plaintiff and Counterclaim Defendant Thrive Natural Care, Inc. ("TNC")'s claims for monetary relief (Dkt. 1, Prayer For Relief ¶¶ 3-8).

This motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the Statement of Undisputed Facts and Conclusions of Law, the Proposed Order, the Declaration of Morgan Smith (and its exhibits) filed in connection therewith, the files and records in this matter, all other matters of which the Court may take judicial notice, and any argument or evidence that may be presented to or considered by the Court prior to its ruling.

This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on June 17, 2022.  Declaration of Morgan Smith ¶ 33.

Dated:  June 27, 2022

Morgan E. Smith (SBN 293503)
  morgan.smith@finnegan.com
Mark Sommers (pro hac vice)
  mark.sommers@finnegan.com
Patrick J. Rodgers (pro hac vice)
  patrick.rodgers@finnegan.com
Daniel R. Mello Jr. (SBN 325714)
  daniel.mello@finnegan.com
FINNEGAN, HENDERSON,

Case No. 2:21-CV-02022-DOC-KES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FARABOW, GARRETT & DUNNER, LLP

Alan Jay Weil (SBN 63153)
   ajweil@kbkfirm.com
Amanda D. Barrow (SBN 313583)
   abarrow@kbkfirm.com
KENDALL BRILL & KELLY LLP

*Attorneys for Le-Vel Brands, LLC*

Case No. 2:21-CV-02022-DOC-KES

LE-VEL'S NOTICE OF AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

I.    INTRODUCTION ......................................................................................... 1

II.   STATEMENT OF FACTS ........................................................................... 1

    A.    Le-Vel's Prior Use of THRIVE and Le-Vel's THRIVE Brand Success ........................................................................................... 1

    B.    Ecomundi, LLC, Its Invalid Assignment, and Lack of Ongoing and Existing Business Related to THRIVE ........................................ 2

    C.    David Drews's Expert Report on Monetary Relief............................. 4

III.  ARGUMENT ............................................................................................... 5

    A.    TNC Cannot Assert Its '942 and '303 Registrations Against Le-Vel Because of Le-Vel's Prior Use ....................................................... 6

    B.    The '942 Registration Has Been Abandoned...................................... 8

        1.    Ecomundi Improperly Assigned the '058 Application in Violation of 15 U.S.C. § 1060 ................................................... 9

        2.    Because Ecomundi's Assignment of the '058 Application Was Invalid, Ecomundi Is the True Registrant of the '942 Registration .............................................................................. 15

        3.    Ecomundi Has Abandoned the '942 Registration. ................... 16

    C.    TNC Has No Evidence of Monetary Harm....................................... 16

        1.    TNC Has Shown No Actual Harm ........................................... 17

        2.    TNC Is Not Entitled to Recover Profits ................................... 18

        3.    TNC Is Not Entitled to a Reasonable Royalty.......................... 20

        4.    TNC Is Not Entitled to Prospectively Recover Corrective Advertising............................................................................... 22

IV.   CONCLUSION .......................................................................................... 24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Adray v. Adry-Mart, Inc.*,
  76 F.3d 984 (9th Cir. 1995) ..................................................................22

*Am. Auto. Ass'n of N. California, Nevada & Utah v. Gen. Motors LLC*,
  367 F. Supp. 3d 1072 (N.D. Cal. 2019).................................................19

*Binder v. Disability Grp., Inc.*,
  772 F. Supp. 2d 1172 (C.D. Cal. 2011)..................................................23

*Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*,
  174 F.3d 1036 (9th Cir. 1999) ...............................................................10

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
  967 F.2d 1280 (9th Cir 1992) ....................................................9, 10, 13

*Electro Source, LLC v. Brandess-Kalt-Aetna Grp., Inc.*,
  458 F.3d 931 (9th Cir. 2006) ...................................................................8

*elotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ..............................................................................5, 6

*Fenner Invs., Ltd. V. Hewlett-Packard Co.*,
  No. CIVA6:08-CV-273, 2010 WL 1727916 (E.D. Tex. Apr. 28,
  2010) .......................................................................................................21

*Georgia-Pac. Corp. v. U.S. Plywood Corp.*,
  318 F. Supp. 1116 (S.D.N.Y. 1970), *modified sub nom. Georgia-
  Pac. Corp. v. U.S. Plywood-Champion Papers, Inc.*, 446 F.2d 295
  (2d Cir. 1971). Drews Rep. 23 ...............................................................20

*Glow Indus., Inc. v. Lopez*,
  273 F. Supp. 2d 1095 (C.D. Cal. 2003)....................................................9

*Int'l Oddities v. Record*,
  No. CV 12-3934-CAS, 2013 WL 3864050 (C.D. Cal. July 22, 2013) .............23

*interState Net Bank*, *interState Net Bank v. NetB@nk, Inc.*,
  348 F. Supp. 2d 340 (D.N.J. 2004).........................................................15

LE-VEL'S NOTICE OF AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT

*Kleven v. Hereford*,
    No. CV 13-02783-AB, 2015 WL 4977185 (C.D. Cal. Aug. 21,
    2015) .......................................................................................................... 15, 16

*McClaran v. Plastic Indus., Inc.*,
    97 F.3d 347 (9th Cir. 1996) ............................................................................ 17

*nderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ........................................................................................... 6

*Novadaq Techs., Inc. v. Karl Storz GmbH & Co. K.G.*,
    No. 14-CV-04853-PSG, 2015 WL 9028123 (N.D. Cal. Dec. 16,
    2015) .................................................................................................................. 19

*Oculu, LLC v. Oculus VR, Inc.*,
    No. SACV 14-0196 DOC, 2015 WL 3619204 (C.D. Cal. June 8,
    2015) (Carter, J.) ....................................................................................... *passim*

*Patagonia, Inc. v. Anheuser-Busch, LLC*,
    No. 19-cv-02702, 2020 WL 8514835 (C.D. Cal. Sept. 3, 2020) ................ 15, 16

*Quia Corp. v. Mattel, Inc.*,
    No. C 10-1902 JF (HRL), 2011 WL 2749576 (N.D. Cal. July 14,
    2011) .............................................................................................................. 22, 23

*Rearden LLC v. Rearden Com., Inc.*,
    683 F.3d 1190 (9th Cir. 2012) .......................................................................... 7

*Romag Fasteners, Inc. v. Fossil, Inc.*,
    140 S. Ct. 1492 (2020) ..................................................................................... 19

*S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co.,
    Inc.*,
    690 F.2d 1235 (9th Cir.1982) ............................................................................ 6

*Sarieddine v. Alien Visions E-Juice, Inc.*,
    No. CV 18-3658 PA, 2019 WL 1966661 (C.D. Cal. Apr. 12, 2019) ............. 6, 7

*Scat Enters., Inc. v. FCA US LLC*,
    No. CV 14-7995-R, 2017 WL 5896182 (C.D. Cal. June 8, 2017) ................... 17

*Sebastian Brown Prods. LLC v. Muzooka Inc.*,
    No. 15-cv-01720, 2016 WL 949004 (N.D. Cal. Mar. 14, 2016) ................ *passim*

*Sebastian Brown Prods. LLC v. Muzooka Inc.*,
    No. 15-cv-01720-LHK, 2016 WL 5910817 (N.D. Cal. Oct. 11,
    2016) .................................................................................................*passim*

