Stephen McArthur (State Bar No. 277712)
stephen@smcarthurlaw.com
Thomas Dietrich (State Bar No. 254282)
tom@smcarthurlaw.com
THE MCARTHUR LAW FIRM, P.C.
9465 Wilshire Blvd., Ste. 300
Beverly Hills, CA 90212
Telephone: (323) 639-4455

*Attorneys for Plaintiff and Counterclaim*
*Defendant Thrive Natural Care, Inc.*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THRIVE NATURAL CARE, INC., | Case No. 2:21-CV-02022-DOC-KES |
| Plaintiff and Counterclaim Defendant, | **THRIVE NATURAL CARE, INC.'S OPPOSITION TO LE-VEL'S MOTION TO EXCLUDE REPORT AND TESTIONY OF ROBERT WALLACE** |
| v. | |
| LE-VEL BRANDS, LLC, | Hon. David O. Carter |
| Defendant and Counterclaim Plaintiff. | **Hearing Date**: July 25, 2022<br>**Time:** 8:30 a.m.<br>**Courtroom:** 9D |

# TABLE OF CONTENTS

**MEMORANDUM OF POINTS AND AUTHORITIES** ...........................................1

**Applicable Legal Standard** .................................................................2

   **A. Wallace's Surveys are Identical to Those Approved By The Ninth Circuit in** *Fortune Dynamic* **and** *Thane*...................................................3

     **1. Mr. Wallace's Surveys are Based on Facts of the Case** ..............................7

     **2. No Data was "Backfilled"** ....................................................8

     **3.** *Pinnacle* **Decision Cited by LE-VEL Supports Admissibility** ...................9

     **4. Mr. Wallace's Remaining Testimony is Admissible Because He Will Not Testify as to the Ultimate Issue of Likelihood of Confusion**....................11

**Conclusion** ...................................................................14

1

# TABLE OF AUTHORITIES

2

## Cases

3
*Airhawk Int'l, LLC v. Ontel Prods. Corp.*, No. 18CV73-MMA (AGS), 2020 WL
10321726, at *6 (S.D. Cal. Jan. 2, 2020)..................................................................5

4
*Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324, 332 (S.D.N.Y. 2013)..11
*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993)..............................2

5
*Desrosiers v. Flight Int'l of Fla. Inc.*, 156 F.3d 952, 961 (9th Cir. 1998) ................2, 3
*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025,
1037 (9th Cir. 2010)..............................................................................1, 3, 4, 5

6
*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) ...............................2, 3
*Kumho Tire*, 526 U.S. at 152 ....................................................................................2

7
*Marketquest Grp., Inc. v. BIC Corp.*, No. 11-CV-618-BAS (JLB), 2018 WL 1756116,
at *3 (S.D. Cal. Apr. 12, 2018)..........................................................................9, 10

8
*Patsy's Italian Rest., Inc. v. Banas*, 531 F. Supp. 2d 483, 486 (E.D.N.Y. 2008) ........11
*Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg. Grp., LLC*, No. 18-

9
CV-81606, 2019 WL 7376782 (S.D. Fla. Sept. 26, 2019)......................................7, 8
*Playboy Enters. v. Terri Welles, Inc.*, 78 F. Supp. 2d 1066, 1082 (S.D. Cal. 1999)......9

10
*Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1142-43 (9th Cir. 1997).....................3
*Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007).....................2

11
*Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894 (9th Cir. 2002) ........................4
*Thrive Nat. Care, Inc. v. Thrive Causemetics, Inc.*, No. CV-20-9091-PA (ASX), 2021

12
WL 4813257 (C.D. Cal. Oct. 6, 2021)....................................................................1
*Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997)....................................4

13
*YKK Corp. v. Jungwoo Zipper Co.*, 213 F. Supp. 2d 1195, 1203 (C.D. Cal 2002) .9, 10

14

## Statutes

15
4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:2.75
(5th ed. 2018)..................................................................................................8, 9

16
6 McCarthy on Trademarks and Unfair Competition § 32:173.50 ...............................8

17

18

19

20

21

22

23

24

25

26

27

28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2      Plaintiff Thrive Natural Care, Inc. ("TNC") respectfully submits this brief in
3  opposition to Defendant Le-Vel Brands, LLC's ("Le-Vel") motion to exclude TNC's
4  survey and marketing expert, Robert Wallace.