*Spin Master, Ltd. v. Zobmondo Ent., LLC*,
    944 F. Supp. 2d 830, at 848- 49 (C.D. Cal. 2012) ............................. 19

*TAP Mfg., LLC v. Signs*,
    No. 15-CV-00797-SVW-PJW, 2015 WL 12658406 (C.D. Cal. Apr.
    13, 2015) .................................................................................................. 7

*Thrive Nat. Care, Inc. v. Thrive Causemetics, Inc.*,
    No. CV 20-9091 PA (ASX), 2021 WL 4813257 (C.D. Cal. Oct. 6,
    2021) .................................................................................................*passim*

*TI Beverage Grp. Ltd. v. S.C. Cramele Recas SA*,
    No. LA CV 06-07793-VBF, 2014 WL 12013438 (C.D. Cal. Oct. 10,
    2014) ........................................................................................................ 7

**State Cases**

*Thrive Natural Care, Inc. v. Thrive Causemetics, Inc.*,
    Case No. 2:20-cv-09091-PA-AS (C.D. Cal.), ECF No. 42
    [Declaration of Rob Wallace in Support of Plaintiff's Motion For
    Partial Summary Judgment (8/9/21)] .................................................. 18

**Federal Statutes**

15 U.S.C. § 1057(c) ........................................................................................ 7

15 U.S.C. § 1057(c)(1) ............................................................................. 1, 6

15 U.S.C. § 1060 ...................................................................................*passim*

15 U.S.C. § 1060(a)(1) ...........................................................9, 10, 12, 15

15 U.S.C. § 1064 ....................................................................................... 1, 8

15 U.S.C. § 1064(3) ...................................................................................... 8

15 U.S.C. § 1114 ................................................................................... 1, 6, 8

15 U.S.C. § 1115(b)(2) ................................................................................. 8

15 U.S.C. § 1117(a) ............................................................................... 18, 19

Case No. 2:21-CV-02022-DOC-KES
LE-VEL'S NOTICE OF AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT

15 U.S.C. § 1127 ................................................................................................. 8, 9

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................................ 1, 5

**Other Authorities**

3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair
    Competition* § 18:17 (5th ed. 2021) ..................................................... 15

Case No. 2:21-CV-02022-DOC-KES
LE-VEL'S NOTICE OF AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT

## I.      INTRODUCTION

Defendant and Counterclaim Plaintiff Le Vel Brands, LLC moves this Court for summary judgment pursuant to Fed. R. Civ. P. 56(a).

First, Le-Vel moves for summary judgment on its affirmative defense of priority under Section 7(c) of the Lanham Act, 15 U.S.C. § 1057(c)(1) (Dkt. 71 ¶ 88). Le-Vel is a prior user under Section 7(c) of the Lanham Act, which precludes Plaintiff and Counterclaim Defendant Thrive Natural Care, Inc. ("TNC") from enforcing its federal trademark registrations against it under 15 U.S.C. § 1114.

Second, Le-Vel moves for summary judgment on its Count 1(b) for abandonment of the '942 Registration under 15 U.S.C. §§ 1064, 1127 (Dkt 71 ¶¶ 212-221). The undisputed facts of this case support a finding that Ecomundi improperly assigned the '058 Application (which matured to the '942 Registration) without any "ongoing and existing business" in violation of 15 U.S.C. § 1060. Ecomundi is therefore the registrant of the '942 Registration, and Ecomundi abandoned the '942 Registration after a decade of nonuse.

Third, Le-Vel moves for summary judgment on TNC's claims for monetary relief (Dkt. 1, Prayer For Relief ¶¶ 3-8). There is no evidence that TNC experienced any monetary damages whatsoever, and the Court should dispose of those claims for relief accordingly.

For these reasons and for those stated below, Le-Vel requests this court grant summary judgment in its favor.

## II.      STATEMENT OF FACTS

### A.      Le-Vel's Prior Use of THRIVE and Le-Vel's THRIVE Brand Success

Le-Vel is a health and wellness lifestyle company founded in the summer of 2012 that offers a wide array of goods, including vitamins (such as capsules, powders, and gels), skin patches infusing the skin with nutrition and skin benefits, collagen protein vitamins supporting firm and healthy skin, snacks, and skincare products

under the trademark THRIVE with the primary goal of helping its customers fill their nutritional gaps, live happier and healthier lives, and look and feel better.  Statement of Uncontroverted Fact ("SUF") 1.  Le-Vel's first THRIVE-branded products—two THRIVE vitamin capsules, (one for men and one for women) and a THRIVE powdered shake—were introduced in commerce in August 2012 and have been continuously offered and sold since then.  SUF 2. On or around August 24, 2012, Le-Vel began distributing and shipping products bearing the THRIVE mark to certain high-performing Le-Vel brand promoters in consideration of the most new customer signups.  SUF 3.

Le-Vel's THRIVE products, including its THRIVE SKIN products, have enjoyed tremendous success.  From the time Le-Vel launched its THRIVE products in August 2012 through September 5, 2013 (the date TNC claims as its first use date), Le-Vel had already sold ███████ of its THRIVE products nationwide.  SUF 4.  Given the success of its THRIVE EXPERIENCE and THRIVE products, Le-Vel reached ██████ in sales, when it eclipsed that milestone in 2017.  SUF 5  Le-Vel surpassed ██████ in sales of its THRIVE products in 2019.  SUF 6  As for THRIVE SKIN specifically, Le-Vel has sold over ████████ in products to date.  SUF 7.

### B.    Ecomundi, LLC, Its Invalid Assignment, and Lack of Ongoing and Existing Business Related to THRIVE

Ecomundi, LLC is a single-member LLC formed with the sole purpose of accelerating the transition to a more sustainable future.  SUF 10.  Alex McIntosh is the sole member of the Ecomundi LLC, SUF 11; there are no co-founders and Ecomundi has never had any employees, SUF 12.  Ecomundi does not sell any goods in commerce and has not sold any products at least from 2012 onward.  SUF 13.

On September 11, 2012, Ecomundi filed intent-to-use Application Serial No. 85726058 for the mark THRIVE (the "'058 Application").  SUF 14.  Ecomundi never used that mark in commerce. *See* SUF 15.  Instead, Ecomundi attempted to assign all rights, title, and interest in the THRIVE mark covered by the '058 Application to TNC

through a Restricted Stock Purchase Agreement.  SUF 16.  Ecomundi purchased 5 million shares of TNC stock for a total of $50.  SUF 17.  $25 was to be paid in cash; the other $25 came in the form of a Technology Assignment Agreement (the "Technology Assignment") attached to the Stock Purchase Agreement.  SUF 18.  The Technology Assignment does not purport to assign TNC any specific ongoing and existing business assets, technologies, or intellectual property.  SUF 19.  Rather, it only specified the assignment of an unidentified THRIVE trademark (which was not then in use) and two parked THRIVE domain names: Thrivenaturalcare.com and Thrive-natural.com.  SUF 20.  Ecomundi testified that it entered into the Stock Purchase Agreement and attempted to transfer all the purported rights in the THRIVE mark to TNC because investors were not interested in investing in an LLC (i.e., Ecomundi).  SUF 21.  According to both TNC and Ecomundi, as of May 23, 2013, everything related to the THRIVE business (which, as explained below, was nothing) was transferred from Ecomundi to TNC, and Ecomundi was no longer involved with THRIVE.  SUF 22.