5      Mr. Wallace's survey and opinions regarding consumer behavior and applying
6  the facts of the case to other *Sleekcraft* factors are admissible expert testimony in light
7  of Mr. Wallace's decades of experience in marketing and advertising, with a focus on
8  consumer awareness and purchase behavior. While he may not testify to the ultimate
9  issue of whether there is a likelihood of confusion, Ninth Circuit case law supports
10 that Mr. Wallace should be permitted to testify to the specific *Sleekcraft* issues.

11     Mr. Wallace's survey must be allowed because it is virtually identical to
12 consumer surveys the Ninth Circuit as held were properly conducted. *See, e.g.,*
13 *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025,
14 1037 (9th Cir. 2010). The similarities with *Fortune* are striking and there is no doubt
15 that excluding Mr. Wallace's survey would create reversible error. Mr. Wallace based
16 his survey on accepted methodology and the facts of the case. Every criticism Le-Vel
17 has go to *weight,* not admissibility. "Surveys are to be admitted as long as they are
18 conducted according to accepted principles and are relevant, such that challenges to
19 survey methodology go to the weight given the survey, not its admissibility." *Wendt v.*
20 *Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997) (internal citations omitted).

21     Importantly, Mr. Wallace's virtually identical survey with identical
22 methodology was approved by Judge Anderson in TNC's action against *Thrive*
23 *Causemetics* last year. *See Thrive Nat. Care, Inc. v. Thrive Causemetics, Inc.*, No.
24 CV-20-9091-PA (ASX), 2021 WL 4813257 (C.D. Cal. Oct. 6, 2021) (Dkt 176, p. 2
25 "Defendant's Motion in Limine No. 2, in which Defendant seeks to exclude evidence
26 of actual confusion [Wallace's survey report], is denied.").

27     Finally, Le-Vel's false assertions that Mr. Wallace "backfilled" his survey data
28 and never visited the point-of-sale for Le-Vel's products are misrepresentations of the

1

facts and mischaracterizations of Mr. Wallace's testimony. Mr. Wallace, in fact, reviewed and analyzed the alleged "backfilled data" and examined the point of sale for Le-Vel's Thrive Skin products, and even added them to an online "shopping cart" on Le-Vel's website, *before* he conducted his survey.

## A. <u>Applicable Legal Standard</u>

Federal Rule of Evidence 702 permits "a witness qualified as an expert by knowledge, skill, experience, training, or education" to testify if the testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue" and "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *See also Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 591 (1993) (tasking district courts with the "gatekeeper" duty of ensuring that expert testimony is relevant and reliable); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (holding that Rule 702 "makes no relevant distinction between 'scientific' knowledge and 'technical' or 'other specialized' knowledge"); *Stilwell v. Smith & Nephew, Inc*., 482 F.3d 1187, 1192 (9th Cir. 2007) (Rule 702 embodies the "twin concerns" of "reliability" and "helpfulness") (internal quotation marks and citation omitted).

The Ninth Circuit "repeatedly has stated that a district court's inquiry under both Rule 702 and *Daubert* is a flexible one." *Desrosiers v. Flight Int'l of Fla. Inc*., 156 F.3d 952, 961 (9th Cir. 1998) ("[T]he trial judge is given discretion in his role as gatekeeper to decide what evidence is relevant, reliable, and helpful to the trier of fact."); *see also Kumho Tire*, 526 U.S. at 152 ("[T]he trial judge must have considerable leeway in . . . determining whether particular expert testimony is reliable."). Moreover, Rule 702 provides expert witnesses with "testimonial latitude unavailable to other witnesses" so long as the testimony is based on "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152; *Desrosiers*, 156 F.3d at 961 (rejecting the contention

1  that Daubert and its progeny require an expert to satisfy a "definitive checklist or

2  test") (internal quotation marks and citation omitted); *Sod Farms v. Stover Seed Co.*,

3  108 F.3d 1134, 1142-43 (9th Cir. 1997) (reversing the district court's exclusion of

4  plaintiff's marketing research expert in the context of a Lanham Act § 43(a) false

5  advertising claim).

6      **B.    <u>Wallace's Survey is Identical to Those Approved by The Ninth</u>
7          <u>Circuit in *Fortune Dynamic* and *Thane*.</u>**

8          In *Fortune Dynamic*, the Ninth Circuit held that an online survey nearly

9  identical to Mr. Wallace's was properly conducted and that exclusion of the survey—

10 based on arguments identical to Le-Vel's here—was an abuse of discretion and

11 reversible error. This Court should not repeat that error. The plaintiff's expert in

12 *Fortune Dynamic* conducted a 300-person online consumer survey to assess

13 likelihood of confusion between the plaintiff's mark DELICIOUS on shoes and the

14 defendant's use of a "delicious" mark on shirts. In the survey, "[m]ost survey

15 participants met two criteria: in the past six months they had purchased shoes and a

16 tank top or in the next six months they planned to purchase shoes and a tank top." *Id*.