On October 4, 2013, a Request for Extension of Time to file a Statement of Use for the '058 Application was filed with the USPTO.  SUF 23.  Also on October 4, 2013, Alex McIntosh filed a Request to Divide the '058 Application and filed a Statement of Use, alleging that as of September 5, 2013,[1] the mark was only in use for the following goods covered by the '058 Application:  "Non-medicated skin care preparations, namely facial lotions, cleansers and creams, creams and oils for cosmetic use, skin moisturizers; pre-shaving preparations; after shave lotions and creams."  SUF 24.  The October 4, 2013 request to divide created a child application (Application Serial No. 85980517, the "'517 Application") for the mark THRIVE covering the goods listed above.  SUF 25.  The '517 Application, purportedly then

---

[1] By September 5, 2013, the '058 Application had already been purportedly assigned to TNC as a result of the Stock Purchase Agreement and Technology Assignment.

owned by TNC, eventually matured to Registration No. 4,467,942 (the "'942 Registration") on January 14, 2014 conferring TNC with a September 11, 2012 constructive first use date.  SUF 26.  TNC later filed Application Serial No. 87021374 on May 2, 2016, which matured to Registration No. 6,164,303 on September 29, 2020 ("the '303 Registration").  SUF 27.

McIntosh chose the THRIVE mark for TNC's use—not Ecomundi's, SUF 28 ("Ecomundi decided to move forward with Thrive as a trademark for Thrive Natural Care, not for Ecomundi.")—and Ecomundi never used the THRIVE mark in connection with the sale or transport of goods in U.S. commerce.  SUF 29.

Having never used the THRIVE mark, none of Ecomundi's business development activities created goodwill in the THRIVE mark prior to the attempted assignment.  Each of Ecomundi's pre-assignment activities can be summed up as mere preparatory activities to develop internal business plans, business partners, business models, and product formulations; one of these activities were public facing; none involved potential purchasers; and none resulted in any product revenue for Ecomundi.  SUF 30.

**C.    David Drews's Expert Report on Monetary Relief**

TNC seeks damages in the form of Le-Vel's profits, a reasonable royalty, and corrective advertising.  SUF 35.  TNC retained David Drews to "███████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████" SUF 36.

Drews's report fails to show actual lost sales or actual monetary damages to TNC.  *See generally* SUF 37.  To the contrary, TNC's sales ███████.  *See* SUF 38. When asked to substantiate actual harm to TNC caused by Le-Vel, Drews could only point to the alleged findings of actual confusion from two surveys, neither of which were designed to test for lost sales or actual harm.  SUF 39.  Drews infers that the survey results demonstrating actual confusion are indicative of actual harm.  SUF 40. Drews did not quantify any harm relating to TNC's claims that Le-Vel has direct sales

4

1   model (█████████████████████████████████████████).
2   SUF 41.

3       TNC contends that Le-Vel unfairly received approximately ██████████ in
4   profits from its sale of allegedly infringing skincare products.  SUF 42.  But Drews
5   did not attempt to value TNC's THRIVE mark or the goodwill developed in the mark.
6   SUF 43.   Drews's sole basis for his opinion that Le-Vel was trading on TNC's
7   goodwill was that Le-Vel was "aware of TNC's trademark and brand prior to offering
8   their own skincare products."   SUF 44.  But Le-Vel's THRIVE SKIN launch was
9   successful because Le-Vel traded on the actual, measurable goodwill that Le-Vel
10  developed in its own THRIVE mark over nearly a decade, and not the speculative and
11  unsubstantiated claims of trading on goodwill allegedly developed in TNC's THRIVE
12  mark.  SUF 45.

13      The parties have no prior licensing history and have never negotiated or entered
14  into a license with each other concerning the THRIVE mark. SUF 46.  Le-Vel has
15  never paid any royalties to or otherwise obtained a license from another party in
16  licensing the third party's THRIVE mark.  SUF 47.  The merchandising agreement
17  between Le-Vel and █████████████████████████████████████
18  ████████████████████████████ is irrelevant.  SUF 48.  Finally, Drews
19  testified that he provided no opinion on corrective advertising in his report.  SUF 49.

## III.   ARGUMENT

21      Summary judgment is proper if "the movant shows that there is no genuine
22  dispute as to any material fact and the movant is entitled to judgment as a matter of
23  law."  *Oculu, LLC v. Oculus VR, Inc.*, No. SACV 14-0196 DOC, 2015 WL 3619204,
24  at *4 (C.D. Cal. June 8, 2015) (Carter, J.) (citing Fed. R. Civ. P. 56(a)).  "The moving
25  party bears the initial burden of demonstrating the absence of a genuine issue of
26  material fact for trial, but it need not disprove the other party's case."  *Id.* (citing
27  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

28      "Once the moving party meets its burden, the burden shifts to the opposing

party to set out specific material facts showing a genuine issue for trial." *Id*. (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986)). "A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. Rather, there must be specific, admissible evidence identifying the basis for the dispute." *Id*. (citing *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir.1982)).

The undisputed facts of this case support summary judgment in Le-Vel's favor. First, Le-Vel is a prior user under Section 7(c) of the Lanham Act, which precludes TNC from enforcing its federal registrations against it. Second, Ecomundi improperly assigned the '058 Application (which matured to the '942 Registration) without any "ongoing and existing business" in violation of 15 U.S.C. § 1060. Ecomundi is therefore the registrant of the '942 Registration, and Ecomundi abandoned the '942 Registration after a decade of nonuse. Third, there is no evidence that TNC experienced any monetary damages whatsoever, and the Court should dispose of those claims for relief accordingly.

## A. TNC Cannot Assert Its '942 and '303 Registrations Against Le-Vel Because of Le-Vel's Prior Use

Le-Vel is entitled to summary judgment on its affirmative defense of priority under Section 7(c) of the Lanham Act, 15 U.S.C. § 1057(c)(1). Dkt. 71 ¶ 88. Because TNC cannot establish priority over Le-Vel through its federal registrations, TNC cannot prevail on its Count 1 for Federal Trademark Infringement under 15 U.S.C § 1114. *See* Dkt. 1 ¶¶ 55-61. *See Sarieddine v. Alien Visions E-Juice, Inc.*, No. CV 18-3658 PA (MAAX), 2019 WL 1966661, at *7 (C.D. Cal. Apr. 12, 2019) (concluding that "Defendant has priority of use over Plaintiff and, as a result, cannot be liable for infringing Plaintiff's registered trademarks. Defendant is entitled to summary judgment with respect to Count I of Plaintiff's complaint," i.e., infringement under § 1114).

To succeed on Count 1 (federal trademark infringement), TNC must show

ownership of the mark and likelihood of confusion. *TI Beverage Grp. Ltd. v. S.C. Cramele Recas SA*, No. LA CV 06-07793-VBF, 2014 WL 12013438, at *3 (C.D. Cal. Oct. 10, 2014) (citing *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1203 (9th Cir. 2012)).  "It is axiomatic in trademark law that the standard test of ownership is priority of use." *Id.*; *TAP Mfg., LLC v. Signs*, No. 15-CV-00797-SVW-PJW, 2015 WL 12658406, at *4 (C.D. Cal. Apr. 13, 2015) ("Ownership rights are not established by federal registration.  Instead, rights flow from priority of use.") (internal citations omitted).