17 at 1036. The Ninth Circuit further explained that the 300 members of the test group

18 "were exposed to pictures of Fortune's DELICIOUS shoes and Victoria's Secret's

19 'Delicious' tank top, one at a time and in rotated order [and] . . . then asked a series of

20 questions about whether they thought the two marks come from the same company,

21 related companies, or they did not know**.**" *Id*. "The same protocol was followed with

22 the control group, of which there were also 300 members, except that instead of the

23 word 'Delicious' on the tank top, one-third of the control group saw the word

24 'Beautiful,' one-third saw 'Fabulous,' and one-third saw 'Incredible.'" *Id*.

25 "Marylander concluded that 54% of the test group . . . confused the products, as

26 compared to only 43% . . . in the control group, and that the difference was

27 statistically significant." *Id*.

28          The district court, agreeing with arguments that are similar to Le-Vel's,

3

excluded Marylander's survey "because the survey compared the products side-by-side, failed to replicate real world conditions, failed to properly screen participants, and was 'highly suggestive.'" *Id*. at 1037. The Ninth Circuit castigated the district court's ruling, noting it had improperly relied on out-of-circuit decisions and misquoted one Ninth Circuit case for the proposition that surveys should not compare products side-by-side, when in fact that was not the law. *Id*. The district court had ignored well-established Ninth Circuit law holding that: (a) "survey evidence should be admitted as long as it is conducted according to accepted principles and is relevant"; and (b) "'technical inadequacies' in a survey, including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility." *Id*. at 1036 (listing cases); *Wendt*, 125 F.3d at 814 ("Challenges to survey methodology go to the weight given the survey, not its admissibility.").

As the Ninth Circuit noted, it had already approved of a similar side-by-side product survey in *Thane Int'l, Inc. v. Trek Bicycle Corp*., 305 F.3d 894 (9th Cir. 2002). There, the survey at issue showed 300 respondents "pictures of Trek products and OrbiTrek products and asked questions about the companies' association" and the remaining 100 respondents "were shown the same Trek pictures, but saw pictures from Yukon, a third company, instead of from OrbiTrek." *Fortune Dynamic*, 618 F.3d at 1037; *Thane*, 305 F.3d at 902-03. The Ninth Circuit found "[t]he principles applied in the Marylander survey are virtually indistinguishable"—respondents "were asked to compare pictures of DELICIOUS shoes and the 'Delicious' tank top, and then to answer questions about the companies that produced them . . . ." *Fortune Dynamic*, 618 F.3d at 1037. The defendant's criticisms about alleged failure to replicate real-world conditions "go to issues of methodology, survey design, reliability, and critique of conclusions, and therefore go to the weight of the survey rather than its admissibility." *Id*. at 1038; *see also Airhawk Int'l, LLC v. Ontel Prods. Corp.*, No. 18CV73-MMA (AGS), 2020 WL 10321726, at *6 (S.D. Cal. Jan. 2, 2020) ("Defendant's arguments that Belch's survey improperly compared products side-by-

4

1   side via the 'Squirt' method, failed to use the proper survey universe, and did not

2   rotate questions with the logos all go to the weight of the survey, not its

3   admissibility.").

4   　　　Here, Mr. Wallace conducted an online survey with 600 participants. As in

5   *Fortune Dynamic*, he used a double-blind protocol and limited the universe of

6   respondents to those who had purchased skincare products online in the past six

7   months and who intended to do so in the next six months, and he excluded those with

8   connections to the skincare industry. [Wallace Report, p. 16 ¶ 41]. As in *Fortune*

9   *Dynamic*, respondents saw images of each party's skincare product, and two control

10  skincare products, and the order of the images was randomly rotated to avoid creating

11  bias. [*Id*. at 21-56]. And like *Fortune Dynamic*, respondents were asked questions

12  after each series of images about whether they believed the products originated from

13  the same or affiliated companies. [*Id*. at 27-60] Mr. Wallace then reviewed the results

14  and tabulated the rates of confusion. [*Id*. at 29-66] In short, every aspect of the

15  Wallace survey tracks nearly identically with the Marylander survey that the Ninth

16  Circuit held it was an abuse of discretion to exclude.

17  　　　Le-Vel's complains that Wallace's survey is unfair because "*TNC and Le-Vel's*

18  *products were the only products that contained the word THRIVE among two other*

19  *products.*" (Le-Vel Motion, p. 18). But, of course, that is the case, since the use of the

20  brand name "THRIVE" is exactly what is being tested. Naming every product

21  THRIVE in the survey would have tested nothing. Every product tested was a skincare

22  product of the same type. If consumers saw two skincare products named Thrive, and

23  were confused as to affiliation, then that is not an unfair survey result, it is simply the

24  natural result of Le-Vel's infringing activity.