TNC's earliest possible claim to priority is through constructive first use, i.e., the filing date of its intent-to-use ("ITU") application.  SUF 9.  But Section 7(c) of the Lanham Act provides that an applicant who has filed a bona fide ITU application will have constructive nationwide rights commencing from the filing date of the ITU application *except* against "a person . . . who, prior to such filing—(1) has used the mark." 15 U.S.C. § 1057(c).  "Prior use, including both sales and non-sales activities, may be sufficient to vest trademark rights in a prior user, based on the court's evaluation of the totality of the circumstances."  *See Sarieddine*, 2019 WL 1966661, at *5.

TNC claims that Le-Vel infringed two of its federal trademark registrations, the '942 Registration and the '303 Registration.  SUF 8.  Each of these registrations was filed as an ITU and claims constructive use dates of September 11, 2012 and May 2, 2016, respectively.  SUF 9.  As to both, Le-Vel is a prior user under Section 7(c).

Le-Vel introduced its first THRIVE-branded products in commerce on or around August 24, 2012, when Le-Vel began distributing products bearing the THRIVE mark to certain high-performing Le-Vel brand promoters in consideration of the most new customer signups.  SUF 3.  Because Le-Vel is a direct sales company, the distribution of those products to Le-Vel's brand promoters also served as advertising and promotion of the THRIVE brand.  Le-Vel has continuously used the THRIVE mark in commerce since then.  SUF 2.

Assuming for argument that TNC's '942 and '303 Registrations are valid,[2] Le-Vel's August 2012 use predates TNC's constructive use dates of September 11, 2012 and May 2, 2016.  Under Section 7(c), this prior use voids TNC's claim of constructive nationwide use.  What's more, by September 5, 2013—the date TNC claims as its first use date—Le-Vel had already sold ███████ in products nationwide.  SUF 4.  And by May 2, 2016, Le-Vel had sold ██████████ in THRIVE-branded products, a milestone it reached in 2017.  SUF 5.  As such, Le-Vel enjoyed prior nationwide common law rights *before* TNC made any legitimate sales or had any consumer-facing marketplace presence.

The undisputed facts of this case establish Le-Vel as a prior user of the THRIVE Mark.  Therefore, TNC cannot assert its '942 or '303 Registrations against Le-Vel and Le-Vel is entitled to summary judgment on its first affirmative defense. In addition, and because TNC cannot establish priority over Le-Vel through its federal registrations, TNC cannot prevail on its Count 1 for infringement under 15 U.S.C. § 1114.

## B.    The '942 Registration Has Been Abandoned

Le-Vel is entitled to summary judgment on Count 1(b) (abandonment of the '942 Registration under 15 U.S.C. §§ 1064, 1127).  Dkt. 71 ¶¶ 212-221.  The Lanham Act provides that a trademark registration, even an incontestable one, may be cancelled at any time if the registered mark has been abandoned.   15 U.S.C. §§ 1064(3),  1115(b)(2).   A trademark is abandoned when "its use has been discontinued with intent not to resume such use." 15 U.S.C. § 1127.  *See also Electro Source, LLC v. Brandess-Kalt-Aetna Grp., Inc.*, 458 F.3d 931, 935 (9th Cir. 2006) (abandonment defined as "(1) discontinuance of trademark use and (2) intent not to resume such use.").  Nonuse for three consecutive years is prima face evidence of

---

[2] Le-Vel asserts that the '942 Registration was improperly assigned and therefore abandoned, as discussed in Section II.B.1.

abandonment, creating a presumption of abandonment.  15 U.S.C. § 1127.

The undisputed facts show that Ecomundi, not TNC, is the true registrant of the '942 Registration because Ecomundi's attempt to assign the '058 Application (which matured to the '942 Registration) in May 2013 was invalid under 15 U.S.C. § 1060. Ecomundi has never used the THRIVE mark covered by the '942 Registration and has no intent to resume use.  Abandonment is thus presumed and TNC cannot rebut that presumption.

### 1.    Ecomundi Improperly Assigned the '058 Application in Violation of 15 U.S.C. § 1060

A trademark can only be assigned "with the good will of the business in which the mark is used, or with that part of the good will of the business connected with the use of and symbolized by the mark."  15 U.S.C. § 1060(a)(1).  *See also E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1289 (9th Cir 1992) ("'[T]he law is well settled that there are no rights in a trademark alone and that no rights can be transferred apart from the business with which the mark has been associated.'") (citation omitted).  If, on the other hand, "the 'assignor' has made no trademark use of a designation, then there are no trademark rights to assign." *Oculu, LLC v. Oculus VR, Inc.*, No. SACV 14-0196 DOC(JPRx), 2015 WL 3619204, at *7 (C.D. Cal. June 8, 2015) (Carter, J.) (citation and quotations omitted).  *See also Glow Indus., Inc. v. Lopez*, 273 F. Supp. 2d 1095, 1107 (C.D. Cal. 2003) ("A 'naked' or 'in gross' transfer of a mark, i.e., without the associated goodwill, is invalid.") (citations omitted).

The rule for assigning intent-to-use applications (like the '058 Application) is even stricter.  "[A]n intent-to-use application is not freely assignable." *Sebastian Brown Prods. LLC v. Muzooka Inc.*, No. 15-cv-01720-LHK, 2016 WL 5910817, at *6 (N.D. Cal. Oct. 11, 2016) (citation omitted) ("*Sebastian Brown II*").  Rather, "an intent-to-use application *cannot be assigned* before the applicant files a verified statement that he or she is using the mark, unless the part of the applicant's business

that pertains to the mark is also assigned and that business is still 'ongoing and existing.'" *Oculu*, 2015 WL 3619204, at *7 (emphasis added) (citing 15 U.S.C. § 1060(a)(1)). "Put simply, § 1060(a)(1) states that an applicant may assign an intent-to-use application in *only* two circumstances: (1) after the applicant had filed an allegation of use; or (2) if the application is transferred "to a successor to the business of the application, or portion thereof, to which the mark pertains, if that business is ongoing and existing." *Sebastian Brown II*, 2016 WL 5910817, at *7 (citation omitted). The purpose of this rule is to "prohibit 'trafficking' in marks: the buying and selling of 'inchoate' marks which as yet have no real existence." *Id.* (citation omitted). Violating this rule voids the assignment, the underlying application, and resulting registration." *Oculu*, 2015 WL 3619204, at *7 (citation omitted).

An "'ongoing and existing' business to which a mark pertains requires at least some use of the mark in commerce." *Sebastian Brown Prods. LLC v. Muzooka Inc.*, No. 15-cv-01720, 2016 WL 949004, at *11 (N.D. Cal. Mar. 14, 2016) ( "*Sebastian Brown I*"). In other words, "the mark must have accrued goodwill before the mark may be validly assigned." *Id.* "Goodwill is established through use of a mark 'in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." *Id.* at *12 (quoting *Dep't of Parks and Rec. for State of Cal. v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1126 (9th Cir. 2006)). "Mere preparation to use a term as a trademark" is not sufficient. *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1052 (9th Cir. 1999) (citations omitted). Nor is goodwill created "through mere intent to use a mark commercially." *Id.* Even "minimal consumer exposure . . . d[oes] not create a brand identity or consumer goodwill." *E. & J. Gallo Winery*, 1989 WL 159628, at *3 (finding no goodwill where mark was "seen by the consuming public only in very limited quantity"), *aff'd* 967 F.2d 1280 (9th Cir. 1992).