25  　　**1.    Mr. Wallace's Survey is Based on Facts of the Case**

26  　　　Le-Vel makes several assertions about the facts Mr. Wallace relied upon and

27  what steps he took (or did not take) before he conducted his survey that are simply

28  untrue. Le-Vel asserts that "the image chosen as the Le-Vel stimulus was not public

facing." (Daubert Motion at 13). That is factually incorrect. (Declaration of Rob
Wallace attached hereto ("Wallace Decl.") ¶ 8). The image Mr. Wallace chose for his
stimuli is taken directly from https://thrivevitamin.le-vel.com/Shop, which is Le-Vel's
publicly facing e-commerce website that allows consumers to directly examine and
add Thrive Skin products to a "shopping cart" for purchase without logging in.
(Wallace Decl. ¶¶ 8-11). Below is a screenshot of the above URL taken on July 1,
2022, showing Le-Vel's Thrive Skin products for sale, with the ability to add them to
an online "shopping cart", all without signing-in or any arduous process of clicking
through to even a second URL or website page. (Wallace Decl. ¶ 10, Ex. 2).



        This is the website that was used for Mr. Wallace's survey. (Wallace Decl. ¶
10). The website is directly reached on the first page of Google Search results for Le-
Vel's Thrive Skin products. (Wallace Decl. ¶ 8). Thus, Le-Vel's assertions that Mr.

1   Wallace used a website that was "not public facing", "overly truncated", or that

2   consumers would need to "click through numerous different pages" or all are

3   demonstrably false.

4         Le-Vel further misrepresents the facts when it asserts that "Mr. Wallace had not

5   gone through all the steps consumers must take to arrive at and purchase one of Le-

6   Vel's products". This is not an accurate representation of the facts or of Mr. Wallace's

7   testimony. Before Mr. Wallace ran his survey, he had in fact examined Le-Vel's

8   Thrive Skin products at the point-of-purchase page on Le-Vel's website, shown in the

9   screenshot above. (Wallace Decl. ¶¶ 12-15). The *only* thing he had not done was

10  "create an account", which is not necessary to view the products at the point of sale

11  with an "add to cart" button. (Wallace Decl. ¶ 15). The screenshot taken above, for

12  example, is before any "sign-in" or account creation. Creating an account adds

13  nothing to the product review page. After Mr. Wallace wrote his report, he then

14  created an account on the Le-Vel website and confirmed that nothing about Le-Vel's

15  generic account creation process changed his opinions or changed how the Thrive

16  Skin products were viewed on the Le-Vel website. (Wallace Decl. ¶ 11). Le-Vel takes

17  the fact that Wallace created an account after he drafted his Report and misconstrues it

18  to pretend that Mr. Wallace never actually visited the product page or point of sale,

19  which are two entirely different things.

20        **2.     No Data was "Backfilled"**

21        Le-Vel misrepresents the record by asserting that Mr. Wallace "backfilled …his

22  survey with data obtained months after designing and conducting his survey…." This

23  assertion is not true. (Wallace Decl. ¶ 12). Le-Vel's assertion is based on a mistaken

24  leap of logic that if a few certain screenshots of webpages cited in Wallace's report

25  were taken *after* his survey, then Wallace must not have visited those webpages *before*

26  his survey. That is simply an inaccurate assumption that is not supported by Wallace's

27  deposition transcript, report, or affidavits. (Wallace Decl. ¶¶ 12-15).

28        The chronological timeline is put forth here for clarity, demonstrating that

1  nothing was "backfilled": First, Mr. Wallace reviewed numerous websites and search
2  engine results showing the products advertised side-by-side and examined Le-Vel's
3  Thrive Skin products at the point of sale on Le-Vel's website. (Wallace Decl. ¶ 15).
4  Second, Mr. Wallace conducted the consumer survey. (*Id*.) Third, Mr. Wallace went
5  back and ran the same searches again and visited the same websites again to take
6  screenshots. (*Id*.) Fourth, he drafted his expert report based on his survey. (*Id*.)  Le-
7  Vel's cited testimony that Mr. Wallace reviewed search engine results and certain
8  websites after his survey is not equivalent to an admission that Mr. Wallace failed to
9  also review the search results and webpages before his survey as well.