For example, in *Brookfield*, email correspondence with lawyers and consumers was insufficient to create goodwill in a mark. 174 F.3d at 1052 ("mere use in limited

10

e-mail correspondence with lawyers and a few customers" insufficient to establish goodwill). And in *Chance v. Pac-Tel Teletrac, Inc.*, the Ninth Circuit found that the "mailing of [] 35,000 post cards, which generated 128 responses" but no sales "[p]aled in comparison to the type of advertising . . . [the Ninth Circuit previously] found determinative." 242 F.3d 1151, 1160, n.4 (9th Cir. 2001) (citation omitted).

The decisions in *Sebastian Brown I* and *Sebastian Brown II* are also particularly instructive and worth discussing in detail. These cases involved a trademark infringement and unfair competition dispute over the marks Muzook (used by plaintiff) and Muzooka (used by defendant). *Sebastian Brown I*, 2016 WL 949004, at *1-3. Prior to the dispute, plaintiff's sole owner, J. Michael Miller, applied to register Muzook on an intent-to-use basis on September 12, 2011. *Id.* at *1. Before any statement of use was filed, Miller assigned that intent-to-use application to the plaintiff. *Id.* The plaintiff filed a statement of use for the child application on August 21, 2013, which asserted first use in commerce of Muzook as of August 14, 2013. *Id.* at *2. The application matured to registration on October 15, 2013. *Id.* After the plaintiff initiated its suit against the defendant, the defendant moved to dismiss plaintiff's infringement claim on the ground that assignment of the intent-to-use application from Miller to the plaintiff (which eventually matured into plaintiff's asserted registration) was invalid under 15 U.S.C. § 1060 because it was assigned prior to any use of the mark without any "ongoing and existing business." *Id.* at *6.

The parties disputed whether the mark was transferred with any "ongoing and existing business." *Id.* at *9. The plaintiff argued that its alleged pre-use activities were sufficient. Specifically, the plaintiff argued that Miller "created an idea for a business, began business activities to implement the business model including the filing of a patent application that covers his collaborative invention and explicitly mentions the MUZOOK trademark, applied for a trademark based on intent to use and then assigned that application to a business entity which he owned and controlled and which has since carried on such business activities related to the trademark." *Id.*

at *12.  In addition, Miller submitted a declaration stating that, prior to the assignment, he had "pitch[ed] collaboration service ides to other" and worked to "develop" the business.  *Id.* at *13.  Notably, however, Miller did not state that he "publicly displayed the Muzook Mark, advertised services under the Muzook Mark, or displayed the Muzook Mark to any consumers."  The court found that these activities did not "involve any use of the Muzook Mark to establish goodwill, as required for an "'ongoing and existing business.'"  *Id.* at *12.  Specifically, the court found that the alleged activities were "analogous to 'mere preparation' or putting the Muzook Mark 'on a prototype displayed to a potential buyer,' and do not plausibly allege use of the Muzook Mark 'in a way sufficiently public' to identify any services.'"  *Id.* at *13.  Accordingly, the court found that plaintiff had "not pled sufficient facts to plausibly allege that the October 1, 2011 assignment of the Muzook Mark complied with § 1060(a)(1)" and granted plaintiff leave to amend.  *Id.* at *14.

The plaintiff amended and alleged numerous additional facts to establish that Miller sufficiently used the MuZook mark in commerce prior to assigning the mark.  *Sebastian Brown II*, 2016 WL 5910817, at *8.  The plaintiff alleged that "Miller engaged in several email exchanges with professionals in 2010 and 2011 in which the Muzook project was discussed; that [p]laintiff arranged several Skype recording sessions with musicians in which the musicians performed Miller's music and 'endorsed' the Muzook idea; and that Miller attended the San Francisco MusicTech Summit IX in which he 'discussed the Muzook project with other attendees.'"  *Id.* Despite these allegations, the court still found that the plaintiff had not alleged facts to plausibly demonstrate that Miller used the mark "in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind."  *Id.* (citing *Dep't of Parks*, 448 F.3d at 1126).  To the contrary, the court found that all the activities alleged by the plaintiff were "analogous to uses of a mark that the Ninth Circuit has held insufficient to convey trademark rights."  *Id.*

The court then proceeded to analyze the different pieces of evidence.  First, the

12

1   six emails that plaintiff provided "show[ed] that Miller reached out and discussed his

2   'business project,' 'proposal.' and 'idea' to individuals in various marketing and

3   creative industries," which the court found insufficient because they showed a "mere

4   intent to use a mark commercially" or "mere preparation to use a term as a trademark,"

5   not public use to identify or distinguish the marked goods. *Id.* at *8-9. Second, while

6   the court did consider the recording sessions with musicians as pre-sales promotion

7   to "potential actual consumers of the Muzook service," there was no allegation (or

8   evidence) that these sessions "generated any revenue for Muzook" and was again

9   "analogous to 'mere preparation'" or, at best "'limited' engagement with potential

10  customers" insufficient to develop goodwill. *Id.* at *9 (citing *E. & J. Gallo Winery*,

11  1989 WL 159628, at *3). As a result, the court found that "Miller's pre-assignment

12  activity indicate[d] that Miller inquired into and promoted the Muzook idea with

13  musicians and other professional in the industry, and that Miller intended and

14  prepared to use the Muzook Mark in commerce in connection with goods and

15  services," but these activities "do not show . . . that Miller used the Muzook Mark

16  such that the mark developed goodwill prior to the assignment." *Id.* at *10. The court

17  thus dismissed plaintiff's trademark claims for failure to state a claim. *Id.*

18          Ecomundi's pre-assignment[3] activities are virtually identical to those deemed

19  insufficient in *Sebastian Brown I* and *II* and no different from activities the Ninth

20  Circuit has consistently found insufficient to establish goodwill. First and foremost,

21  Ecomundi has *never* (including before its alleged assignment on May 23, 2013) sold,

22  offered, distributed, advertised, transported, or ever received money in exchange for

23  any Products bearing the mark THRIVE. *See* SUF 29. Ecomundi did not use the

---

[3] Le-Vel does not dispute that May 23, 2013 is the date on which Ecomundi attempted
to assign whatever business it had developed surrounding the THRIVE mark covered
by the '058 Application to TNC. As such, for purposes of this motion, May 23, 2013
is the date by which the Court must determine whether Ecomundi had any "ongoing
and existing business" to assign to TNC related to THRIVE. As a matter of law, it
did not.

LE-VEL'S NOTICE OF AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT

THRIVE mark in commerce before September 11, 2012, nor has Ecomundi *ever* sold any products in commerce, let alone products bearing the THRIVE mark.  *See* SUF 13.  In light of these admissions, it is unsurprising that Ecomundi even admits that the THRIVE mark was "not for Ecomundi," but was chosen solely for use by TNC, demonstrating that Ecomundi never had an intent to use the THRIVE mark, just to improperly reserve it for TNC.  *See* SUF 28. ("Ecomundi decided to move forward with Thrive as a trademark for Thrive Natural Care, not for Ecomundi.").

With no use, advertising, or sales related to the THRIVE mark, what did Ecomundi do related to the THRIVE mark?  It researched products, product ingredients, manufacturers, and suppliers; formulated products; developed *internal* business plans and business models; began to develop the THRIVE branding; conducted non-public presentations and pitches to potential cofounders, business partners, and subject matter experts (not consumers); and registered two domain names.  *See* SUF 30.  None of these activities were consumer- or public-facing and there is no evidence that any of the preparatory activities resulted in any revenue related to the THRIVE mark.  To the contrary, Ecomundi testified that at least one investor did not invest until *after* Ecomundi transferred its "business" on May 23, 2013, SUF 32, and that Ecomundi could not garner investors because it was an unattractive investment option as an LLC, SUF 21.