10       **3.      *Pinnacle* Decision Cited by LE-VEL Supports Admissibility**

11       Le-Vel cites to *Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg.*
12  *Grp., LLC*, No. 18-CV-81606, 2019 WL 7376782 (S.D. Fla. Sept. 26, 2019), where
13  the court excluded a survey by Mr. Wallace, but that case does not support Le-Vel for
14  two reasons. First, *Pinnacle* is an unpublished out-of-circuit decision, exactly the type
15  of case the Ninth Circuit rebuked the district court in *Fortune Dynamic* for relying on.
16  It was not decided under Ninth Circuit law, which as explained above strongly
17  supports admissibility of the Wallace survey.

18       Second, the context and the survey at issue is very different. *Pinnacle* involved
19  a service mark and parties who provided consulting services, not trademarks for
20  goods. 2019 WL 7376782, at *1. Mr. Wallace's survey in that case asked respondents
21  directly whether two consulting firms with the same names as each of the parties were
22  believed to be the same or affiliated. *Id*. at *5. The court deemed that question to be
23  too suggestive and leading. *Id*. The court also found the circumstances did not support
24  use of a *Squirt* survey because it was attempting to test confusion regarding services
25  "rather than applicable *products* bearing similar (or the same) mark are produced by
26  the same company." *Id*.

27       By contrast, the *Pinnacle* court found *Squirt* surveys were proper where "the
28  consumer is asked whether products bearing similar trademarks are produced by the

8

same company . . . ." *Id*. Indeed, the court explained that "[a]nother variation of the Squirt test compares *multiple competing products or services*, through a survey, and asks consumers about all the businesses that sell the competing products and whether they believe that two of those products/services are offered by the same company." *Id*. at *3. That "latter version of the Squirt test has been found to be subtler and more reliable." *Id*. (citing 6 McCarthy on Trademarks and Unfair Competition § 32:173.50). And that method is particularly reliable where the competing products are presented in the manner they appear in the actual marketplace. *Id*. That is exactly the type of survey that Mr. Wallace prepared for use in this case—one that tests respondents' confusion regarding multiple different competing *products*, using images of how those products appear online.

The Wallace survey at issue in this case is of the type considered "more reliable" by *Pinnacle*. And it bears no resemblance to the survey that was excluded by that court. Therefore, if this Court considers *Pinnacle* at all, that case supports that Mr. Wallace's survey here is proper, admissible, and that his questions are not leading. Finally, even if the follow-up questions that Le-Vel asserts were leading were dismissed altogether, it is immaterial since even if one were to remove the results of those questions entirely, there would still be nearly a 50% confusion rate, which is more than enough to find a likelihood of confusion. [Wallace Report 29:66 – 30:70).

### 4. Mr. Wallace's Remaining Testimony is Admissible Because He Will Not Testify as to the Ultimate Issue of Likelihood of Confusion

Le-Vel also seeks to exclude Mr. Wallace's testimony concerning consumer response to online advertising and the application of other *Sleekcraft* factors to the facts of the case. TNC does not dispute that Mr. Wallace is not permitted to, and will not, testify concerning the ultimate issue of whether or not there is a likelihood of confusion in this case. However, "courts distinguish between permissible expert opinions on the individual *Sleekcraft* factors from impermissible testimony amounting to legal conclusions on whether there is or is not a likelihood of confusion."

1   *Marketquest Grp., Inc. v. BIC Corp.*, No. 11-CV-618-BAS (JLB), 2018 WL 1756116,

2   at *3 (S.D. Cal. Apr. 12, 2018) (citing *Playboy Enters. v. Terri Welles, I*nc., 78 F.

3   Supp. 2d 1066, 1082 (S.D. Cal. 1999); *YKK Corp. v. Jungwoo Zipper Co*., 213 F.

4   Supp. 2d 1195, 1203 (C.D. Cal 2002)). In *YKK*, for example, even with an "expert"

5   that was barely qualified and whose report was "completely unhelpful," the court still

6   held the witness's "opinions on the individual foundational facts, i.e. the individual

7   *Sleekcraft* factors are admissible and will be considered." 213 F. Supp. 2d at 1203.