Ecomundi's pre-assignment activities are no different than the activities found insufficient to create goodwill in *Sebastian Brown II*.  Ecomundi's actions, like those in *Sebastian Brown II*, show that Ecomundi was merely "inquir[ing] into and promot[ing] the [THRIVE] idea with . . . professionals in the industry" and that Ecomundi "intended and prepared to use the [THRIVE] mark in commerce."  2016 WL 5910817, at *10.  But these activities do not show that Ecomundi "used the [THRIVE] Mark such that the mark developed goodwill prior to the assignment." *Id.*

"While the assignment from [Ecomundi] to Plaintiff 'might not seem to amount to what we commonly think of as 'trafficking' in a mark, 'Congress saw fit to protect

against trafficking by a *bright line rule not admitting of exceptions*, and that rule allows a transferor to establish her bona fides *only one way*:  by transferring the [intent-to-use] application along with an ongoing business.'"  *Sebastian Brown I*, 2016 WL 949004, at *14 (quoting *Creative Arts by Calloway, LLC v. Brooks*, No. 09-CV-10488 (CS) 2012 WL 6732907, at *5 (S.D.N.Y. Dec. 27, 2012)).   Because Ecomundi transferred the '058 Application without any ongoing or existing business, the transfer was invalid under 15 U.S.C. § 1060(a)(1).

### 2.    Because Ecomundi's Assignment of the '058 Application Was Invalid, Ecomundi Is the True Registrant of the '942 Registration

"Violating [the] 'anti-trafficking rule' [under § 1060(a)(1)] voids the assignment as well as the underlying application *and* resulting registration."  *Patagonia, Inc. v. Anheuser-Busch, LLC*, No. 19-cv-02702, 2020 WL 8514835, at *7 (C.D. Cal. Sept. 3, 2020) (citing *Oculu*, 2015 WL 3619204, at *7).  "Only after a valid assignment of trademarks does the assignee succeed to the rights of the assignor."  *Id.* (citation omitted); *see also* 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18:17 (5th ed. 2021) ("The general rule is that an 'assignment in gross' of a trademark is invalid, and operates to pass *no rights* to the purported *assignee*.") (citations omitted).  Where an assignment is invalid, the rights revert back to the assignor, and the assignee never steps into the shoes of the assignee.  *See interState Net Bank*, *interState Net Bank v. NetB@nk, Inc.*, 348 F. Supp. 2d 340, 351-52 (D.N.J. 2004) (finding "effect of the invalid assignment" caused "'rights [to] revert'" from assignee to assignor); *Kleven v. Hereford*, No. CV 13-02783-AB (AGRx), 2015 WL 4977185, at *22 (C.D. Cal. Aug. 21, 2015) ("Hereford's assignment of [incontestable] Registration '135 to Belleair was an invalid assignment in gross.  Thus, Registration '135 is deemed to revert to Hereford . . .").  That is true whether the improperly assigned trademark is currently subject of an *incontestable* registration or not.  *See interState Net Bank*, 348 F. Supp. 2d at 346, 348-52 (D.N.J.

2004) (cancelling incontestable trademark based on abandonment by assignor after invalid assignment); *Kleven*, 2015 WL 4977185, at *29 (same).

Because Ecomundi's purported assignment to TNC was and is invalid, TNC never "succeed[ed] to the rights of the assignor [Ecomundi]." *See Patagonia*, 2020 WL 8514835, at *7 (citation omitted). In other words, TNC was not, nor has it ever been, the rightful "registrant" of the '942 Registration—that right belongs exclusively to Ecomundi. Indeed, this Court has already held in denying TNC's Motion to Dismiss that, as a result of Ecomundi's violation of § 1060, "Ecomundi possessed all the rights of mark ownership" and "it [thus] follows that Ecomundi also became the true 'registrant'" for purposes of the abandonment inquiry. *See* SUF 33. The Court's ruling should be no different here.

### 3. Ecomundi Has Abandoned the '942 Registration.

As explained above, because Ecomundi's purported transfer to TNC was improper and invalid, TNC never stepped into the shoes of Ecomundi, and Ecomundi is the proper registrant for purposes of the abandonment inquiry. *See* SUF 33; *see also Kleven*, 2015 WL 4977185, at *22. Ecomundi has never sold any products, let alone products bearing the THRIVE mark. SUF 13. Ecomundi has not advertised or distributed any THRIVE products since at least May 23, 2013 (if ever). *Id.*. Ecomundi has no plans, and has never had any plans (at least since May 23, 2013), to sell, advertise, or distribute any THRIVE products. SUF 34. There is simply no genuine dispute of fact that Ecomundi has never used the THRIVE mark and has no intent to use it in the future. Ecomundi has thus abandoned the THRIVE mark identified the '942 Registration and the '942 Registration should be cancelled.

### C. TNC Has No Evidence of Monetary Harm

TNC seeks damages in the form of Le-Vel's profits, a reasonable royalty, and corrective advertising, SUF 35, but these forms of relief are unavailable as a matter of law, lack evidentiary support, or both. First, TNC has no evidence that it was harmed by Le-Vel's alleged infringement. Second, TNC seeks equitable

disgorgement of Le-Vel's profits from the sale of Le-Vel's THRIVE SKIN products but offers zero evidence that Le-Vel traded on TNC's goodwill when earning those profits.  Third, TNC's claim for a reasonable royalty is unsupported in law or fact because there is no evidence of any prior licensing history between the parties, and the evidence relied on to develop TNC's proposed royalty rate is unreasonable and speculative.   Finally, TNC has no evidence that it made corrective advertising expenditures or that its THRIVE mark lost value such that TNC is owed prospective compensation for corrective advertising.  Le-Vel is thus entitled to summary judgment as to all TNC's monetary recovery theories.

### 1.     TNC Has Shown No Actual Harm

Proof of infringement does not entitle TNC to compensatory damages without a specific showing that it actually suffered damages caused by that infringement.  *See McClaran v. Plastic Indus., Inc.*, 97 F.3d 347, 361 (9th Cir. 1996) (rejecting compensatory damages award, despite a finding of trademark infringement, because plaintiff "did not show with reasonable certainty that he suffered any damages from [defendant's] infringement").  TNC's May 6, 2022 Expert Report from David Drews[4] fails to show any actual lost sales or actual monetary damages to TNC. [5]  *See generally* SUF 37.  When asked to substantiate actual harm to TNC caused by Le-Vel, Drews could only point to the alleged findings of actual confusion from two surveys, neither of which were designed to test for lost sales or actual harm.  SUF 39.  He infers that survey results demonstrating actual confusion are indicative of actual harm, SUF 40, but that has no basis in law, *see, e.g., Scat Enters., Inc. v. FCA US LLC*, No. CV 14-7995-R, 2017 WL 5896182, at *3 (C.D. Cal. June 8, 2017) ("Moreover, even if Plaintiff was able to show that actual confusion exists and is likely to exist, it fails to persuade this Court that such a fact, by itself, is sufficient to make the requisite

---

[4] To the contrary, TNC's sales actually ██████ during the period of alleged infringement.  *See* SUF 38.