8   Overall, "[p]rovided a proper foundation is laid and the expert has the requisite

9   experience, '[e]xpert testimony on the factors that go into the ultimate finding on the

10  confusion issue is generally quite proper and helpful to both judge and jury.'"

11  *Marketquest*, 2018 WL 1756116, at *3 (quoting 4 J. Thomas McCarthy, McCarthy on

12  Trademarks and Unfair Competition § 23:2.75 (5th ed. 2018)).

13      *Marketquest* is analogous. The court there rejected a defendant's challenge to

14  the plaintiff's marketing and branding expert who had "over forty years of experience

15  in consumer behavior, branding, and advertising in the business-to-business context,

16  including the promotional products industry." *Marketquest*, 2018 WL 1756116, at *3.

17  Based on that experience, "[i]t is entirely proper and relevant for him to employ his

18  knowledge of marketing communication and buyer behavior to assist the jury in

19  understanding the *Sleekcraft* factors in the business-to-business promotional products

20  context." *Id*. Such opinions, the court found, "will help lay jurors to understand the

21  unique facts and industry setting of this case." *Id*. And "[a]ny lingering doubts as to

22  the negative impact of [the expert's] testimony can be managed by instructing the

23  jurors to follow only the judge's instructions as to what the law is and to disregard any

24  testimony that is inconsistent with those instructions." *Id*. at *4.

25      Similarly, here Le-Vel does not dispute that Mr. Wallace is a marketing and

26  branding expert with more than 30 years of experience developing brand identities and

27  marketing strategies for prominent product sales companies, including more than three

28  dozen leading consumer skincare brands, such as Jergen's, Dove, St. Ives, Suave, and

1   Burt's Bees [Wallace Report at 42, 48] Mr. Wallace's core expertise is consumer
2   awareness and purchase behavior. [*Id.*] As such, Mr. Wallace is properly qualified and
3   can lay the foundation for his expertise in relation to consumer behavior online—
4   including with regard to searching for products and selecting products from presented
5   search results. He is similarly qualified to testify concerning application of the facts to
6   other *Sleekcraft* factors, including the strength of TNC's mark, the relatively low
7   degree of consumer care in the skincare product market, where consumer habits are
8   often driven by impulse purchases, and the impact of product line expansions. [*Id.* at
9   39-42] Le-Vel can vigorously cross-examine Mr. Wallace regarding his opinions and
10  any further doubts can be managed by jury instructions; there is no basis to exclude
11  Mr. Wallace's opinions as to consumer behavior and the *Sleekcraft* factors altogether.
12  *See YKK*, 213 F. Supp. 2d at 1203; *Marketquest*, 2018 WL 1756116, at *3-4.

13          The cases Le-Vel cites where Mr. Wallace's testimony was excluded are
14  irrelevant, and Le-Vel did not even attempt to analyze or draw any similarities
15  between the excluded opinions and the current survey. The testimony at issue in those
16  cases was a comparison of elements of similarity or difference between *design logo*
17  *and trade dress* of brands, such as package structure, color schemes, fonts, logo
18  elements, and signage. *See Akiro LLC v. House of Cheatham, Inc*., 946 F. Supp. 2d
19  324, 332 (S.D.N.Y. 2013); *Patsy's Italian Rest., Inc. v. Banas*, 531 F. Supp. 2d 483,
20  486 (E.D.N.Y. 2008). Neither decision followed Ninth Circuit law, and Mr. Wallace
21  has not offered testimony on those types of issues in this case. Those decisions are
22  thus irrelevant to the admissibility of Mr. Wallace's testimony here.

23          Because Mr. Wallace is highly-qualified and can lay foundation as to his
24  knowledge regarding consumer behavior online and application of the facts to certain
25  *Sleekcraft* factors, that testimony should be allowed. And because Mr. Wallace
26  conducted his consumer survey based on a reliable, well-known methodology that is
27  appropriate for the circumstances and has been approved by the Ninth Circuit, the
28  Wallace survey and his related testimony should also be permitted.

## Conclusion

For the foregoing reasons, TNC respectfully requests that the Court deny Le-Vel's motion to exclude the testimony and expert report of Rob Wallace.

Dated: July 1, 2022                    Respectfully submitted

                                       **THE MCARTHUR LAW FIRM, PC**

                                       By */s/ Stephen C. McArthur*
                                       _____

                                       Stephen C. McArthur
                                       Thomas E. Dietrich

                                       *Attorneys for Plaintiff and Counterclaim*
                                       *Defendant Thrive Natural Care, Inc.*