[5] Le-Vel has contemporaneously moved to exclude Drews's report and testimony.

showing of actual harm to its mark.").  TNC has no other evidence of actual harm.[6]

TNC also failed to account for the alleged confusion attributable to Thrive Causemetics (or other third parties) that sold allegedly infringing THRIVE-branded products in commerce during the damages period.  For example, TNC's survey expert Robert Wallace ran a survey in the *Thrive Natural Care, Inc. v. Thrive Causemetics, Inc.* case that was virtually identical to the survey in this case on which Drews relied. *Compare* Wallace Rep. 1 *with Thrive Natural Care, Inc. v. Thrive Causemetics, Inc.*, Case No. 2:20-cv-09091-PA-AS (C.D. Cal.), ECF No. 42 [Declaration of Rob Wallace in Support of Plaintiff's Motion For Partial Summary Judgment (8/9/21)] at 3.  The *Thrive Causemetics* survey found virtually identical net rates of confusion (55%).  *See id*.  Because TNC failed to separate the actual harm caused by Thrive Causemetics from the actual harm allegedly caused by Le-Vel, TNC's claims for monetary relief are pure guesswork and speculation.

### 2.    TNC Is Not Entitled to Recover Profits

TNC cannot recover Le-Vel's profits because it has no evidence that Le-Vel was unjustly enriched by the alleged infringement.  The Lanham Act authorizes an award of defendant's profits to compensate the plaintiff for the *unjust enrichment* realized by the defendant, not to penalize the defendant.  *See* 15 U.S.C. § 1117(a); *Oculu, LLC v. Oculus VR, Inc.*, No. SACV 14-0196 DOC, 2015 WL 3619204, at *22 (C.D. Cal. June 8, 2015) (Carter, J.) (explaining that disgorgement is an available remedy based in part on the rationale that a defendant "should not be unjustly enriched").  Without proof that the defendant is trading on the plaintiff's goodwill or mark, disgorging profits "'amount[s] to a penalty to the infringer and a windfall to the trademark holder," not compensation for any purported harm, "'even if the infringer's conduct was otherwise intentional.'"  *Thrive Nat. Care, Inc. v. Thrive Causemetics*,

---

[6] TNC claims that Le-Vel's direct sales model (███████████████████████ ██████████████████████████) is potentially harmful, but Drews did not quantify that hypothetical harm.  SUF 41.

Inc., No. CV 20-9091 PA (ASX), 2021 WL 4813257, at *8 (C.D. Cal. Oct. 6, 2021); *Novadaq Techs., Inc. v. Karl Storz GmbH & Co. K.G.*, No. 14-CV-04853-PSG, 2015 WL 9028123, at *3 (N.D. Cal. Dec. 16, 2015) (quoting *Spin Master, Ltd. v. Zobmondo Ent., LLC*, 944 F. Supp. 2d 830, at 848- 49 (C.D. Cal. 2012)).

TNC contends that Le-Vel unfairly received approximately ████ in profits from its sale of allegedly infringing skincare products.  SUF 42.  But TNC proffers no evidence that Le-Vel was unjustly enriched through the alleged infringement, i.e., that Le-Vel traded on or gained value from TNC's mark or goodwill (to the extent any goodwill was developed whatsoever).  TNC cannot show Le-Vel was *unjustly enriched* by merely identifying Le-Vel's revenues or profits under § 1117.  Instead, TNC must show that Le-Vel was trading on TNC's goodwill or mark in earning those profits.  *See Spin Master, Ltd. v. Zobmondo Ent., LLC*, 944 F. Supp. 2d 830, 847 (C.D. Cal. 2012) ("*Lindy Pen* requires at least a showing of trading on the mark holder's established name as part of the willfulness required to justify disgorgement.").  Drews did not attempt to value TNC's THRIVE mark or the goodwill developed in the mark.  SUF 43.  Drews's sole basis for his opinion that Le-Vel was trading on TNC's goodwill was that Le-Vel was "aware of TNC's trademark and brand prior to offering their own skincare products."  SUF 44.  That evidence lacks a legal basis: "mere knowledge [of another's mark] is not sufficient" to establish unjust enrichment.  *See Am. Auto. Ass'n of N. California, Nevada & Utah v. Gen. Motors LLC*, 367 F. Supp. 3d 1072, 1103 (N.D. Cal. 2019); *Thrive Nat. Care, Inc.*, 2021 WL 4813257, at *5 ("[I]ntent is still relevant because 'a trademark defendant's mental state is a highly important consideration in determining whether an award of profits is appropriate.'") (citing *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020)).

The undisputed facts of this case show that Le-Vel's THRIVE SKIN launch was successful because Le-Vel traded on the actual, measurable goodwill that Le-Vel developed in its own THRIVE mark over nearly a decade, and not the speculative and

19

unsubstantiated claims of trading on goodwill allegedly developed in TNC's THRIVE mark. *See also* SUF 45. (admitting that Drews was unaware of any evidence that "Le-Vel was not seeking to trade off the goodwill associated with its own Thrive brand for its skincare products.").   Le-Vel has continuously used the THRIVE mark in commerce since August 2012 and has experienced tremendous success in the market, grossing over ███████ in sales since its inception and over ███████ in THRIVE SKIN products sales.  Dkt 39-2, Dkt. 39-3; SUF 6; SUF 7.

Thus, Le-Vel did not unjustly benefit by trading on TNC's goodwill or mark. Since the evidentiary record is devoid of any such evidence, TNC's claim to disgorgement is supported only by rank speculation.  TNC's request for disgorgement amounts to nothing more than a penalty and as such this Court should grant Le-Vel's motion for summary judgment to dismiss this prayer for relief.

### 3.   TNC Is Not Entitled to a Reasonable Royalty

TNC's request for an award of reasonable royalties presumes actual pecuniary harm caused by Le-Vel occurred, without making such showing.  *See* Section II.C.1 *supra*.  Moreover, TNC's request for a reasonable royalty is speculative, and should be rejected for the reasons stated in the contemporaneously filed *Daubert* motion to exclude report and testimony of David Drews.

Drews opines that a reasonable royalty in this case would be proper based on an analysis of the factors set forth in *Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified sub nom. Georgia-Pac. Corp. v. U.S. Plywood-Champion Papers, Inc.*, 446 F.2d 295 (2d Cir. 1971).  Drews Rep. 23.  On several prior occasions and for similar reasons, courts have excluded Drews's reasonable royalty analysis.  The most closely analogous case is *Thrive Nat. Care, Inc. v. Thrive Causemetics, Inc.*, No. CV 20-9091 PA (ASX), 2021 WL 4813257, at *6 (C.D. Cal. Oct. 6, 2021), where this court held TNC's cease-and-desist letters are "not arms-length negotiations, but rather one-sided demands, and do not provide a reliable basis for calculating reasonable royalties" and "the *Georgia-Pacific* factors

are 'impermissibly speculative' where there is 'the absence of a prior licensing agreement, evidence of licensing negotiations between the parties, or evidence otherwise showing either side's intent to license.'"  Further, in *Marketquest Group, Inc.*, 316 F. Supp. 3d 1234, the court found that "Drews expressly relied on the *Georgia–Pacific* test to calculate a reasonable royalty here.  While the *Georgia–Pacific* test may be appropriate in patent cases for statutorily-sanctioned reasonable royalty damages, the Court finds its application impermissibly speculative in this case given the absence of a prior licensing agreement, evidence of licensing negotiations between the parties, or evidence otherwise showing either side's intent to license." *Id*. at 1301 n.34 (internal citations omitted).

The conclusions above apply with equal merit here.  First, this case does not involve a holdover license between Le-Vel and TNC.  The undisputed facts show that the parties have *no* prior licensing history and have never negotiated or entered into a license with each other concerning the THRIVE mark.  SUF 46.

Second, TNC never licensed its THRIVE mark to a third party.  TNC cites to two prior settlement agreements as analogs, neither of which are licenses or arms-length negotiations.  *See* SUF 46; Declaration of Morgan E. Smith ("Smith Decl."), Exs. 29, 30.  Rather, the settlement agreements are party compromises to prevent costly and inherently unpredictable litigation.  *See Thrive Nat. Care, Inc. v. Thrive Causemetics, Inc.*, No. CV 20-9091 PA (ASX), 2021 WL 4813257, at *6 (C.D. Cal. Oct. 6, 2021); *Fenner Invs., Ltd. V. Hewlett-Packard Co.*, No. CIVA6:08-CV-273, 2010 WL 1727916, at *3 (E.D. Tex. Apr. 28, 2010); Drews Dep. 154:6-156:9. Moreover, both agreements were executed *after* TNC filed the present lawsuit and do not adequately represent a hypothetical negotiation occurring at the start of the alleged damages period in April 2019.  *See Lodestar Anstalt*, 2019 WL 8105378, at *14.

Third, Le-Vel has never paid any royalties to or otherwise obtained a license from another party in licensing the third party's THRIVE mark.  SUF 47.  TNC cites to a merchandising agreement between Le-Vel and ███████████

1  ████████████████████████████████████████████████  *See*

2  SUF 48.  But *Georgia-Pacific* Factor 2 asks for licenses where royalties were paid *by*

3  *the licensee*, here Le-Vel, *to a third party* for the license of a THRIVE (or comparable)

4  trademark; the merchandising agreement provides for payment *to Le-Vel* for sales of

5  THRIVE merchandise.  SUF 50.  Further, a negotiation with a merchandising partner

6  relating to royalties on merchandise sales (where Le-Vel's incentive would be to

7  *maximize* the royalty amount) is wholly different from the hypothetical negotiation at

8  issue, which would occur between Le-Vel and a skincare company regarding the use

9  of the THRIVE mark on potentially competing products (where Le-Vel's incentive

10  would be to *minimize* the royalty it pays).

11  Under these circumstances, courts have concluded that a reasonable royalty is

12  not available as a matter of law.  *See*, *e.g.*, *Quia Corp. v. Mattel, Inc.*, No. C 10-1902

13  JF (HRL), 2011 WL 2749576 at *7 (N.D. Cal. July 14, 2011) (granting summary

14  judgment where the record lacked "evidence of a prior license or licensing

15  negotiations between the parties, a prior license or negotiations with respect to

16  Plaintiff's mark with a third party, or of a plan or timeline for licensing the mark").

17  The Court should therefore grant summary judgment for Le-Vel.

### 4.    TNC Is Not Entitled to Prospectively Recover Corrective Advertising

20  TNC provided no evidence of expenditures made on corrective advertising and

21  no proof of damage to the value of its mark.  "An award of the cost of corrective

22  advertising, like compensatory damage awards in general, is intended to make the

23  plaintiff whole.  It does so by allowing the plaintiff to recover the cost of advertising

24  undertaken to restore the value plaintiff's trademark has lost due to defendant's

25  infringement."  *Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 988 (9th Cir. 1995) (citation

26  omitted).  Absent an actual expenditure, a plaintiff "must present non-speculative

27  evidence that goodwill and reputation—that is, the value of its mark—was damaged

28  in some way."  *Quia Corp.*, 2011 WL 2749576, at * 5 (internal citations omitted).

TNC "has the burden of presenting evidence as to the foundational fact that its mark lost value at all." *Id.* At *6.

Courts routinely decline to award corrective advertising damages in the absence of evidence that the infringed mark lost any value. *See Binder v. Disability Grp., Inc.*, 772 F. Supp. 2d 1172, 1181 (C.D. Cal. 2011) (finding that compensatory damages should not be awarded for corrective advertising where plaintiff offered no definitive evidence of any diminishment in the goodwill associated with the defendant's mark); *Int'l Oddities v. Record*, No. CV 12-3934-CAS (VBKx), 2013 WL 3864050, at *14 (C.D. Cal. July 22, 2013) (granting the plaintiff's motion for summary judgment as to the defendant's liability but denying the plaintiff's request for the costs of corrective advertising because "plaintiff has offered only speculative evidence as to the potential loss of goodwill or business reputation that it has suffered").

Here, TNC has no evidence that it has made any expenditures on corrective advertising for which it should be compensated.  TNC must therefore rely on a showing that its mark has lost monetary value.  However, TNC provides no evidence on the monetary value of TNC's THRIVE mark prior to the alleged period of infringement and the resulting loss in value to the THRIVE mark caused by Le-Vel's alleged infringement.  SUF 43 (stating that he did not assess the value of TNC's mark before infringement, at the time the report was prepared, and did not calculate any change in the mark over time).  Indeed, TNC made no attempt to quantify the value of TNC's THRIVE mark whatsoever, neither before nor after Le-Vel's THRIVE SKIN launch.  *Id.* .  And when asked about corrective advertising during his deposition, Drews testified that he provided no opinion on corrective advertising in his report, SUF 49, and did not otherwise provide an opinion on corrective advertising during his deposition.  Thus, TNC's claim for corrective advertising in its complaint appears to be a mere relic.

The other types of harm alleged in Drews's report, e.g., that Le-Vel's advertising caused the parties' products to appear together in internet searches and the

Case No. 2:21-CV-02022-DOC-KES
LE-VEL'S NOTICE OF AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

price of advertising to rise (Smith Decl., Ex. 24 at 8-9), also cannot support awarding TNC corrective advertising because that harm fails to show that TNC's mark itself has lost value, as is required. *Thrive Nat. Care, Inc. v. Thrive Causemetics, Inc.*, No. CV 20-9091 PA (ASX), 2021 WL 4813257, at *7 (C.D. Cal. Oct. 6, 2021) (granting Thrive Causemetics's motion for summary judgment as to TNC's corrective advertising claims for this precise reason). Because the record is silent on how Le-Vel's actions impacted the value of TNC's mark, no reasonable calculation can be made for a corrective advertising award and this Court should grant Le-Vel's motion for summary judgment as it relates to corrective advertising.

## IV.    CONCLUSION

For the reasons and authorities above, Le-Vel respectfully requests that the Court grant its motion for summary judgment.


Dated:  June 27, 2022

Morgan E. Smith (SBN 293503)
morgan.smith@finnegan.com
Mark Sommers (pro hac vice)
mark.sommers@finnegan.com
Patrick J. Rodgers (pro hac vice)
patrick.rodgers@finnegan.com
Daniel R. Mello Jr. (SBN 325714)
daniel.mello@finnegan.com
FINNEGAN, HENDERSON,
FARABOW, GARRETT & DUNNER,
LLP

Alan Jay Weil (SBN 63153)
ajweil@kbkfirm.com
Amanda D. Barrow (SBN 313583)
abarrow@kbkfirm.com
KENDALL BRILL & KELLY LLP

*Attorneys for Le-Vel Brands, LLC*

24

Case No. 2:21-CV-02022-DOC-KES